UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
LIGHTBOX VENTURES, LLC,                 :          16cv2379(DLC)
                                        :
                    Plaintiff,          :          OPINION AND ORDER
                                        :
        -v-                             :
                                        :
3RD HOME LIMITED and WADE SHEALY,       :
                                        :
                    Defendants.         :
                                        :
----------------------------------------X

APPEARANCES

For the plaintiff:
Richard J.J. Scarola
Alexander Zubatov
Scarola Malone & Zubatov LLP
1700 Broadway, 41st Floor
New York, NY 10019

For the defendants:
Phillip Byron Jones
Evans, Jones & Reynolds, P.C.
401 Commerce St., Suite 710
Nashville, TN 37219

Thomas Brian Kelly
Kasowitz, Benson, Torres & Friedman, LLP (NYC)
1633 Broadway
New York, NY 10019

DENISE COTE, District Judge:

        This case arises from a contract dispute between plaintiff

Lightbox Ventures, LLC ("Lightbox") and defendant 3rd Home

Limited ("Third Home") over a failed joint venture (the "Joint

Venture").  The Joint Venture was intended to operate as a

website (the "Website") that facilitates the sale of high-end

vacation properties.  The Website would be used by the customers
of Third Home -- which operates a vacation home exchange
business -- through the use of an internet hyperlink on Third
Home's website.  Lightbox would assist the customers in these
property sales and split any profits equally with Third Home.
Lightbox claims that Third Home has breached the contract
between them and has violated its fiduciary duties by entering
into similar arrangements with several real estate brokerage
firms, who are Lightbox's competitors.  Lightbox has moved for a
preliminary injunction enjoining Lightbox from continuing those
arrangements.  For the reasons that follow, the motion is
denied.

## Procedural History

Lightbox filed this action on March 31, 2016, alleging that
Third Home breached the written agreement between them (the
"Agreement"), and breached its fiduciary duties to Lightbox.  It
seeks a declaratory judgment and damages.  The original
complaint did not seek injunctive relief.  Lightbox originally
sought a declaration that it had validly terminated the
Agreement for cause.

Third Home filed its answer on April 28.  On July 13,
Lightbox filed the instant motion for a preliminary injunction,
seeking to enjoin Third Home, during the pendency of this

action, from (1) entering into any agreement, other than with
Lightbox, concerning the brokerage or marketing of real property
and (2) promoting or mentioning on its website any service,
other than the Joint Venture, concerning the brokerage or
marketing for sale of real property.

On August 25, the plaintiffs filed their first amended
complaint ("FAC").  The FAC added as a defendant Wade Shealy
("Shealy"), the founder, chairman, and CEO of Third Home.  The
FAC includes a claim against Shealy for tortious conduct and
aiding and abetting Third Home's breach of fiduciary duty.  The
FAC also modified the request for a declaratory judgment.
Instead of seeking a declaration that it has already terminated
the Agreement for cause, it seeks a declaration that Lightbox
has the present right to terminate the Agreement for cause; it
no longer purports to terminate the Agreement.  Finally, the FAC
added a claim for a permanent injunction ordering specific
performance of the Agreement.

The defendants filed their answer to the FAC on September
6, and also filed a counterclaim against Lightbox alleging that
Lightbox infringed Third Home's trademarks.  Third Home also
filed a third party complaint against Lightbox's owner, Andrew
Ellner ("Ellner"), alleging violation of Third Home's
trademarks.

3

A preliminary injunction hearing was held on October 21. Without objection from the parties, the hearing was conducted in accordance with the Court's customary practices for non-jury proceedings, which includes taking direct testimony from witnesses through affidavits submitted with the preliminary injunction papers.  The parties also served with the preliminary injunction papers copies of all exhibits that they intended to offer as evidence in chief at the hearing.  During the hearing, Lightbox called Ellner and Stephen Zacks ("Zacks"),[1] the former President of Third Home, as witnesses, and the defendants cross examined them.  Third Home offered testimony from Shealy, and he was cross examined.

This Opinion presents the Court's findings of fact and conclusions of law.  The findings of fact appear principally in the Background section, but also appear in the remaining sections of the Opinion.

## Background

Lightbox was established in 2015 as a "web-based real estate listing business" that would earn brokerage commissions from the sale of vacation homes through its website.  Lightbox intends to target its business to owners, brokers, and

---

[1] Zacks testified pursuant to a subpoena.  His direct testimony was presented live.

developers of high-end vacation properties.  In August 2015,
Lightbox acquired a real estate brokerage license in New York
State.  It is not licensed in any other jurisdiction.  If it
obtains the opportunity to buy or sell property for a client,
and that client does not already have a broker, Lightbox intends
to obtain the necessary real estate license to allow it to
operate as the broker and receive a full commission on any
property sale or to negotiate an arrangement with a local
licensed broker that would permit it to participate in that
broker's commission.

　　　Third Home operates a website -- www.3rdhome.com -- that
facilitates the exchange of time between the owners of luxury
homes who are members of Third Home.  For example, an owner of a
home in Antigua may permit another member to stay in his home
for one week, and in return may stay in another member's home in
Vail, Colorado for a week.  These exchanges are facilitated by
the use of points, or "keys,"[2] which are the currency used to
reserve time in a given property.  Third Home has approximately
6,500 owners, or members, who participate in the online
exchange.  Third Home obtains members from referrals made to it

---

[2] For example, a property valued between $500,000 and $1,000,000
is worth one key for every non-peak week and two keys for every
peak week.

by brokers working in the luxury vacation home market in the
United States and abroad.

On or around June 2015, Ellner, who is both a member of and
an investor in Third Home, contacted Third Home about the
possibility of forming a Joint Venture in which Lightbox's sales
business would be promoted to Third Homes' members via a link on
Third Home's website.  Ellner believed that these members, and
other visitors to Third Home's website, would be ideal targets
for the Joint Venture's sale business.

## I.   The Agreement

On July 13, 2015, Lightbox and Third Home entered into the
Agreement.  The stated purpose of the Agreement is to "to
establish a joint venture between the parties to create an
online platform for the resale of vacation homes, fractional
ownership properties and other properties eligible to be listed
on 3RDHOME.COM, which is to be linked to the existing 3RD HOME
site."[3]  Any profits realized from the business are to be split
evenly between Lightbox and Third Home after deducting the
"reasonable direct costs of doing business."

---

[3] In his affidavit, Shealy states that when Ellner proposed the
idea of the Joint Venture, the intent was "to create an online
platform for the resale of _fractional_ vacation homes." (Emphasis
added.)  Regardless of whether the Joint Venture was originally
limited to fractional vacation homes, the unambiguous language
of the Agreement provides that the Joint Venture covers the sale
of homes, fractional properties, and other properties that are
eligible to be listed on Third Home's exchange website.

Lightbox's obligations under the Agreement include: fronting the cost of creating the Website at a level equivalent to the Third Home website, and managing all interactions with potential buyers and sellers of properties, as well as all intermediaries required for any sale.  Lightbox also agreed not to enter into any other competing business arrangement for the sale of vacation homes.

Third Home's obligations under the Agreement include: (1) keeping an active link to the Website in a prominent place on the Third Home website; (2) forwarding all inquiries related to the buying and selling of properties to Lightbox; (3) being a "passive partner" to Lightbox in the sale and marketing of those properties; and (4) refraining from entering into any similar arrangement with any other sales and marketing organization without permission from Lightbox.  Third Home is responsible for handling relationships with "affiliates" and retains the right to determine whether certain affiliate properties may be sold through the Website.[4]  The Agreement contained a number of other

---

[4] The Third Home website contains a page titled "Affiliates," which lists a number of vacation resorts and buildings that have a relationship with Third Home.  For example, one affiliate is the Vail Mountain Lodge & Spa in Vail, Co.  According to the Third Home website, being an affiliate "means that [Third Home] members have the opportunity to exchange their homes for stays at these branded full-service properties."  Affiliates do not appear to be real estate brokers, and thus are distinct from the "Exclusive Brokers" that are discussed below.

provisions, including a force majeure clause; a choice of law provision; an attorney's fees shifting agreement; provisions regarding amendment, assignment, and delegation; a non-severability clause; and an integration clause.

The parties envisioned that the Agreement would be supplemented quickly by a document addressing termination of the relationship in more detail.  A section of the Agreement titled "Termination" provides:

> This is a <u>temporary interim agreement</u> to indicate the intent of the parties, and will remain in effect until July 13, 2017 or earlier if superseded by a later agreement.  If 3RD HOME should desire to terminate because of unanticipated issues before July 13, 2017 then it will promptly reimburse LightBox for any unreimbursed costs of the technology build out. Additional terms regarding termination of this agreement and the rights and steps to terminate it are expected before August 31, 2015.

(Emphasis added.)

## II.  Amended Agreement

In December 2015, the parties executed an amendment to the Agreement (the "Amended Agreement") that principally modifies the termination provision of the Agreement.  It also provides that the Agreement shall last for a term of thirty months -- until July 1, 2018 -- unless terminated earlier.  It contains an automatic renewal term for periods following July 1, 2018, in the event certain conditions are met.

Among its several termination provisions, each party has the right to terminate the Agreement by giving written notice to the other party thirty days prior to termination.  If Third Home elects to terminate the agreement, in all events, it must reimburse Lightbox for certain technology costs.  In the event that Third Home terminates the Agreement without cause and upon thirty days' notice, it agrees not to operate for two years an online platform for the sale and resale of vacation homes or "otherwise engage in any venture which is intended to compete with" the Joint Venture ("Non-Compete Clause").

Both parties also have the right to terminate the Agreement "for cause," if certain conditions are met.  Lightbox may terminate the agreement "for cause" if Third Home "does not adequately create an attractive inventory of homes and/or generate adequate sales leads," but only after Third Home is given a reasonable period of time to cure its poor performance. In the event Lightbox terminates the Agreement "for cause," Third Home is subject to the two-year Non-Compete Clause.

Third Home may terminate the Agreement "for cause" if Lightbox "does not expeditiously follow up on leads generated and otherwise make a good faith effort to generate sales as contemplated by [the] Agreement," and Lightbox also has a reasonable time in which to cure such poor performance.  In the event Third Home terminates the Agreement "for cause," it must

9

reimburse Lightbox for technology costs and may continue to operate the business of the Joint Venture.

Finally, Third Home can acquire the business of the Joint Venture to operate on its own.  In the event Third Home "wishes to terminate [the Joint Venture,] but continue to operate the business of the joint venture contemplated by th[e] Agreement independently of LIGHTBOX," it must conduct a valuation of the Joint Enterprise at its own expense, and buy out Lightbox's share of the Joint Venture.

### III.   The Website Becomes Active But Is Never Linked.

In January 2016, the Website became active.  Lighthouse had given Third Home roughly $60,000 to build the Website.  This amount has not been reimbursed by Third Home, despite its duty to do so.  At the request of Third Home, the Website was named www.3rdHomeRealEstate.com.

Although the Website was operational, the Joint Venture never got off the ground.  Starting in January 2016, disagreements began to develop between Third Home and Lightbox.  One disagreement concerned the role that Lightbox was expected to play in the Joint Venture.  In an email dated February 2, Ellner wrote to Zacks in response to a business outline Zacks appears to have sent to Ellner, "you continuously refer to [Lightbox] merely acting as referral agents which is not what we had agreed to.  We are a brokerage firm."  Ellner also

complained that Third Home had been actively involved in the sales business, despite the Agreement's requirement that Third Home play a purely passive role.

A second issue concerned whether transactions on the Website would be limited to Third Home members, or rather, would be open to all potential buyers and sellers.  According to the Third Home website, eligible homes must be located in a "desirable location," and have "quality furnishings," and "amenities."  Homes must also have a minimum value of $500,000.

A final, and most important, issue concerned Third Home's designation of certain real estate brokerage firms as "exclusive brokers" ("Exclusive Brokers").  In its 2015 Year-End Review and Outlook, published on January 9, 2016, Third Home stated that it expected to earn revenue from "Real Estate Brokerages paying to be the exclusive representative of 3RD HOME in their market. And through [the Website], we will earn commissions on referrals for listed properties, from them, new developments, and existing members who decide to list."  The day after Third Home published the Year-End Review, Ellner first voiced concerns about designating certain brokers as Exclusive Brokers.  In a January 10 email, Ellner wrote to Shealy stating "[w]hile having preferred (and paid) brokerage arrangements is a great idea, it should not hold up seeking appropriate listings from all sources."  Ellner reiterated his objections to the Exclusive

Brokers in subsequent emails the following month.  In a February 11 email to Zacks, Ellner wrote "I suggest that you don't use the term Exclusive Brokers as that is not what we agreed to.  I allowed and even suggested that you sell advertising and keep that specific revenue.  I do not want any exclusive broker arrangements and suggest you therefore use the term Preferred Broker."  Later that day, Ellner emailed Shealy stating "[r]egarding your Exclusive Brokers . . . as long as they provide us the level of service we need at [sic] right price, we will view them as the preferred broker for us to use in that area."  He also wrote "I strongly suggest that you don't make reference to your Exclusive Brokers that they are also 3rdHomeRealEstate's exclusive listing brokers, as we agreed they are not . . . . No brokerage company has a monopoly on exclusive listing."

The Third Home website currently contains a page titled "Exclusive Brokers," that states "[t]hese brokerage firms offer desirable real estate in sought-after destinations at resorts and in locations that match THIRDHOME's luxury standards.  Their clients have an opportunity to become members and receive special benefits."  The brokerage firms listed as Exclusive Brokers are: (1) Berkshire Hathaway HomeServices Utah Properties, (2) Coldwell Banker Brokers of the Valley, (3) Panorama, (4) Russ Lyon Sotheby's International Realty, (5)

Steamboat Sotheby's International Realty, (6) Slifer Smith & Frampton Real Estate, and (7) Telluride Sotheby's International Realty.  For each of the Exclusive Brokers, a link exists to the broker's website, and a brief description of the broker is provided.

Unbeknownst to Lightbox at the time, Third Home has executed contracts with all or most of the Exclusive Brokers (the "Regional Transactions").  Those contracts, which are more fully described below, involved both the promotion of the Exclusive Brokers on the Third Home website and an arrangement whereby Third Home was entitled to receive a percentage of sales commissions without paying a portion to Lightbox.  Notably, Third Home entered into these contractual arrangements with the Joint Venture's competitors, regarding the same business contemplated by the Joint Venture, at the same time Third Home and Lightbox were discussing how to implement the Joint Venture.

While these email exchanges took place, a small number of listing were posted on the Website.  The Website had approximately eighteen foreign properties listed by March 2016, with a total value of approximately $31 million.  In February 2016, Third Home had still not activated a link to the Website on the Third Home website.  In an email to Ellner of February 12, Zacks stated that Third Home was waiting to activate the link until there was "a decent set of properties" listed and

until the descriptions of the existing properties were finished. Third Home never activated the link, which deprived the Website of its primary source of web traffic.  No properties were ever sold through the Website, and the Joint Venture has not collected any commissions or referral fees from the sale of any properties.  This refusal occurred despite Third Home's obligation in the Agreement "to keep an active link" to the Website on its own website "in a prominent place."

By early March 2016, the relationship between Ellner and Shealy had so deteriorated that Ellner wrote an email to Zacks stating that "[Shealy] is irrelevant now and not my problem.  My lawyers will deal with him. . . . I won't be satisfied until he's caged or we own 3rdHome."  At that time, there was internal agreement at Third Home that termination was preferable to continuing working with Lightbox in the Joint Venture.

## IV.  Notice of Termination

On March 8, 2016, counsel for Third Home sent Lightbox a written notice of termination (the "Notice of Termination"). The Notice of Termination states that "3rd Home is exercising its termination rights under Paragraph 15."  It also stated that the "Notice of Termination is sent pursuant to sub-part (e) of Paragraph 15."  Paragraph 15(e) is the provision that allows Third Home, in the event it wishes to terminate the Joint Venture but continue to operate the business of the Joint

14

Venture, to do so by buying out Lightbox's share of the
business.  As of that time, Shealy and Zacks were considering
whether to continue the business of the Joint Venture, but
believed that the Joint Venture was not worth very much.  Third
Home never took any steps to operate the Joint Venture's
business after sending the March 8 Notice of Termination.

Third Home sent a subsequent letter to Lightbox on March
21, seeking to arrange a time for the parties to discuss
valuation and dissolution of the Joint Venture.  No discussions
ever occurred regarding valuation and dissolution of the Joint
Venture.  Lightbox filed this lawsuit ten days later, on March
31.  In that complaint Lightbox declared that it was electing to
terminate the Joint Venture for cause.

For all practical purposes, the Joint Venture is defunct.
Third Home has rendered the Website nonfunctional, and internet
users attempting to visit the Website are redirected to Third
Home's home page.  No property sales have occurred through the
operation of the Joint Venture and both parties have taken
actions indicating that they no longer intend to cooperate in
the Joint Venture.

**V.   Third Home's Transactions with the Exclusive Brokers**

Because they are central to the plaintiff's theory of
breach, it is important to describe in detail Third Home's
contracts with the Exclusive Brokers.  Starting in December 2015

-- when Third Home was ostensibly cooperating with Lightbox to
further the Joint Venture -- and continuing until at least April
2016,[5] Third Home executed contracts with at least five Exclusive
Brokers.  In each of these Regional Transactions, Third Home
agrees to promote the Exclusive Broker as an exclusive or
"preferred broker" for a particular geographic region.  These
regions include (1) Napa and Sonoma counties, California; (2)
Park City/Deer Valley, Utah; (2) Vail Valley/Summit County,
Colorado; (3) Telluride, Colorado; and (5) certain areas of
Arizona.  It also offers membership and certain benefits to the
customers of the Exclusive Broker.  In exchange, Third Home has
a right to receive referral fees and, in some instances, an
upfront payment from the Exclusive Broker.

    Each of the five transactions is substantially similar, and
thus only the first one will be described in detail.  On or
about December 8, 2015, Third Home entered into an agreement
with a broker in Napa and Sonoma counties in California.  The
agreement states that the broker "desires to obtain exclusive
brokerage rights related to 3rd Home" in the geographic region
in which it operates.  The agreement principally has two
components.  First, Third Home agrees to promote the Exclusive
Broker's business by (1) advertising it as a "Preferred Broker"

_____

[5] One agreement was executed on an unspecified date.

on the Third Home website, (2) referring new Third Home members to the Exclusive Broker, (3) giving the Exclusive Broker a master account "showing all enrolled members from the community and all activity by those members;" and (4) giving special discounts and perks to the Exclusive Broker's customers who become Third Home Members.  Second, Third Home agreed to send sales leads to the Exclusive Broker, and if a sale occurred, Third Home would obtain a percentage of the commission.  The Exclusive Broker also agreed to pay Third Home an initial fee.

Third Home at least considered the possibility that revenues obtained through the Regional Transactions belong to the Joint Venture because in an early draft of one agreement, dated December 2, 2016, the Exclusive Broker was supposed to send the upfront payment directly to Lightbox.  In the executed version of the agreement, however, the payment was to be sent to Third Home.  Third Home obtained approximately $42,500 from the Regional Transactions.

Third Home did not provide copies of the contracts in the Regional Transactions to Lightbox at any time before the commencement of this litigation.  Nor did it seek permission from Lightbox to establish exclusive broker arrangements with any of the five Exclusive Brokers or any other broker, or to contract with those brokers to receive a portion of commissions on home sales made by clients it referred to the Exclusive

17

Broker.  Lightbox was aware, however, that Third Home had
informal arrangements with certain brokers to advertise their
services on the Third Home website.  For example, in an email
dated October 15, 2015, Ellner told Shealy and Zacks that he
wanted "to be sure not to interfere with the separate
Sponsorship advertising opportunities with major real estate
brokers you are developing in tandem to ours in real estate
sales."

## Discussion

In its instant motion, Lightbox seeks an injunction
enjoining Third Home from "promoting, identifying or mentioning"
any service concerning the sale of real estate -- other than
that of the Joint Venture -- to its members, whether on the
Third Home website or through any other communication.  In
practice, the requested injunction would enjoin Third Home from
fulfilling its obligations in the Regional Transactions,
effectively nullifying the contracts between Third Home and the
various third-party Exclusive Broker.  Lightbox also seeks to
enjoin Third Home from entering into any new agreements similar
to the Regional Transactions.

A party seeking a preliminary injunction is generally
required to show (1) either (a) a likelihood of success on the
merits or (b) sufficiently serious questions going to the merits

of its claims to make them fair ground for litigation, (2) that
the moving party is likely to suffer irreparable injury in the
absence of a preliminary injunction, (3) a balance of the
hardships tipping in favor of the moving party, and (4) that the
public interest would not be disserved by the issuance of a
preliminary injunction.  eBay Inc. v. MercExchange, L.L.C., 547
U.S. 388, 391 (2006); Salinger v. Colting, 607 F.3d 68, 79–80
(2d Cir. 2010).  When the requested injunction would alter,
rather than maintain, the status quo, the moving party must show
a "substantial" likelihood of success on the merits.  N.Y.
Progress & Prot. PAC v. Walsh, 733 F.3d 483, 486 (2d Cir. 2013)
(citation omitted).  A court may not "presume that the plaintiff
will suffer irreparable harm;" rather the plaintiff must
demonstrate actual harm that cannot be remedied later by
monetary damages should the plaintiff prevail on the merits.
Salinger, 607 F.3d at 80.  Harm may be irreparable where the
loss is difficult to replace or measure, or where plaintiffs
should not be expected to suffer the loss.  Id. at 81.  Courts
must pay "particular attention to whether the 'remedies
available at law, such as monetary damages, are inadequate to
compensate for [the] injury.'"  Id. at 80 (quoting eBay, 547
U.S. at 391).

## I.   Likelihood of Success on the Merits

Lightbox brings two causes of action: breach of contract and breach of fiduciary duty.  The parties agree that New York law applies to these claims.  The Agreement contains a choice of law clause, which provides that New York law governs the Agreement.  The Amended Agreement does not alter the parties' choice of governing law.

### A. Breach of Contract

The elements of a breach of contract claim under New York law are well established.  They are "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004).  The parties do not dispute that Lightbox performed its obligations under the Agreement.  For that reason, Lightbox must show that it is likely to prove that the Agreement is an enforceable contract, that Third Home breached the Agreement, and that Lightbox suffered damages thereby.

### 1.   Existence of a Contract

Third Home admitted in its Answer to the FAC that the parties entered into the Agreement, and nowhere in its moving papers disputed that the Agreement and Amended Agreement collectively constitute an enforceable contract.  During oral

argument at the preliminary injunction hearing, Third Home's counsel, for the first time, raised an argument that the parties never had a "meeting of the minds," and therefore no enforceable contract exists between Lightbox and Third Home.

Under New York law, "[t]o create a binding contract, there must be a meeting of the minds as to the material terms of the agreement." Metro. Enterprises N.Y. v. Khan Enter. Const., Inc., 1 N.Y.S.3d 328, 329 (2d Dep't 2015) (citation omitted). In making this determination, "courts should not be pedantic or meticulous in interpreting contract expressions," because parties to a contract "should be held to their promises." Id. (citation omitted). "[N]ot all terms of a contract need be fixed with absolute certainty;" it is sufficient that there is "a manifestation of mutual assent to [the] essential terms." Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp., 93 N.Y.2d 584, 589 (1999) (citation omitted).

The Agreement and the Amended Agreement collectively constitute an enforceable agreement because Lightbox and Third Home agreed on all the materials terms necessary to express their mutual assent to the creation of the Joint Venture. The Agreement clearly defines the roles that Lightbox and Third Home were to play in the Joint Venture. Lightbox agreed to pay for the start-up costs of developing the Website, and was responsible for managing the sale of properties. Third Home

agreed to place a link to the Website on the Third Home website,
refer all sales customers to Lightbox, and play a passive role
in the sales business.  Both parties agreed to deal exclusively
with each other.  Second, the Agreement provides that any
profits, in excess of reasonable costs, are to be split evenly
between Lightbox and Third Home.  Any advertising expenses must
be shared equally between the parties.  Third, although the
original Agreement left open the issue of termination and
described the parties' intent to supplement the Agreement
concerning that issue, the Amended Agreement added detailed
provisions relating to termination.  Fourth, the parties'
conduct evinces their intent to be bound.  Both parties took
steps to perform the Agreement prior to the failure of the Joint
Venture.  Specifically, Third Home worked to secure listings for
the Website, worked with Lightbox to choose a name for the Joint
Venture, and has admitted that it is contractually obligated to
reimburse technology costs to Lightbox.  This conduct
demonstrates that Third Home considered the Agreement to be
executed, rather than merely an "agreement to agree."

Third Home contends that certain unresolved issues -- such
as what percentage the Joint Venture would charge for sales
commissions or who would operate as the licensed broker for a
given transaction -- were material to the contract and their
omission renders the parties' Agreement unenforceable.  Not so.

As with any partnership, the parties had a duty under New York law to cooperate in good faith to further the Joint Venture, and there is no requirement that they reduce every aspect of their business to writing.  Moreover, since the Agreement gave Lightbox sole responsibility for managing the brokerage of the sales of homes, not only across the nation but also internationally, it was entirely reasonable to give Lightbox flexibility when it came to decisions such as the precise commission for an individual sale and whether to retain a third party broker for the sale.  Accordingly, Lightbox is likely to prove at trial that the Agreement and Amended Agreement collectively constitute an enforceable contract.

### 2.  Breach

Lightbox contends that it is likely to prevail at trial in proving the following breaches of the Agreement: (1) Third Home failed to activate a link to the Website on the Third Home webpage; (2) Third Home failed to share profits with Lightbox; (3) Third Home failed to play a purely passive role in the business of the Joint Venture, and instead usurped Lightbox's exclusive role in managing interactions with customers; (4) Third Home failed to forward all potential business for the Joint Venture to Lightbox; (5) Third Home entered into the Regional Transactions in violation of its obligation to deal exclusively with Lightbox; and (6) Third Home made unauthorized

changes to the Website and billed the expenses to Lightbox.
Lightbox also argues that, to the extent Third Home purports to
have terminated the Agreement, it has breached the Agreement's
termination clause because (1) Third Home failed to buy out
Lightbox's share of the Joint Venture, or alternatively, (2) has
engaged in the Regional Transactions in violation of the Non-
Compete Clause.

Lightbox has carried its burden of proving that it is
likely to succeed at trial in showing that Third Home materially
beached its obligations under the Joint Venture in most, if not
all, of the ways Lightbox identifies.  For example, it is
undisputed that Third Home failed to activate the link to the
Website.  The linking of the Website was essential to the launch
of the Joint Venture because the link was to provide traffic to
the Website.  Third Home also entered into contracts with
brokers that Lighthouse has shown, at least as a preliminary
matter, competed directly with the brokerage business the
parties intended that the Joint Venture would develop and
pursue.  Lighthouse has shown that Third Homes' promises to
those Exclusive Brokers that it would, for example, advertise
the Exclusive Brokers to its members and send leads to the
Exclusive Broker, and its displaying the names of those
Exclusive Brokers on the Third Home website, promoted the

business of those Exclusive Brokers to the detriment of the business that the Joint Venture was created to develop.

Lightbox contends that Third Home's breaches continue.  To the extent that either party effectively terminated the Joint Venture, which is contested, Lightbox argues, inter alia, that the Agreement provides that Third Home may not compete with the business contemplated by the Joint Venture for two years after it is terminated and that Lightbox has breached that obligation. This argument regarding the Non-Compete Clause raises a series of issues which have only been partially addressed by the parties' preliminary injunction submissions.

For instance, there are several termination provisions in the Amended Agreement, and each one is different.  Pursuant to Paragraph 15(d), Lightbox may terminate the Agreement for cause, which it sought to do when it filed this action.  Paragraph 15(d) lists two grounds which permit such a termination: Third Home's failure to adequately create an inventory of homes or to generate adequate sales leads.  While there is a Non-Compete Clause associated with that termination provision, New York law disfavors the enforcement of non-competition agreements.  See, e.g., Crye Precision LLC v. Duro Textiles, LLC, No. 15cv1681 (DLC), 2016 WL 1629343, at *5 (S.D.N.Y. Apr. 22, 2016) (New York law views non-compete provisions "with high disfavor" and considers them "against the benefit of the commonwealth."

(citation omitted)).  Non-compete provisions outside the
employment context are analyzed "under a simple rule of reason,
balancing the competing public policies in favor of robust
competition and freedom to contract."  Id.  Factors relevant to
the enforceability of a non-compete agreement are: "(1) whether
the covenant protects a legitimate business interest; (2) the
reasonableness of the covenant with respect to geographic scope
and temporal duration; and (3) the degree of hardship imposed
upon the party against whom the covenant is enforced."  Id.

        For its part, Third Home contends that it terminated the
Joint Venture pursuant to Paragraph 15(e), which allows for its
unilateral termination of the Joint Venture if it wishes to
continue to operate the business of the Joint Venture and buys
out Lightbox's interest.  It is unclear on the record created at
the hearing whether Third Home had such a wish at the time it
gave its Notice of Termination or whether there even was an
existing business that could have been continued.  It is
undisputed that, even if the Notice of Termination was
effective, Third Home has financial obligations to Lightbox
under that paragraph that it has not yet fulfilled.

        In sum, Lightbox has carried its burden of showing a
likelihood of proving at trial that Third Home has materially
breached several of its contractual duties.  Lightbox has also
shown that Third Home owes it money pursuant to the Agreement's

terms, and may be able to show that there is an enforceable Non-Compete Clause for some reasonable period of time and covering some reasonably defined geographic scope.

## B. Breach of Fiduciary Duty

"A joint venture is a special combination of two or more persons where in some specific venture a profit is jointly sought." Gramercy Equities Corp. v. Dumont, 72 N.Y.2d 560, 565 (1988). "It is in a sense a partnership for a limited purpose, and it has long been recognized that the legal consequences of a joint venture are equivalent to those of a partnership." Id. A party's fiduciary duty to a partnership or joint venture exists only so long as the partnership or joint venture continues in existence. See Chin Tsun Yang v. Sneh Prabha Shukla, 29 N.Y.S.3d 66, 68 (1st Dep't 2016) (noting that breach of fiduciary duty must occur while partnership exists); see also Bayer v. Bayer, 214 N.Y.S. 322, 337 (1st Dep't 1926) ("Upon such dissolution of the partnership, any fiduciary duty which the defendant owed toward the plaintiffs while the copartnership existed ceased.").

As discussed above, Lightbox is likely to show at trial that its Joint Venture partner Third Home breached the exclusive dealing provision of the Agreement as well as other material contractual duties. It has also shown a likelihood to be awarded damages, and perhaps a reasonably defined injunction at

the time of trial.  Accordingly, it is likely to show that Third
Home had a fiduciary duty to Lightbox and breached that duty.

## II.  Irreparable Harm

The "showing of irreparable harm is the single most
important prerequisite for the issuance of a preliminary
injunction."  Faiveley Transp. Malmo AB v. Wabtec Corp., 559
F.3d 110, 118 (2d Cir. 2009) (citation omitted).  A court may
not "presume that the plaintiff will suffer irreparable harm;"
rather, the plaintiff must demonstrate actual harm that cannot
be remedied later by monetary damages or a permanent injunction
should the plaintiff prevail on the merits.  Salinger, 607 F.3d
at 80-81.  Harm may be irreparable where the loss is difficult
to replace or measure, or where plaintiffs "should not be
expected to suffer the loss."  Id. at 81.  "It is well
established that an irreparable injury is an injury that is not
remote or speculative but actual and imminent, and for which a
monetary award cannot be adequate compensation."  Dexter 345
Inc. v. Cuomo, 663 F.3d 59, 63 (2d Cir. 2011) (citation
omitted).  For instance, an injury to one's reputation may not
be sufficiently imminent to require issuance of a preliminary
injunction.  Id.  Similarly, where the "damage flowing from the
injury, in terms of lost profits, may last well into the future,
that damage is compensable through monetary award."  Buckingham
Corp. v. Karp, 762 F.2d 257, 262 (2d Cir. 1985).  Even

"reprehensible, inequitable conduct" cannot justify a preliminary injunction where the threatened irreparable harm will not be prevented by the injunction.   Id.

Lightbox has failed to show that it will suffer irreparable harm pending trial without the issuance of a preliminary injunction.   This action is, at its heart, a damages action.[6] While Lightbox may be able to show at trial that it is also entitled to narrowly tailored equitable relief, damages will largely compensate it for Third Home's violations of the Agreement since the Joint Venture never got off the ground. While preparatory work was done, and Lighthouse is entitled to compensation for some of that work, without the link to the Third Home website, the Joint Venture could not and did not begin to operate in the way the Agreement envisioned.   Moreover, there is little evidence that Third Home's breaches of the exclusivity provisions of the Agreement have had any material impact on the market that Lighthouse hopes to enter.   There is no evidence that even one home has been sold or that Third Home

---

[6] Based on the evidence presented at the preliminary injunction hearing, it appears Lightbox will be able to show at trial that Third Home is liable for approximately $80,000.  This amount includes approximately $60,000 that Lightbox paid to develop the Website and approximately $20,000 for Lightbox's share of the roughly $40,000 Third Home obtained through the Regional Transactions.  Lightbox may also be able to show that it is entitled to attorney's fees under the Agreement as well as prejudgment interest.

received a portion of any sales commission because of its promotion of the Exclusive Brokers at the expense of its commitments to the Joint Venture. Third Home has essentially used its agreements with the Exclusive Brokers to earn referral fees in connection with its home exchange program. To the extent evidence of sales commissions is developed at trial, an award of damages and an appropriately drafted permanent injunction may be sufficient to address that harm.

Lightbox claims that it will suffer irreparable harm if the Regional Transactions are not enjoined for three reasons. First, it contends that the Joint Venture was poised to take advantage of its "first mover" status because the vacation home sales market is currently confined to regional brokers who primarily operate brick-and-mortar businesses. The Joint Venture, on the other hand, is international in scope and can capture a large portion of the market for vacation home sales. Lightbox argues that this "first mover" advantage is being lost due to the delay in implementing the Joint Venture's business.

It appears that the Joint Venture was doomed to failure from conception. Third Home places a higher priority of its own vacation home exchange business than on the Joint Venture's sales commission business. As a result, Third Home wishes to develop opportunities to obtain referrals for its exchange business from the Exclusive Brokers, and is unwilling to support

the Joint Venture as a competitor to those Exclusive Brokers.
No injunction can cure this mismatch.  Lighthouse has failed to
show, therefore, that a viable, profitable business was about to
launch and that the injunction that it seeks here would redress
the breaches that Lightbox is likely to prove at trial.  As a
result, Lightbox's argument that the Joint Venture was poised to
capture a large share of the vacation homes sales business is
speculative.  The loss of theoretical future sales is too
speculative to warrant a preliminary injunction.  See Empower
Energies, Inc. v. SolarBlue, LLC, No. 16cv3220 (DLC), 2016 WL
5338555, at *13 (S.D.N.Y. Sept. 23, 2016).

Second, Lightbox argues that it has suffered and will
continue to suffer harm to its reputation because it cannot
deliver on promises it made to brokers about listing properties
on the Website.  Lightbox has offered no evidence that any
specific relationship has been damaged or that its reputation
has been harmed.

Finally, Lightbox argues that in the absence of a
preliminary injunction, Third Home will be unable to pay any
money judgment entered against it.  This argument does not
suggest that Lighthouse is entitled to the injunction it seeks.
Lighthouse does not ask that any of Third Home's assets be
frozen.  It seeks to vacate the Regional Transactions.
Moreover, the Regional Transactions generate referral fees and,

in some instances, upfront payments for Third Home.  Enjoining those transactions would result in Third Home having less money available to pay a judgment if Lightbox ultimately prevails in this action.  For each of these reasons, therefore, Lighthouse has failed to show that it will be irreparably harmed in the absence of a preliminary injunction.

### III.  Balance of Hardships

In order to obtain a preliminary injunction, a plaintiff must demonstrate that the balance of hardships tips in its favor.  Salinger, 607 F.3d at 79-80.  The effect of an injunction on third parties should be considered in this balancing of the equities.  See NML Capital, Ltd. v. Republic of Argentina, 699 F.3d 246, 264 (2d Cir. 2012).

Lighthouse has not shown that the balance of hardships favors issuance of a preliminary injunction.  If an injunction were granted, the only result would be to prevent Third Home from transacting certain business with the Exclusive Brokers. It would not alter the fact that Third Home has elected to terminate the Agreement and proceed with the dissolution of the Joint Venture.  Thus, the principal harm that Lighthouse has suffered -- the failure of the Joint Venture -- will continue unabated.

The injunction may, however, impose hardships on Third Home and third parties.  If the Court were to enjoin the Regional

Transactions, it may disrupt the business of the Exclusive
Brokers with whom Third Home has contracted, and who have no
contractual relationship with Lightbox.  Those Exclusive Brokers
have paid promotional fees to Third Home, and have legitimate
expectations based on those payments.  An injunction may also
impose a hardship on Third Home's customers, who may lose access
to special benefits they obtained pursuant to the Regional
Transactions.  Accordingly, the balance of hardships tips
against issuance of a preliminary injunction that would enjoin
the Regional Transactions.

## IV.   Public Interest

Finally, courts must consider whether the public interest
would be served by the issuance of a preliminary injunction.
Salinger, 607 F.3d at 79-80.  There is a well-recognized public
interest in enforcing contracts.  Advance-Rumely Thresher Co. v.
Jackson, 287 U.S. 283, 288 (1932) (liberty of contract is
protected by the Due Process Clause.  Lighthouse has not shown
that the public's interest in contract enforcement requires
issuance of a preliminary injunction here.  It interest will be
adequately vindicated through summary judgment or a trial.

## Conclusion

Lightbox's July 13, 2016 motion for a preliminary injunction is denied.

Dated:     New York, New York
           October 28, 2016

                              _____
                                    DENISE COTE
                         United States District Judge