UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LIGHTBOX VENTURES, LLC,<br><br>    Plaintiff/Counterclaim Defendant,<br><br>    -against-<br><br>3RD HOME LIMITED and WADE SHEALY,<br><br>    Defendants/Counterclaim Plaintiffs and<br>    Third-Party Plaintiffs. | **DEFENDANTS'**<br><br>**MEMORANDUM IN SUPPORT OF**<br><br>**MOTION FOR**<br><br>**SUMMARY JUDGMENT**<br><br>16-cv-02379 (DLC) |
| 3RD HOME LIMITED/WADE SHEALY,<br><br>    Third-Party Plaintiffs,<br><br>    -against-<br><br>ANDREW ELLNER,<br><br>    Third-Party Defendant. | |

The Defendants have moved this Court for Summary Judgment (or alternatively, Partial Summary Judgment).   Specifically, the Defendants contend that Plaintiff is entitled to no damages (or, alternatively, only nominal damages).   In support of that Motion, the Defendants state as follows:

## <u>INTRODUCTION</u>

This case arises from a contract dispute between Plaintiff, Lightbox Ventures, LLC ["Lightbox"], and Defendant, 3rd Home Limited ["3HL"], over a failed joint venture [the "Joint Venture"].   The Joint Venture was intended to operate as a website [the "Website"] that facilitates high end vacation properties.

Lightbox contends that 3HL breached the Joint Venture by refusing to attach a link to 3HL's existing website (*i.e.,* 3HL's property exchange website).

Lightbox filed this lawsuit on March 31, 2016, alleging (1) that 3HL had defaulted, (2) that Lightbox was entitled to terminate under 15(d), and (3) that as a result, Lightbox was entitled to imposition of a two-year non-competition agreement, thereby prohibiting 3HL from operating a similar business, and (4) compensatory damages.

## SUMMARY OF FACTS

### 3HL's Existence Prior to Being Solicited by the Plaintiff

3HL was formed in 2009 and owns the website known as www.3rdhome.com. It owns a trademark registration for its name and related marks. Its website is a global site that allows its Members to exchange weeks in their luxury homes. As of the summer of 2015, 3HL had in excess of 5,000 Members.[1]

Once an individual becomes a Member of 3HL's property exchange program, and their property is determined to be eligible, they are afforded the opportunity to spend days in a luxury home owned by another Member, in exchange for allowing other Members to stay in their home. For example, as a 3HL Member, an owner of a home in Antigua may permit another Member to stay in his/her home for one week and in return, may stay in another Member's home in Vail, Colorado (as an example) for one week. These exchanges are facilitated by the use of points or "keys," which is the currency used in the exchange program to reserve time in a given property.

3HL obtains Members from referrals made to it by Brokers working in the luxury vacation home market in the United States and abroad.

---

[1] All of these facts are based on citations to actual evidence in the record, the citations to which are set out (in detail) in Defendants' separate Statement of Uncontested Facts. Facts were also pulled from the Court's earlier Findings of Fact **[Doc. 69]**.

**The Involvement of Andrew "Andy" Ellner**

Mr. Ellner is a former Managing Director at Lehman Brothers.  In 2008, he formed LightBox Capital Management Company, LLC, otherwise known as a "money management firm" with multiple funds for different investors, including hedge funds.

Mr. Ellner had never owned a real estate sales company, worked for one, or held a license as a Real Estate Realtor or Broker.  Yet, in June of 2015, Mr. Ellner formed a new company known as LightBox Ventures, LLC ["Lightbox"] with the hopes of getting into online real estate sales.  He asked his wife to apply for a New York Real Estate License.[2]

Mr. Ellner then contacted 3HL about the possibility of forming a joint venture in which Lightbox's hopeful business would be promoted to 3HL's Members via a link to 3HL's existing website.  At that time, neither Mr. Ellner, his wife, nor anyone employed by Lightbox actually held a license as a Real Estate Realtor or Broker.

Although Mr. Ellner formed the new company (Lightbox Ventures, LLC), he did not open a bank account for it or otherwise follow any corporate formalities with regard to it.  Mr. Ellner continued to operate (from a financial standpoint) out of his prior company (Lightbox Capital Management, LLC).[3]

---

[2] Like her husband, Mrs. Ellner (a retired labor lawyer) had never owned a real estate company, worked for one or consulted for one.

[3] For instance, the technology costs which Lightbox later invested into the Joint Venture were actually paid by Lightbox Capital Management, LLC (and not Mr. Ellner's new company, which was purportedly 3HL's venture partner).

**The Joint Venture**

On July 13, 2015, Lightbox and 3HL entered into an agreement ["the Joint Venture"]. The stated purpose of the Joint Venture was to "*establish a joint venture between the parties to create an online platform for the resale of vacation homes, fractional ownership properties and other properties eligible to be listed on 3$^{rd}$Home.com, which is to be linked to the existing 3rd Home site.*"

The parties agreed that the Joint Venture would be a "*temporary interim agreement*" and that an additional agreement would be ironed out, and signed by August 31, 2015.  However, the parties did not meet that deadline.  In fact, it was not until late August, 2015 that Lightbox obtained its real estate license.

**Delays in Launching the Joint Venture**

Mr. Ellner's wife was encouraged by him to obtain a real estate license for use in connection with the Joint Venture.  However, she was unable to obtain that license until late August, 2015.  And, as of November 11, 2015, the parties had still not determined what the Joint Venture would be named.  Thus, very little occurred in the 6 months following the signing of the Joint Venture.

Finally, in December, 2015, the parties executed an amendment to the agreement [the "Amended Agreement"].  The Amended Agreement principally modified the Termination provision of the Joint Venture.

Yet, as of January 28, 2016, Mr. Ellner (who was to manage the Joint Venture) had not determined the address that the Joint Venture would use.  As of January 28, 2016, Mr. Ellner had also not procured a telephone number (800 or equivalent) for the Joint Venture.

Additionally, Mr. Ellner's company (Lightbox), which was to manage the Joint Venture, never opened a bank account for itself or for the Joint Venture.

Although Mr. Ellner was hopeful that the Joint Venture would operate nationally and internationally, his wife never actually sought to obtain a reciprocal real estate license outside of New York, or elsewhere.

As of the date the Amended Agreement was signed, the parties had also yet to come to any agreement as to:

- The nature of the referral fees the Joint Venture wanted to receive from third parties for future referral agreements;

- The percentage or amount of commission that the Joint Venture would receive for sales in which the buyer and seller were both represented by a Realtor; or

- The percentage or amount of commission that the Joint Venture would receive for those scenarios in which there was a Realtor involved on both sides.

As part of the development of the Joint Venture, Lightbox was to pay for the costs of developing the technology (software), whereby the Joint Venture would link to 3HL's existing website (*i.e.,* the property exchange website).[4]  Those costs were not fully paid until December, 2015.


**The Problems**

After January 1, 2016, disagreements arose between the parties.  By early March, 2016, the relationship between Mr. Ellner and 3HL's Chairman, Mr. Shealy, had fully deteriorated.

On March 7, 2016, Ellner wrote to 3HL's President stating that, "*[Shealy] is irrelevant now and not my problem.  My lawyers will deal with him...   I won't be satisfied until he is caged or we own 3rd Home.*"

---

[4] While it is not disputed that $60,000 was incurred in connection with that software, the evidence has now confirmed that Lightbox did not actually incur that expense.  An unrelated third-party (which is not a party to this litigation) paid those costs.

-5-

**The Reciprocal Termination of the Joint Venture**

On March 8, 2016 (the day after Ellner's inflammatory email), counsel for 3HL sent Lightbox written notice of Termination.  Lightbox responded, and claimed the deal was not "ripe" for termination.

However, 3 weeks later, Lightbox filed suit, and asserted (in ¶¶ 37-40) that it had terminated the agreement (pursuant to ¶15(d) of the Amended Agreement).  Paragraph 15(d) of the Amended Agreement allows Lightbox to terminate and, thereafter, to use its technology. And, to restrain 3HL from operating the Joint Venture (exclusively) or to operate a competing enterprise.

In its Complaint, Lightbox made it clear that it had terminated.  It made the following statements related thereto:

- *"Lightbox is choosing to exercise its right to terminate for cause pursuant to Amendment, Section 15(d);"* and

- *"Lightbox asked for a declaration that the agreement has been validly terminated for cause by Lightbox."*

**[Pl. Complaint, ¶¶ 37-40, p. 10, Doc. 1]**

Thus, there is no dispute that the venture terminated by March 31, 2016 (date of suit), if not earlier.

**The Joint Venture Never Actually Launched Before Being Terminated, and is Effectively "Defunct"**

In an Affidavit filed in this Court on October 6, 2016, Mr. Ellner represented that on behalf of the Joint Venture, he had obtained "*numerous brokerage sales listings on the website for properties worth more than $30 million...*" At the Injunction Hearing held October 21, 2016 (two weeks later), Mr. Ellner testified that there were approximately 18 foreign properties listed by March of 2016 with a total value of approximately $31 million.[5] Several months thereafter, he represented to his litigation consultants that he had extensive signed listings, shadow listings and potential listings valued at $65 million.

He now concedes that he had procured <u>only</u> 2 signed listing agreements as of the date this lawsuit was filed. Those are for timeshares in small condominiums with a collective value of less than $200,000.

Additionally, as of the date that Lightbox filed its lawsuit, the Joint Venture:

- Had no W-2 employees;
- Had no designated street address;
- Had no designated telephone number;
- Had no bank account;
- Had no real estate holdings; and,
- Had no personal property (other than the technology).

Although Lightbox was to handle the management affairs of the Joint Venture, it never actually opened a bank account (in its name or in the name of the Joint Venture).

---

[5] **[Court Memorandum, Doc. 69].**

## ARGUMENT

**LIGHTBOX IS ENTITLED TO NO, OR ONLY NOMINAL, DAMAGES
TO COMPENSATE IT FOR ITS INVOLVEMENT IN THE JOINT VENTURE**

## I.   Technology Costs

It is not disputed that in connection with the Joint Venture that $60,000 was paid for the cost of technology.  In its earlier ruling, this Court stated that Lightbox might have a colorable claim for reimbursement of that $60,000.  Specifically, the Court held:

> Based on the evidence presented at the preliminary Injunction Hearing, it appears Lightbox will be able to show at trial that 3rd Home is liable for approximately $80,000.  This amount includes approximately $60,000 that Lightbox paid to develop the website and approximately $20,000 for Lightbox's share of the roughly $40,000 3rd Home obtained through the regional transactions.

**[Court Memorandum, Doc. 69, fn. 6, p. 29]**

The evidence has now confirmed that Lightbox did not actually pay for the aforementioned technology.  Instead, Mr. Ellner's other company (the hedge fund, Lightbox Capital) paid for those expenses.  That entity is not a party to this proceeding and it has not assigned that claim to Lightbox.  Accordingly, the actual claimant involved herein (Lightbox) does not have standing to seek an award for reimbursement of costs paid by a third-party. However, if it is assumed that Lightbox controls that claim, it is still not an appropriate claim for compensatory damages.  Such an award would effectively require that 3HL pay for something it does not own or control.

Again, it is not disputed that the Joint Venture is not only defunct, but that it was terminated at the insistence of both parties.  3HL gave Notice of Termination on March 7. Lightbox then gave its Notice of Termination, as evidenced by statements made in its Complaint **[Complaint, Doc. 1, ¶¶ 37-40]**.  In connection therewith, Lightbox terminated pursuant to Section 15(d) of the Amendment.  That clause does not give Lightbox any rights to require 3HL to

reimburse Lightbox for its technology costs.  Nor does Section 15(d) require 3HL to take control of the technology.  In fact, 3HL has no interest in using the technology.  Thus, 3HL concedes to the entry of a Declaration by this Court that Lightbox has exclusive ownership and control of the technology.  Such a Declaration by this Court would fully address Lightbox's claim for compensatory damages, to the extent based on technology costs.

## II.  Marketing Fees from Exclusive Brokerage Agreements

Lightbox contended from the outset that 3HL had breached the Joint Venture and more importantly, that it was attempting to compete by entering into agreements with third party brokers otherwise known as **Exclusive Brokerage Agreements**.  At the Injunction Hearing held on October 21, 2016, it was determined that 3HL had entered into "at least five" such agreements with marketing revenue totaling $42,500 **[Court Memorandum, Doc. 69]**.  In connection therewith, the Court stated as follows:

### V.  *Third Home's Transactions with the Exclusive Brokers*

*Because they are central to the plaintiff's theory of breach, it is important to describe in detail Third Home's contracts with the Exclusive Brokers.  Starting in December 2015 – when Third Home was ostensibly cooperating with Lightbox to further the Joint Venture – and continuing until at least April 2016, [fn. One agreement was executed on an unspecified date.]* <u>*Third Home executed contracts with at least five Exclusive Brokers*</u>*.  In each of these Regional Transactions, Third Home agrees to promote the Exclusive Broker as an exclusive or "preferred broker" for a particular geographic region.  These regions include (1) Napa and Sonoma counties, California; (2) Park City/Deer Valley, Utah; (2) Vail Valley/Summit County, Colorado; (3) Telluride, Colorado; and (5) certain areas of Arizona.  It also offers membership and certain benefits to the customers of the Exclusive Broker.  In exchange, Third Home has a right to receive referral fees and, in some instances, an upfront payment from the Exclusive Broker.* (**Emphasis added**.)

*Each of the five transactions is substantially similar, and thus only the first one will be described in detail.  On or about December 8, 2015, Third Home entered into an agreement with a broker in Napa and Sonoma counties in California.  The agreement states that the broker "desire to obtain exclusive brokerage rights related to 3rd Home" in the geographic region in which it operates.  The agreement principally has two components.  First, Third Home agrees to promote*

-9-

*the Exclusive Broker's business by (1) advertising it as a "Preferred Broker" on the Third Home website, (2) referring new Third Home members to the Exclusive Broker, (3) giving the Exclusive Broker a master account "showing all enrolled members from the community and all activity by those members;" and (4) giving special discounts and perks to the Exclusive Broker's customers who become Third Home Members. <u>**Second, Third Home agreed to send sales leads to the Exclusive Broker, and if a sale occurred, Third Home would obtain a percentage of the commission.**</u>   The Exclusive Broker also agreed to pay Third Home an <u>**initial fee**</u>.*   (**Emphasis added**.)

*Third Home at least considered the possibility that revenues obtained through the Regional Transactions belong to the Joint Venture because in an early draft of one agreement, dated December 2, 2016, the Exclusive Broker was supposed to send the upfront payment directly to Lightbox.  In the executed version of the agreement, however, the payment was to be sent to Third Home.  <u>Third Home obtained approximately $42,500 from the Regional Transactions</u>.* (**Emphasis added**.)

*Third Home did not provide copies of the contracts in the Regional Transactions to Lightbox at any time before the commencement of this litigation.  Nor did it seek permission from Lightbox to establish exclusive broker arrangements with any of the five Exclusive Brokers or any other broker, or to contract with those brokers to receive a portion of commissions on home sales made by clients it referred to the Exclusive Broker.  Lightbox was aware, however, that Third Home had informal arrangements with certain brokers to advertise their services on the Third Home website.  For example, <u>in an email dated October 15, 2015, Ellner told Shealy and Zacks that he wanted "to be sure not to interfere with the separate Sponsorship advertising opportunities with major real estate brokers you are developing in tandem to ours in real estate sales."</u>*  (Emphasis added.)

**[Court Memorandum, Doc. 69, p. 16-18]**

As the Court noted in its earlier Memorandum, the Brokerage Agreements provided, in part, that <u>if</u> 3HL sent sales leads to the exclusive Broker and <u>if</u> a sale occurred, that 3HL would obtain a percentage of the commissions.  The Brokers also agreed to pay 3HL an "initial fee."

It is not disputed that 3HL received payment of "initial fees" which have been generally referred to as marketing fees.  However, the undisputed evidence is that 3HL <u>never</u> received a commission or other payment based upon a percentage of a sale.  Thus, the issue before the Court is whether the marketing fees paid by third-party Brokers to 3HL creates a pool of funds which should have gone to the Joint Venture for allocation between the two owners.

## THE MARKETING FEES

It was subsequently determined that there were actually 6 Exclusive Brokerage Agreements (not 5).  And, the total revenue received by 3HL for those equals $52,500 (not $42,500, as was originally thought).

The testimony of 3HL's Chairman (in his deposition and in his Affidavit) confirms that those payments were "initial fees," or "marketing fees."  They were not commissions.  The payments were not tied to a percentage of a sales price or, related to a real estate closing.  The unrebutted testimony of Mr. Shealy on this issue was as follows:

Q:      So leaving aside the attachment, where it says 3rd Home Brokerage Program, what is that referring to?

A:      Its, as I mentioned, [in the first stage of my deposition] its where a brokerage firm gains the rights in their area, geographic area, to represent the 3rd Home Exchange Program and offer free memberships into the exchange program for 3rd Home.

**[Shealy Depo., p. 218/11-21]**

Q:      But out of the 80, if you take out the approximately 7 who are brokers, is it accurate to say that there is no commissions on the sales or purchases of real estate that generate revenue out at any of those... relationships?

A:      Our company has never received a commission for a sales transaction of real estate.

**[Shealy Depo., p. 221/12-18]**

Q:      And what is the nature of the, well, is it accurate to say that the nature of the relationship amongst-between 3rd Home and each of the 7, approximately, of the brokers, is approximately the same type of relationship?

A:      It's the same general relationship.  As I said, the relationship is geared towards allowing that company to represent our exchange, and enroll members into the exchange program.

**[Shealy Depo., p. 221/19 – 222/2]**

Moreover, the goal of the brokerage agreements was not to compete with the Joint Venture.  To the contrary, the goal was to obtain new members in the exchange program (which existed years prior to the Joint Venture).   Mr. Shealy made it clear that the brokerage arrangements had one goal: "*the goal is to get members into the exchange program.*"  *Id.,* p. 222/8. On that issue, his testimony was clear.  It was as follows:

Q:     *Well, what I'm referring to is, there were revenues from exclusive broker agreements that came to about $42,000 as of like the third quarter of '16 and as of the fourth quarter it came to about $52,000.  That's the stream of income I'm talking about.*

A:     *Yes.  That's the marketing fee.  It has absolutely nothing to do with sales, commissions of sales, or referrals from any sales.  It was a marketing fee that [Lightbox's owner] knew that we were doing.  He agreed that he had no interest in that money, that he would not participate in that money in any shape or form, and that that was a 100% 3rd Home's money for the marketing of the exchange program.*

**[Shealy Depo., p. 295/10-25]**

Thus, 3HL contends that the aforementioned marketing fees are not the fruits of a competitive real estate sales enterprise.

However, and to the extent the Court concludes otherwise, the aforementioned fees would result in an award to Lightbox of only $26,250.  This is consistent with the Court's prior ruling that Lightbox might be entitled to receive 50% of the aforementioned fees.  An award of $26,250 would place Lightbox in the exact same position it would have been in had the marketing fees been paid directly to the Joint Venture (for subsequent distribution between the equal partners).  An award in excess of $26,250 would constitute a windfall for Lightbox.

Compensatory damages are to "compensate" a litigant; not to create a windfall.  *See, Dixon v. Agbai,* 2016 U.S. Dist. LEXIS 88844 (S.D.N.Y., 2016) where this Court held that compensatory damages are to redress a "*concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct*…"  *Id.,* p. 2.  *See also, TVT Records v. Island Def Jam Music Group,* 279 F. Supp. 2d 413 (S.D.N.Y. 2003) where this Court held that compensatory damages

function to "redress" harms actually caused by the defendant's wrongful conduct. *Id.,* p. 422. Compensatory damages are to make the insured party "whole." *Id.* Anything in excess of making the injured party "whole" would be punitive in nature. *Id. See also,* Restatement 2d of Torts §903.

### III.   LightBox's Attempt to Force 3HL to Fund a Judicial Dissolution of a Defunct Entity is Misplaced

As noted, this Court has already held that the Joint Venture is "defunct."[6] Notwithstanding, Lightbox retained two consultants and advised them to value the Joint Venture as if it was a "going concern" on March 7, 2016 and also, March 14, 2016. In so doing, the consultants relied exclusively upon the representations of Lightbox's owner, Mr. Ellner. 3HL has moved to bar those experts.

To start, Mr. Ellner represented to this Court in a sworn Affidavit on October 6, 2016, that he had obtained "*numerous*" listings valued at approximately $30 million. **[Doc. 60]**. At the Injunction Hearing two weeks later, he testified under oath that he had obtained 18 listings worth approximately $31 million. **[Court Memorandum, Doc. 69]**.

Without any explanation, Mr. Ellner then advised his consultants that he had countless other listing agreements and also, things known as "*shadow listings*" and "*potential listings*." He represented that those listings included properties valued at $65 million. Based on ***those*** statements, Lightbox's consultants opined that the Joint Venture was worth millions as of March, 2016.

As separately addressed in Defendant's Motion in Limine, it has now been determined that Mr. Ellner actually procured only two signed listing agreements as of the date his company filed this lawsuit. Ironically, one of those listings is for property actually owned by Mr. Ellner

---

[6] **[Court Memorandum, Doc. 69, p. 15]**

and his wife.  That property, and the other property, are only timeshares in small condominiums.  Those timeshares are collectively valued at less than $200,000.  **[Shealy Aff., ¶¶ 7-10]**

Defendants believe that their separate Motion in Limine is grounded and, therefore, that it should be granted.  Notwithstanding, Defendants separately believe that the admissions procured from those experts confirms that Lightbox's other claims are unreasonably speculative.  Because Lightbox's remaining claims are speculative, they are not appropriate for an award.  *See, Makinen v. City of New York*, 167 F. Supp. 3d 472 (S.D.N.Y. 2016) confirming that compensatory damages for economic injury must be "*established with reasonable certainty and may not be based on pure speculation and conjecture*."  *Id.,* p. 497.

Additionally, compensatory damages are not permitted when the connection between the claimed loss and the tortious act is "speculative or uncertain."  *See, Dixon, supra,* p. 2.  In this case, 3HL refused to allow Lightbox to attach its link to 3HL's existing website (*i.e.,* 3HL's property exchange website).  Lightbox contends that ***that*** action was wrongful and, therefore, a breach of the contract.  Hypothetically, 3HL could have launched the link and turned around 24 or 48 hours, thereafter and exercised its rights of termination.

In like manner, Lightbox could have exercised its right of termination.  Thus, the refusal to attach the link is not directly related to the alleged losses.

Thus, an award based on speculation that a business would have had future sales, if not terminated, would be not only speculative, but also would effectively evaporate the termination clause the parties agreed to include.  This is because Lightbox's alleged losses flow from its right to receive 50% of the revenue that the Joint Venture might have received <u>if</u> it had launched and <u>if</u> it had not been terminated.  However, for the Joint Venture to have received <u>any</u> revenue from commissions, it would have to have first obtained listings in New York (where Mrs. Ellner was

licensed); however, there is no evidence that it ever obtained any listings in that state. Alternatively, the Joint Venture would have had to obtain reciprocal licenses in other states and/or internationally. Yet, Mr. Ellner's wife never even attempted to obtain such reciprocity.

With regard to those regulatory hurdles, 3HL designated Mike Collins as an expert. Mr. Collins is the CEO and a founding principal partner of IMI Worldwide Properties, which is a global real estate sales, marketing and consulting company based in Manhattan. Mr. Collins has specific experience in the resort real estate industry, gleaned from 25 years on projects throughout the United States and internationally, including Mexico, Central America and the Caribbean (including Anguilla). He has a Real Estate License, as well.

Lightbox has not designated any real estate industry experts to support its claim or to rebut the expert testimony of Mr. Collins.

Regarding Lightbox's huge regulatory hurdles, Mr. Collins opined as follows:

### I.   Plaintiff's Expert's Valuation of the Joint Venture Sometimes Known as 3HRE

The report of the Plaintiff's [valuation] expert contains a section titled: "Company Overview." In that section the Plaintiff's expert states that the joint venture between Plaintiff and 3HL, known as *3rd Home Real Estate* ["3HRE"] was created as an "*internet-based real estate brokerage business and multi-listing vacation home sales platform specifically servicing the luxury vacation/second home market*."

It then goes on to state that this is allegedly a "unique market" which includes, according to the report, resort properties in multiple-related markets, including "*Rocky Mountain Ski Resorts, Caribbean resorts, California wine country resorts and other similar categories of global luxury resorts*."

Yet, the joint venture had only one licensed real estate professional, that being the wife of its founder, Andy Ellner. Mrs. Ellner did not obtain her real estate license until August 27, 2015. Her license is limited to the State of New York. She holds no licenses or reciprocal licenses in any other state (or internationally). According to her sworn testimony, she had no prior real estate experience, licensed or otherwise. Since obtaining her license, she has never listed a property for sale or been associated with a real estate transaction generating a commission or a fee. On her own admission, she has no knowledge of the restrictions, regulatory or otherwise, that apply to real

estate transactions outside the State of New York, or internationally, outside the United States.

In the Plaintiff's [valuation] report, it makes numerous assumptions, including assuming the number of members in 3HL; assuming the number of members in 3HL that would desire listing their property for sale with 3HRE; assuming the asking price; and assuming the percentage of homes listed that would turn into an actual sale.  The report then quantifies the estimated sales volume by a commission percentage calculated at ten percent (10%) and then projects first year revenue of $4,693,000. The report quantifies those projections, and then values the business at $6,606,847.

The report also calculates some short term damages of $278,487, resulting from lost sales.

The report does not, however, address any of the administrative and regulatory obstacles which restrict a real estate company and in particular, those that restrict a real estate company from one state from operating in other states, or internationally. This is important because the report concedes (pages 4-5) that the Plaintiff's expert did not independently verify the "accuracy and completeness" of the information provided to him by the Plaintiff.

Our company operates through various staff members and subsidiaries in various states and foreign countries.  As a result, we regularly use licensed professionals in other states and in other countries.  We also regularly consult with licensed professionals such as attorneys and accountants, to insure that we are regulatory compliant.  All of these actions are necessary because Realtors and real estate Brokers are regulated by state.  A Realtor license or a Broker license issued by one state does not afford the individual holding that license with the right to act as a Realtor or as a Broker in another state.

There are two ways a Realtor from one state can operate in another state.  Some states require that an individual obtain a second license in that other state.  Thus, a secondary license is one route to operate in a second state.

Alternatively, some states allow a licensed individual to obtain what is known as a reciprocal license in that other state.  Thus, a reciprocal license is another route to operate in a second state.

However, many states do not provide reciprocity for a real estate license.  While some states do issue reciprocal licenses, they are limited.  By example, many states require that a Realtor from one state work as a Realtor in that state for a minimum number of years or pass the state licensing test before that individual is eligible to seek a reciprocal license in another state.

These regulatory restrictions are significant to the alleged value of the 3HRE joint venture, based upon the fact that the Plaintiff's expert valued the joint venture on assumptions which (factually) do not withstand basic scrutiny.  The largest problem

with the Plaintiff's expert's valuation is that it overlooks the fact that the joint venture had only one licensed real estate professional associated with it and that her license was limited to only one state (New York).

In reality, real estate transactions typically include a Listing Agent, a Selling Agent and a Buying Agent. If more than one Broker is involved, those individuals will typically enter into what is known as a Co-Bro Agreement (which is an industry phrase for a co-brokerage arrangement). However, to participate in a Co-Bro, both agents will need either a traditional, secondary or reciprocal license in the state where the transaction is to occur or where the agent is paid.

I have reviewed excerpts from the testimony of Mr. Ellner. He conceded during his testimony that the joint venture never came to terms with the details of any co-brokerage arrangements that it would have needed to have with agents at the local level (outside New York and outside the United States). Therefore, any analysis by the Plaintiff's expert that assumes that all (or a large portion of) commissions would go to the joint venture is factually flawed.

Additionally, the business model offered by the Plaintiff simply was not viable due to the regulatory hurdles which would have prohibited it from handling any transactions outside the State of New York, and outside of the United States. In like manner, if the joint venture had retained local (and licensed) professionals to assist it at the local level in transactions outside of the State of New York and outside of the United States, then it would have had to enter into Co-Bro agreements with those other licensed professionals. The existence of such Co-Bro agreements would have diminished by at least 50% the revenue that the joint venture might otherwise have received from any transactions involving other licensed professionals.

Additionally, and regarding these issues, Lightbox's own valuation experts conceded that a host of **additional** obstacles would have to be met before the Joint Venture could generate the first dollar in revenue.

Mr. Rencher made these admissions:

Q:      *Would you agree with me as a fundamental premise that a real estate sales company, whether web-based or land-based, generates a vast majority of its revenue through real estate commissions?*

A:      *Based on my understanding, yes.*

Q:      *And real estate commissions only occur upon actual real estate closings; isn't that true?*

A:      *That's correct.*

Q:      *To project future revenue for a real estate company, based on sales, is it true that several things will have to happen, <u>starting with a listing agreement</u>?*

A:      <u>*Yes*</u>*, it is subject to various requirements in order to generate revenue.*

Q:      *And one of those, if not the primary obstacle, would be the execution of signed listing agreements, right?*

A:      <u>*Yes*</u>*.*

Q:      *Then the property would have to be marketed, correct?*

A:      *Yes.*

Q:      *And then the property would have to actually sell, correct?*

A:      *Correct.*

Q:      *And it would be necessary to iron out the terms in writing of any reciprocal arrangements with other brokers, otherwise known as co-broker; isn't that true?*

A:      *Yes.*

Q:      *As of March 14, 2016, the Joint Venture did not have any signed co-broker agreements with any other Realtors or Brokers, did it?*

A:      *Not to my knowledge.*

**[Rencher Depo., p. 105/18 – 108/7]**.  (Emphasis added.)

Lightbox's <u>other</u> valuation expert, Mr. Nguyen, made the same concessions when he testified.  His admissions were as follows:

Q:      *You assume that Lightbox Ventures had or would obtain all applicable licenses and would be regulatory compliant, correct?  And you assumed that it would, in fact, get listing agreements, correct?*

A:      *Correct.*

Q:      *And you assumed that upon getting those listing agreements, that those particular properties would actually sell, correct?*

A:      *Yes.*

Q:      *And that upon the sale of those properties, that they would sell at or near a hopeful price, correct?*

A:      *Correct.*

Q:     *And you assumed that certain costs of operation would be at a certain level, correct?*

A:     *Correct.*

Q:     *And that a commission would be paid a specific percentage, correct?*

A:     *Correct.*

Q:     *If any number of those changes, that would have a material effect on the valuation of a real estate business, wouldn't it?*

A:     *Doesn't have to be material.*

Q:     *Well, for instance, if you don't get listings, you don't get sales, correct?*

A:     *Correct.*

Q:     *And if you don't get a listing, you don't necessarily successfully sell the property, correct?*

A:     *Correct.*

Q:     *If you successfully sell a property, you don't necessarily sell it at the hopeful price, do you?*

A:     *No.*

Q:     *If you sell it at some price, there can often times be expenses that reduce profits that were not anticipated, isn't that correct?*

A:     *That's correct.*

Q:     *And then, obviously, you can't do any of that unless you're regulatory compliant; isn't that correct?*

A:     *Correct.*

**[Nguyen Depo., p. 49/1 – 50/24]**.

Thus, and assuming, *arguendo,* that the Joint Venture had met all of those regulatory hurdles, it <u>then</u> had to procure actual clients to enter into signed listing agreements.  The properties related thereto would <u>then</u> have to have been sold.  The commissions generated from those sales would <u>then</u> have had to have been sufficient to surpass the Joint Venture's cost of operation.  Simply stated, an award for Lightbox based on value (vested upon future sales) would require this Court to:

(1)     Ignore that the agreement was only a short-term arrangement;

(2)     Ignore the respective rights to terminate; and

(3)     Assume that all applicable stars aligned and that future sales would occur, and occur with certainty.

## <u>CONCLUSION</u>

For the reasons set forth herein, the Defendants request that their Motion for Summary Judgment be GRANTED (wholly, or at least partially).

*/s/ Phillip Byron Jones*
**Phillip Byron Jones** (BPR 14125)
EVANS, JONES & REYNOLDS, P.C.
401 Commerce Street, Suite 710
Nashville, TN  37219
Telephone: (615) 259-4685/Fax: (615) 256-4448
Email: Pjones@ejrlaw.com
*Co-Counsel for Defendants/Counter-Plaintiff and*
*Third-Party Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been sent as follows on this the 13th day of June, 2017, to:

| Addressee | Method(s) of Service |
|---|---|
| /s/ Brem Modolvsky<br>**Brem Modolvsky**<br>Brem Modolvsky, LLC<br>411 Lafayette Street, 6th Floor<br>New York, NY  10003<br>212-563-3370 ph.<br>brem@bremlaw.com<br>*Attorneys for Plaintiff/Counter-Defendant* | ◉   Electronically via the Court's ECF System<br><br>☐   U.S. Postal Service (First-Class, Postage Prepaid)<br><br>☐   Email |
|  |  |

*/s/ Phillip Byron Jones*
Phillip Byron Jones

838803.029