UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X
                                      :
LIGHTBOX VENTURES, LLC,               :
                      Plaintiff,      :      16cv2379(DLC)
                                      :
           -v-                        :      OPINION & ORDER
                                      :
3RD HOME LIMITED and WADE SHEALY,     :
                                      :
                      Defendants.     :
                                      :
-------------------------------------X

APPEARANCES

For Lightbox Ventures, LLC and Andrew Ellner:
Brem Moldovsky
Brem Moldovsky, LLC
411 Lafayette Street, 6th Floor
New York, New York 10003

For 3RD Home Limited and Wade Shealy:
Phillip Byron Jones
Evans, Jones & Reynolds, P.C.
401 Commerce Street, Suite 710
Nashville, TN 37219

DENISE COTE, District Judge:

     This litigation arises out of a failed joint venture

("Joint Venture") between plaintiff Lightbox Ventures, LLC

("Lightbox") and defendant 3RD Home Limited ("Third Home").  The

Joint Venture was designed to facilitate the sale of high-end

vacation properties by Lightbox.  The parties have cross-moved

for summary judgment.  For the following reasons, the summary

judgment motions are each granted in part.

The history of this litigation is set out in this Court's October 28, 2016 Opinion, with which familiarity is assumed. Lightbox Ventures, LLC v. 3RD Home Ltd., 16-cv-2379(DLC), 2016 WL 6562107 (S.D.N.Y. Oct. 28, 2016). The following facts are undisputed unless otherwise noted.

Third Home was established as a luxury home exchange program in 2011 by Wade Shealy ("Shealy") and others. Shealy is Third Home's Chief Executive Officer ("CEO"). On January 11, 2011, Third Home obtained registrations for the trademarks "3RD HOME" (Registration No. 3,905,513) and "3RD HOME" with a symbol of a house replacing the letter "O" (Registration No. 3,905,514).

Third Home operates a website -- www.3rdhome.com -- that allows its members to exchange time in their luxury homes. Once an individual becomes a member of Third Home's property exchange program, and their property is determined to be eligible, they can spend days in a luxury home owned by another member in exchange for allowing other members to stay in their home. For example, a Third Home member who owns a home in Antigua may permit another member to stay in his home for one week, and in return may stay in another member's home in Vail, Colorado for a week. These exchanges are facilitated by the use of points or "keys," which is the currency used in the exchange program to

reserve time in a given property.  By October 2015, Third Home had approximately 6,500 members.

Andrew Ellner ("Ellner") is a former managing director at Lehman Brothers.  He is also a member of and investor in Third Home.  In 2015, Ellner established Lightbox as an online real estate listing and sales business for luxury vacation homes and contacted Third Home about forming a joint venture.  Hoping that Lightbox would earn brokerage commissions and other fees from the sale of vacation homes through the joint venture, Ellner proposed that Third Home promote Lightbox's online real estate sales business via a link on Third Home's website.

Lightbox and Third Home entered into a joint venture agreement ("the Agreement") on July 13, 2015.  Shortly thereafter, on August 27, Lightbox acquired its first real estate brokerage license.  That license is for the State of New York.  Neither Lightbox nor Ellner are licensed real estate brokers in any other jurisdiction.

## A. The Agreement

The stated purpose of the Agreement is "to establish a joint venture between the parties to create an online platform for the resale of vacation homes, fractional ownership properties and other properties eligible to be listed on 3RDHOME.COM, which is to be linked to the existing 3RD HOME site."  Paragraph 1 of the Agreement describes Lightbox's

obligations.  These included paying for the necessary build-out of a website for the Joint Venture and managing the sale of real estate business.

Paragraph 1 provides in pertinent part:

a.  [Lightbox] shall be responsible for fronting the cost for the technology build-out of the 3RD Home website including an interface for [Lightbox] use. Fronting the cost of the creating a [Lightbox] website at a level equivalent to the 3RD Home site is also the financial responsibility of [Lightbox].

  . . .

c.  [Lightbox] shall be fully responsible for managing any and all interactions with buyers and sellers and potential buyers and sellers, as well as all intermediaries for any sale, including local real estate brokers, property management companies and local attorneys as needed.

  . . .

f.  [Lightbox] agrees that it will share evenly with 3RD Home (50%/50%) all profits realized from this business venture after deducting reasonable direct costs of doing business, which costs will be documented and records presented to 3RD Home upon request.  However, this profit share will begin only after the outlay for the technology build-out has been recouped, as described in paragraph 2b below.

(Emphasis supplied.)

Paragraph 2 of the Agreement describes Third Home's obligations.  These included maintaining an active link to the Joint Venture website, forwarding all inquiries regarding property sales to Lightbox, and not entering into any "similar"

4

arrangement with another real estate sales business.  Paragraph

2 provides in pertinent part:

a.  <u>3RD Home agrees to keep an active link on their site to the [Lightbox] site</u>, this link shall be in a prominent place which is easily recognizable and usable by potential buyers and sellers of properties through the site.  The location and visibility of the link shall be agreed upon between the parties with final determination by 3RD HOME.

b.  3RD Home agrees that the first profits of [Lightbox] will go toward reimbursing [Lightbox] for the technology build-out mentioned earlier in paragraph 1(a).  After that amount has been reimbursed, the 50%/50% profit sharing will begin and continue as long as this Agreement remains in full force and effect.

c.  <u>3RD Home agrees to forward all inquiries related to the buying and selling of vacation homes, residence clubs, fractionals and the like to [Lightbox] and that 3RD Home will be a passive partner in the sales and marketing of these homes</u>, with its only active role being the maintenance of the links on the 3RD HOME site with [Lightbox].  It will forward all inquiries regarding sales and purchases of vacation homes, residence clubs, fractionals and the like to [Lightbox] exclusively and in a timely manner.

d.  <u>3RD Home agrees to [sic] that this arrangement is exclusive</u> and that they will not enter into any similar arrangement with another sales and marketing organization without the permission of [Lightbox].

e.  3RD Home will be responsible for all relationships with the affiliates.  In the interest of maintaining these relationships, 3RD Home retains the right to determine that certain affiliate properties may not be able to be sold through [Lightbox].  3RD Home will inform [Lightbox] in writing of such an exclusion, should it occur.

f.  3RD HOME will make the final determination of the name and the URL of the resale business.  <u>All 3RD HOME names, marks, and other proprietary assets that may be</u>

used in conjunction with the marketing of this program
will remain the exclusive property of 3RD HOME at all
times during the term and after.

(Emphasis supplied.)

The Agreement contained a number of other provisions,
including a choice of law provision selecting New York law and a
provision shifting attorneys' fees.  The Agreement requires
written notice of any requests or demands made under the
Agreement.

The parties envisioned that the Agreement would be
supplemented by a document addressing termination of the
relationship in more detail.  Paragraph 15 of the Agreement
titled "Termination" provides:

This is a temporary interim agreement to indicate the
intent of the parties, and will remain in effect until
July 13, 2017 or earlier if superseded by a later
agreement.  If 3RD HOME should desire to terminate
because of unanticipated issues before July 13, 2017
then it will promptly reimburse LightBox for any
unreimbursed costs of the technology build out.
Additional terms regarding termination of this
agreement and the rights and steps to terminate it are
expected before August 31, 2015.

(Emphasis supplied.)

Ellner signed the Agreement on behalf of Lightbox.  An
authorized representative for Shealy signed the Agreement on
Shealy's behalf.

**B. The Amendment**

In December 2015, the parties executed an amendment to the Agreement that principally modifies the termination provision contained in Paragraph 15. The amendment extended the Joint Venture to July 1, 2018, but outlined the terms by which either of the parties could terminate it earlier. It reads in pertinent part as follows:

15. TERMINATION

(a) <u>The Agreement shall be for a term of thirty (30) months, expiring on July 1, 2018, unless terminated earlier</u> in accordance with the provisions set forth below. . . .

(b) LIGHTBOX VENTURES may terminate this Agreement in advance of its expiration upon thirty (30) days' written notice. In the event LIGHTBOX VENTURES terminates this Agreement pursuant to this clause, it waives any claim it has or may have for reimbursement of the technology costs referenced in Paragraph 1(a), herein, and the fees referenced in 1(d), herein. Furthermore, in the event LIGHTBOX VENTURES so terminates this Agreement in advance of its expiration, without selling its portion of the joint venture to either 3RD HOME or a third party, in accordance with the terms of Paragraph 16 herein, it thereby waives any claim it has or may have to its share of the joint venture between the parties as set forth in this Agreement.

(c) <u>3RD HOME may terminate this Agreement in advance of its expiration upon a upon [sic] thirty (30) days written notice without cause</u>. In the event of an early termination pursuant to this clause, 3RD HOME agrees to reimburse LIGHTBOX VENTURES for the technology costs referenced in Paragraph 1(a) herein, to the extent those costs are not already fully recouped at the time of said termination, pursuant to Paragraph 1(f), herein. Furthermore, in the event 3RD HOME elects to terminate this Agreement in accordance

with this Paragraph 15(c), it agrees that it will not re-enter the business of or otherwise operate, in any manner, an online platform for the sale and resale of vacation homes and fractional ownership properties or otherwise engage in any venture which is intended to compete with or does compete with LIGHTBOX VENTURES in the business contemplated by this Agreement for a period of time totaling two (2) years following the date of termination of this Agreement.  Nothing herein however shall restrict, prohibit or otherwise restrain 3RD HOME from the continued operation of its other business activities, including but not limited to its operation of a vacation property management and home exchange website and those matters related hereto.

(d)  Either party may terminate this agreement due to cause as follows.  In the case of LIGHTBOX VENTURES, they may terminate this Agreement due to cause if 3RD HOME does not adequately create an attractive inventory of homes and/or generate adequate sales leads.  If 3RD HOME is unable to cure such poor performance within a reasonable period of time, and LIGHTBOX VENTURES decides to exercise its right to terminate the Agreement due to cause, 3RD HOME agrees not to re-enter the business of or otherwise operate, in any manner, an online platform for the sale and resale of vacation homes and fractional ownership properties or otherwise engage in any venture which is intended to compete with or does compete with LIGHTBOX VENTURES in the business contemplated by this Agreement for a period of two (2) years following the date of termination of this Agreement.  In the case of 3RD HOME, they may terminate due to cause if LIGHTBOX VENTURES does not expeditiously follow up on leads generated and otherwise make a good faith effort to generate sales as contemplated by this Agreement.  If LIGHTBOX VENTURES is unable to cure such poor performance within a reasonable period of time, 3RD HOME will promptly reimburse LIGHTBOX VENTURES for any unreimbursed costs of the technology build out and may continue to operate the business independently.

(e)  In addition, in the event 3RD HOME wishes to terminate this Agreement with LIGHTBOX VENTURES but continue to operate the business of the joint venture contemplated by this Agreement independently of LIGHTBOX VENTURES, 3RD HOME will buy out LIGHTBOX

VENTURES from the joint venture, and the price of such buyout will be determined by averaging three (3) separate prices determined by three separate and independent accredited business valuation professionals who will each value the joint venture created by this Agreement. 3RD HOME will pay all costs of such valuations. At the conclusion of these valuations 3RD HOME will pay to LIGHTBOX VENTURES an amount equal to fifty percent (50%) of the average of the three (3) values as determined by the aforementioned business valuation professionals. Upon such payment the joint venture between the parties shall terminate.

(Emphasis supplied.)

The amendment also included provisions concerning the winding up of the Joint Venture and the use of either party's trademarks.

(f)   In the event of a termination of this Agreement pursuant to Paragraph 15 above (by LIGHTBOX VENTURES) or 15(c), above (by 3RD HOME), it is agreed and understood that the operation of the joint venture shall cease within a reasonable time thereafter. In such event, the parties agree to cooperate with one another to wrap up the affairs of the joint venture in an appropriate and orderly manner, and to sign any and all documents necessary to effectuate the termination and dissolution of the joint venture. As part of the winding up of the affairs of the joint venture, it is agreed and understood that each party will take those steps necessary, and within a reasonable period of time, to deactivate any links to their respective websites that identify the remaining party.

(g)   Other than as set forth herein, neither party shall have the right to use the other party's trademarks or name in any manner whatsoever other than in the materials that are approved in writing by the party whose trademarks or name is being used, and only for the express purposes set forth herein. Any such permission to use the aforementioned names and/or marks shall cease upon the expiration or termination of this Agreement, in accordance herewith.

(Emphasis supplied.)  Ellner and Shealy signed the amendment.

## C. Exclusive Brokers

At the same time that Third Home was amending its agreement with Lightbox, it started to execute about six contracts with other real estate brokers.  Each contract was for a specified luxury home region ("Exclusive Brokers").  In these contracts, Third Home principally agrees to offer complimentary membership to Third Home's exchange program to owners and buyers sponsored by the Exclusive Broker and to promote the Exclusive Broker's business on Third Home's website.  In return, the Exclusive Broker agrees to pay Third Home an upfront fee and promote the Third Home luxury home exchange program to its owners and buyers.  The upfront fee, which ranged from $2,500 to $10,000 generally gives the Exclusive Broker "the agreed territory for exclusive representation for one year."  Of particular relevance to the instant dispute, some of these contracts also include a provision indicating that the Exclusive Broker "will receive all the leads generated by [Third Home's] inbound members and by our real estate posting site and as part of this agreement agrees to pay a referral fee of 25% on any real estate transaction that takes place based on that referral buying or selling." (Emphasis in original.)

A December 2015 draft of one such contract required the Exclusive Broker to pay the 25% referral fee to Third Home's "partner" Lightbox. A later version of this contract omitted the duty to pay Lightbox. Third Home received $52,500 from Exclusive Brokers in 2016.[1] Lightbox has not received any of these funds.

### D. Joint Venture's Operations

In January 2016, the website contemplated by the Joint Venture ("Website") -- www.3rdhomerealestate.com -- became operational.[2] Lightbox spent over $60,000 to build the Website.[3] Third Home has not reimbursed Lightbox for this expense of the Joint Venture.

Third Home also provided Ellner with an email address for use in connection with the Joint Venture. Ellner was given the email address andy@3rdhomerealestate.com.

---

[1] Third Home's financial records characterize the fees it received from the Exclusive Brokers as "Exclusive Real Estate Agent Fee," "Exclusive Realtor affiliate fees," "Exclusive Brokerage fee[s]," "Exclusive Realtor Fee," "Exclusive Affiliate Revenue," or something similar.

[2] Third Home registered the domain name 3rdhomerealestate.com on or around October 9, 2015 in Shealy's name.

[3] Most, if not all, of these costs appear to have been paid in the first instance by another of Ellner's companies, Lightbox Capital Management LLC ("Lightbox Capital"). The parties dispute whether the figure is approximately $67,088 or $62,158. Some of the supporting invoices submitted with this motion are illegible.

No properties were ever sold through the Website, and the Joint Venture has not collected any commissions or revenue from the sale of any properties. The Joint Venture only procured two listing agreements from two property owners before the commencement of this lawsuit. One of the signed listing agreements concerned a timeshare in Costa Rican property owned by Ellner himself and valued at less than $200,000. The second agreement was for a timeshare in Aspen, Colorado.

Under these listing agreements, the owners of the properties retained the Joint Venture "for the purpose of marketing and/or selling" the properties on the Website. The owners agreed to give the Joint Venture a commission upon the sale of their properties "when such sale is either directly or indirectly the result of the Buyer, or a broker representing the Buyer, contacting 3rdHomeRealEstate.com to inquire about this or another property listed on 3rdHomeRealEstate.com." The commission percentage ranged from 6% to 10% depending on the price at which the property was sold, but the agreement acknowledged that the commission would be split with the buyer's broker if that broker made the initial contact with the Joint Venture. The agreements expired after one year unless a contract was signed during that time.[4]

_____

[4] In addition, Ellner has submitted two listing agreements with real estate brokers dated March 21 and April 13, 2016. Under

According to a list prepared by Ellner, as of March 2016, the Website had eighteen properties with listing prices totaling approximately $33 million ("Ellner List").[5]  The list calculates commissions for the sale of each property ranging from 4% to 10% of the listing price, and arrives at a total "possible" commission figure of $1,383,615.  Although the Website was operational, Third Home never activated the link to the Website from the Third Home website.  By February 2016, the relationship between Ellner and Shealy had soured.  Ellner repeatedly raised concerns with Shealy about Third Home's arrangements with the Exclusive Brokers.  On March 21, Ellner received an email from a broker stating that Shealy had expressed concern with her listing certain real estate property on the Website because one of the Exclusive Brokers "has an exclusive."  Third Home did not provide copies of the contracts with the Exclusive Brokers to Lightbox before the commencement of this litigation.

---

these agreements, the brokers retain the Joint Venture for the purpose of marketing and/or selling properties and agree to give the Joint Venture a commission, upon the sale of the properties when the sale is the result of the buyer or the buyer's broker contacting the Joint Venture to inquire about the property in question.  The agreements do not identify or describe the covered property or properties.

[5]  Lightbox has submitted a printout of the Website listing fifteen properties, and in some cases, listing prices for these properties.  The properties on the printout of the Website that are legible appear to be included on the Ellner List.

On March 8, counsel for Third Home sent Lightbox a written notice of termination.  The notice stated that Third Home was exercising its termination rights under Paragraph 15 and sub-paragraph 15(e).  Third Home sent a second letter to Lightbox on March 21 insisting on its "unconditional right to terminate under Section 15(e)" and to arrange a time for the parties to discuss valuation of the Joint Venture.  Third Home never hired or paid the cost of the appraisals of the Joint Venture specified in 15(e) of the amended Agreement.

**E. The Lawsuit**

Lightbox filed this lawsuit on March 31, 2016, alleging that Third Home had breached the Agreement and its fiduciary duties to Lightbox.  Lightbox sought declaratory relief, damages, and its fees and costs.  In its original complaint Lightbox declared that it "is choosing to exercise its right to terminate [the Agreement] for cause pursuant to Amendment, ¶15(d)" and sought a declaration that "the Agreement has been validly terminated for cause by Lightbox."  Third Home answered the complaint on April 28, and pleaded four affirmative defenses including lack of subject matter jurisdiction,[6] inappropriate venue, and lack of consideration because the Joint Venture was never launched.

---

[6]  Third Home asserted that the jurisdictional amount required for diversity jurisdiction was absent.

While the litigation was ongoing, the parties skirmished over the Joint Venture's internet presence. The Website was taken down at Shealy's instruction on or around July 19, 2016. After the Website was taken down, on July 21 and July 22, Ellner used his andy@3rdhomerealestate.com email address to inform Joint Venture clients that "there is a temporary problem with the 3rdhomerealestate.com website," and apologizing on behalf of "Wade and I." On July 21, Shealy wrote Ellner "please do not include me or my name on any more emails."

Ellner then acted to restore the listings on a separate website that also used the name "3rdhome." On July 21, Ellner registered a new domain name -- 3rdhomerealty.com. (The domain name for the Website was 3rdhomerealestate.com.) With the new domain name registered, on July 27 and July 28, Ellner informed clients with properties listed on the Website that their listings are "again live" on the 3rdhomerealty.com website. The 3rdhomerealty.com website depicted the "3RD HOME" trademark, which had been registered to Third Home since 2011.

On August 8, counsel for Third Home sent Lightbox and Ellner a letter indicating that the Agreement had been terminated and that their use of websites and email addresses using Third Home's name and marks constituted violations of law.[7]

---

[7] The letter alleged violations of the Lanham Act, 15 U.S.C. § 1051 et seq., related state laws, the Uniform Domain Name

The letter demanded that Lightbox and Ellner "immediately cease and forever desist from the use of the Marks and confusingly similar variations of the Marks in any form, including the Domain Names, in website content, email addresses, and in any other form."[8]  Meanwhile, on or around July 28, the domain name thirdhomerealestate.com was registered in Shealy's name.

On August 25, Lightbox filed an amended complaint ("FAC"). The FAC added Shealy as a defendant and included a cause of action against Shealy for aiding and abetting Third Home's breach of fiduciary duty.  The FAC also modified Lightbox's request for a declaratory judgment.  Instead of seeking a declaration that it had already terminated the Agreement for cause, the FAC states that Lightbox "may choose to exercise its right to terminate for cause pursuant to Amendment, ¶15(d)" and asks for a declaration that the Agreement "may" be validly terminated for cause by Lightbox.  Finally, the FAC added an alternative cause of action for a permanent injunction mandating Third Home's compliance with the Agreement.

---

Dispute Resolution Policy ("UDRP") approved by the Internet Corporation for Assigned Names and Numbers ("ICAAN"), and the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d).

[8]  As indicated in the letter, "Marks" refers to Third Home's registered trademarks (Registration Nos. 3,905,513 and Registration No. 3,905,514).  "[T]he Domain Names" refers to 3rdhomerealestate.com, 3rdhomerealty.com, and thirdhomerealestate.com.

On September 6, the defendants answered the FAC and Third Home asserted counterclaims against Lightbox under the Lanham Act, related state laws, UDRP, and ACPA.  Third Home also filed a third-party complaint against Ellner, alleging similar violations.  Lightbox's motion for a preliminary injunction was denied on October 28.  Lightbox Ventures, 2016 WL 6562107.

In December, Anvil Advisors, LLC ("Anvil"), a financial consulting firm, prepared a report for Lightbox analyzing the Joint Venture's value and damages as of March 4, 2016 ("Anvil Report").  Anvil assessed the Joint Venture's damages based on its existing listings through March 4, 2016 to be $278,478, and its value based on a projection of listings after March 4, 2016 as $6,606,847 million.[9]

On January 12, 2017, the parties' request to stay the case pending settlement discussions was granted.  On February 4, the Patent and Trademark Office accepted Third Home's request to amend its trademark "3RD HOME" (Registration No. 3,905,513) to "THIRDHOME" because it had "modified its use of the mark in commerce."  On or about March 18, Third Home deactivated Ellner's andy@3rdhomerealestate.com email address.

On April 3, the stay was lifted.  An April 20 preliminary injunction barred Lightbox and Ellner from using Third Home's

---

[9] Anvil supplemented its valuation report on April 20, 2017 ("Supplemental Report").

trademarks or "confusingly similar variations" of Third Home's trademarks "in any form" pending the outcome of this litigation. On April 21, a second business valuation firm -- Scalar Analytics ("Scalar") -- issued a report for Lightbox valuing the Joint Venture at $11,618,560 million as of March 14, 2016 ("Scalar Report").[10]

On June 13, in connection with the close of discovery, the defendants filed a motion pursuant to Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), seeking to exclude the testimony of Lightbox's valuation experts at Anvil and Scalar. The Daubert motion is addressed below. That same day, the defendants also moved for partial summary judgment on Lightbox's causes of action, arguing that Lightbox cannot demonstrate its entitlement to damages. They argue that Lightbox is not entitled to the costs it incurred in developing the Website, to revenue generated by Third Home's contracts with the Exclusive Brokers, or to other damages based on the value of the Joint Venture. On June 16, Lightbox and Ellner moved for summary judgment in their favor on all of Lightbox's causes of action and Third Home's counterclaims and for leave to amend the amended complaint to conform to the evidence. As for damages, their motion only moves for summary

---

[10] In supplying information to Scalar, Ellner represented that the Website had listings of $65 million as of March 14.

judgment on damages incurred in developing the Website and
damages based on the overall value of the Joint Venture.

## DISCUSSION

Summary judgment may not be granted unless all of the
submissions taken together "show[] that there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary
judgment is appropriate when the record taken as a whole could
not lead a rational trier of fact to find for the non-moving
party."  Smith v. Cty. of Suffolk, 776 F.3d 114, 121 (2d Cir.
2015) (citation omitted).  The moving party bears the burden of
demonstrating the absence of a material factual question, and in
making this determination, the court must view all facts in the
light most favorable to the non-moving party.  See Eastman Kodak
Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992);
Gemmink v. Jay Peak Inc., 807 F.3d. 46, 48 (2d Cir. 2015).
"[W]here the evidentiary matter in support of the motion does
not establish the absence of a genuine issue, summary judgment
must be denied even if no opposing evidentiary matter is
presented."  Sec. Ins. Co. of Hartford v. Old Dominion Freight
Line Inc., 391 F.3d 77, 83 (2d Cir. 2004) (citation omitted)
(emphasis omitted).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, "the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation omitted). "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment," Ridinger v. Dow Jones & Co. Inc., 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted), as is "mere speculation or conjecture as to the true nature of the facts." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).

## I.   Third Home's Motion to Exclude Expert Testimony

Third Home has moved to exclude the two expert reports prepared on behalf of Lightbox.  Federal Rule of Evidence 702 governs the admissibility of expert testimony.  It provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b) the testimony is based on sufficient facts or data;

    (c) the testimony is the product of reliable principles and methods; and

    (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The proponent of expert testimony carries the burden of establishing its admissibility by a preponderance of the evidence. United States v. Williams*,* 506 F.3d 151, 160 (2d Cir. 2007). Expert testimony admitted under Rule 702 must be relevant and rest on a reliable foundation. Daubert, 509 U.S. at 597; Williams, 506 F.3d at 160. An expert's opinion is relevant if it will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; see Daubert, 509 U.S. at 591.

An expert's opinion must have "a reliable basis in the knowledge and experience of his discipline." Daubert, 509 U.S. at 592. In order to be admissible, an expert opinion "requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion."

Riegel v. Medtronic, Inc.*,* 451 F.3d 104, 127 (2d Cir. 2006).

"[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." Ruggiero v. Warner–Lambert Co.*,* 424 F.3d 249, 255 (2d Cir. 2005) (citation omitted). Expert testimony must likewise be excluded if it is "speculative or conjectural" or if it is based on assumptions that "are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." Restivo v. Hessemann, 846 F.3d 547, 577 (2d Cir. 2017) (citation omitted).

Experts may rely upon otherwise inadmissible facts or data in reaching conclusions "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703. But an expert cannot simply transmit hearsay to the jury. United States v. Mejia*,* 545 F.3d 179, 197 (2d Cir. 2008). The expert must still "form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials." Id. (citation omitted). "[A] party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." Marvel Characters, Inc. v. Kirby*,* 726 F.3d 119, 136 (2d Cir. 2013) (citation omitted). Moreover, expert testimony

that usurps the role of the fact finder must be excluded.
United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999).

Third Home challenges the testimony of Anvil's Lan Nguyen
("Nguyen") and Scalar's Mitchell Rencher ("Rencher"), two
individuals designated by Lightbox to value the Joint Venture.
Neither has ever testified as an expert witness. Nguyen is
Anvil's Founder and President. Nguyen's reports are generally
prepared for the private use of his clients. Rencher is
Scalar's Head of Consulting.

## A. Anvil Reports

The Anvil Report and Supplemental Report contain two
valuations. One assesses damages as of March 4, 2016; the other
determines the fair market value of the Website,
3rdHomeRealEstate.com, as a going concern for the period
following March 4, 2016. The first valuation is $278,487; the
second is $6,606,847.

As for the first valuation, the Anvil Reports assess
damages through March 4, 2016 based on the inability of Lightbox
to monetize "existing real estate brokerage contracts." Using
presumed listing property values that total close to $100
million, Anvil determines the damages to be $278,487. The
Reports assert that the Joint Venture "had a non-exclusive
contract to sell 28 units in the Viceroy Anguilla and exclusive
contracts to sell fractional interest in 8 other units located

23

in Costa Rica, California, Mexico and Aspen." The documents on which Anvil relied to prepare this analysis are identified in the Anvil Report as the plaintiff's Rule 26(a)(1) initial disclosure and the parties' pleadings. It explains that it did not independently verify the information supplied by Lightbox.

The damages analysis reflects numerous other assumptions as well. First, it assumes that the Lightbox had contracts in place to list and sell the identified interests. The record contains evidence that Lightbox only had listing agreements with property owners to sell two properties. Even if one assumes that a signed listing agreement existed for each of the properties on the Ellner List, the number of properties is not greater than eighteen.

Anvil further assumes that Lightbox would obtain all applicable licenses to sell these properties. There is no evidence that Lightbox has obtained a brokerage license in any of the jurisdictions in which the properties were located.

For the twenty-eight Anguilla properties, Anvil assumes all twenty-eight properties would be sold within fifteen months and that each sale would be near an assumed price point of $3.5 million. The Anvil Report states that the 100% sale assumption for the Anguilla properties is "based on Lightbox's best estimate" and knowledge of the new development market since "a developer has to repay its construction financing, therefore

eventually they must sell everything."  The Reports do not
identify the source for the sale price figure of $3.5 million
for each of the Anguilla properties and Lightbox has not
supplied evidence to fill that gap.

For the remaining properties in Costa Rica, California,
Mexico, and Colorado, Anvil estimates that approximately 33% of
would be sold at or near assumed price points between $60,667
and $320,000, and that those sales would occur within three to
six months.  Anvil supports its 33% completed sales figure by
referring to the New York City "investment property" market as
informative.  It explains that real estate data "was generally
not available" for the relevant markets, and that "by necessity"
it made assumptions based on the available data for New York,
which it asserts shares "a similar level of liquidity."  Using
these and other assumptions, including that the sales would
generate revenue for the Joint Venture, the Reports determine
lost profits by calculating the expected revenue or profits to
be generated by the assumed sales, subtracting additional costs
required to receive the expected revenue, and adjusting for the
time value of money based on how long it would take to receive
the net revenue or profit.

The Anvil Reports also opine on the value of projected
listings for the Website after March 4, 2016.  They arrive at

the valuation of $6,606,847.[11]  Because the business "has barely

any track record," Anvil warns that the projection is "highly

dependent upon the assumptions and inputs used."  Accordingly,

the Supplemental Report's first sensitivity grid projects the

value at anywhere from $372,000 and $31,215,000.  Anvil also

disclaims any opinion as to whether the business could actually

be sold.[12]

The Anvil valuation is derived from the first-year revenue

and growth projections that Lightbox provided to Anvil, which

Anvil accepted without verification and then supplemented with

industry data.[13]  The figures Lightbox provided included the

number of Third Home members, the percentage of potential sale

listings the Joint Venture would win, the average sales price,

and cost assumptions, among other things.[14]  The Lightbox

---

[11]  The Reports assume that as of March 4, 2016, "there had been
no material adverse change in the assets, financial condition,
business or prospects" of the Joint Venture.

[12]  The Reports state that "we express no opinion as to whether
[the business] would actually be sold for the amount we believe
to be its Fair Market Value to any particular buyer."

[13]  According to the Reports, Lightbox asked Anvil "to rely and
assume, without independent verification, that the data provided
to us by LightBox were accurate, reasonably prepared and
reflected the best available estimates of the future financial
results and condition" of the business.

[14]  These assumptions were made more complicated by the degree to
which Third Home property owners held only fractional shares in
property.

projections also included an assumed annual growth rate of 40%
projected over four years, which Anvil did little to validate.[15]
As it had done with the damages analysis, Anvil relied on market
data about New York City investment property to estimate the 33%
probability that listed properties would sell.

Third Home has shown that the Anvil Reports must be
stricken. Even if it is assumed that Anvil is qualified to
provide an opinion on damages as of March 2016 and on the value
of the Joint Venture after that date, its Reports are not based
upon the kind of information which valuation experts require to
form their opinions. Anvil's valuations rely instead on
unverified information and optimistic projections provided by
Lightbox and industry data that is of limited relevance.
Lightbox has not submitted admissible evidence to support the
description of facts that it tendered to Anvil and asked Anvil
to assume for the purposes of its valuations. The number of
unsupported assumptions at play in Anvil's analysis renders it
unreliable. Among other things, there is no evidence provided
for the assumption that the sale of any listed property would
entitle the Joint Venture to earn a commission. As the Joint
Venture's listing agreements with the property owners explain,

---

[15]  Anvil noted that the growth rate was inferred from a March
2015 document prepared by a Third Home employee and that it
falls within "the high and low of similarly publicly-listed
companies."

the Joint Venture would earn a commission only if the sale of a property "is either directly or indirectly the result of the Buyer, or a broker representing the Buyer, contacting 3rdHomeRealEstate.com to inquire about [the property] or another property listed on 3rdHomeRealEstate.com."  In addition, the disclaimers that accompany the valuation analyses and the large range in the potential valuations undermine any remaining value in the expert opinion and invite jury speculation.

**B. Scalar Report**

The Scalar Report values the Joint Venture at $11,618,560 as of March 14, 2016.  This figure represents the equity value of the Joint Venture if Third Home were required to buy out Lightbox pursuant to Paragraph 15(e) of the Agreement.  Scalar arrives at this figure by calculating the Joint Venture's value using six different methodologies.  The six valuations ranged between $469,028 and $21,909,278 million.  Scalar then weighted each methodology to arrive at a single valuation figure.

In performing its analysis, Scalar relied on information provided to it by Lightbox and industry data.  The information it received from Lightbox included projections for the growth of the business and a representation that the Joint Venture had approximately $65 million in listings "on the site" as of March

14, 2016, neither of which Scalar verified.[16]  Scalar relied on

this information in a variety of ways that bear on its

$11,618,560 valuation.  For instance, the $65 million figure

influences Scalar's assessment of the Joint Venture's stage of

development, is incorporated into Scalar's revenue forecasts,

influenced Scalar's valuation of the Joint Venture using a

methodology based on the value of "similar" companies and

transactions, and influenced Scalar's overall assessment of the

Joint Venture's strengths and weaknesses.  Lightbox has not

provided evidence to support either the projections it provided

to Scalar or the $65 million figure.

The Scalar Report's weighting of various methodologies

presupposes Third Home's malfeasance.  For instance, Scalar only

gave a certain valuation methodology a 5% weighting because it

would "inappropriately reward 3rd Home for their obstructive

---

[16]  In connection with the instant motions, Lightbox and Ellner
represent that by March 2016, "the [Website] had at least $31
million in listings, with tens of millions of dollars in
'shadow' listings (additional unsold units at a development
shown on the [W]ebsite) available, committed or soon to be
committed, with an estimated value of $65 million, and really in
excess of $150 million."  Lightbox has not submitted evidence
that establishes that the Website had listings worth $65 or $150
million.  The $65 million figure is roughly twice the
approximately $33 million in total listings contained in the
Ellner List.  To support these figures, Ellner supplies emails
and other documents from 2015 and 2016.  These documents do not
establish the $65 or $150 million figures asserted.

actions," including by giving competing brokers access to Third Home's network of luxury home owners.

The Scalar Report must also be excluded.  Without a showing that it is customary and reasonable for an expert to value a new enterprise based on listings of property on a website, particularly when no commissions have yet been earned from the sale of any listed properties, the expert report fails to meet the evidentiary standards imposed by <u>Daubert</u>.  Moreover, without a basis to find that the data regarding the listings and the projections for the business were reliable, any valuations based on the data must be stricken.  Despite the volume of analysis provided by Scalar, its valuation is ultimately a projection built on sand.

## II.   Third Home's Breach of Contract

Lightbox has moved for summary judgment on three separate causes of action for breach of contract.  The causes of action relate to Third Home's (1) failure to activate a link to the Website on the Third Home webpage, (2) failure to act as a "passive partner" in the sales and marketing of homes, and (3) entering into competition against the Joint Venture, among other things.  In connection with this motion, Lightbox only moves for summary judgment on damages it incurred in developing the Website and damages based on the overall value of the Joint Venture.  Third Home and Shealy have cross-moved for partial

summary judgment, arguing that Lightbox cannot establish its
entitlement to any damages. Specifically, they argue that
Lightbox is not entitled to website development costs, to
revenue generated by Third Home's contracts with the Exclusive
Brokers, and to other damages based on the value of the Joint
Venture. The parties agree that New York law applies to
Lightbox's breach of contract claims.

The elements of a breach of contract claim under New York
law are well established. They are "(1) the existence of an
agreement, (2) adequate performance of the contract by the
plaintiff, (3) breach of contract by the defendant, and (4)
damages." Eternity Global Master Fund Ltd. v. Morgan Guar.
Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004). A party
claiming consequential damages must demonstrate the existence
and amount of such damages with "reasonable certainty," and that
the damages were foreseeable and within the contemplation of
both parties. Tractebel Energy Mktg., Inc. v. AEP Power Mktg.,
Inc., 487 F.3d 89, 111 (2d Cir. 2007) (citation omitted).

Lightbox has shown that it is entitled to partial summary
judgment on each of its breach of contract claims. The parties
do not dispute that the Agreement as amended constitutes an
enforceable contract or Lightbox's performance under the
contract. There is also no doubt as to breach. Third Home
materially breached the Agreement in several ways. It is

undisputed that Third Home failed to activate the link from its own website to the Joint Venture's Website, in violation of Paragraph 2(a) of the Agreement. In addition, Third Home executed contracts with Exclusive Brokers that competed directly with the business of the Joint Venture. For instance, under Paragraph 2(c) of the Agreement, Third Home agreed to forward all sales inquiries exclusively to Lightbox. In some of its Exclusive Broker contracts, however, Third Home agreed to forward leads to the Exclusive Brokers. In doing so, Third Home also materially breached its obligation to remain a "passive partner" in the sales and marketing of homes, as required by Paragraph 2(c), and to treat the Joint Venture arrangement as exclusive, as set forth in Paragraph 2(d).

### A. Damages

As noted above, the parties have cross-moved for summary judgment on Lightbox's claims for damages. Each motion is granted in part.

Lightbox has demonstrated its entitlement to damages arising from Third Home's breaches. Pursuant to paragraphs 1 and 2 of the Agreement, Lightbox is entitled to any costs it incurred in building the Website.[17] Third Home does not dispute

---

[17] It appears that the actual costs of building the Website were incurred in the first instance by Lightbox Capital, a company also owned by Ellner.

Lightbox's entitlement to these costs under these paragraphs. It seeks to avoid its obligation to make this payment, however, by an offer to agree that the Website "is exclusively owned and controlled by Lightbox." That attempt to avoid payment of damages is denied.

Third Home has shown that it is entitled to summary judgment on the claim that Lightbox is entitled to any portion of the $52,500 that Third Home received from its Exclusive Broker contracts.[18] According to Third Home, the fees it obtained from the Exclusive Brokers are "marketing fees" and the financial records it has submitted indicate that the $52,500 does indeed represent the upfront fees paid by the Exclusive Brokers. Lightbox has offered no evidence to the contrary. Moreover, since the Joint Venture did not contemplate that Third Home would earn these fees, it contained no provision requiring Third Home to share the fees with Lightbox. While the breach of the Agreement entitles Lightbox to damages for that breach, it has not shown that the fees Third Home earned in these arrangements with the Exclusive Brokers -- even if these arrangements were entered in violation of the Agreement -- constitute such damages. They do not assert, for instance,

---

[18] Lightbox does not move for summary judgment on this claim for damages. This Opinion does not address whether Lightbox may be entitled to seek $52,500 on a theory other than its breach of contract claim.

amounts that reflect the benefit of the bargain that Lightbox lost from the breach or its lost profits.

Finally, the defendants are entitled to summary judgment on the plaintiff's request for consequential damages based on lost profits or the overall value of the Joint Venture. Under New York law, lost profits "may not be merely speculative, possible or imaginary." Schonfeld v. Hilliard, 218 F.3d 164, 172 (2d Cir. 2000) (New York law) (citation omitted). Moreover, "evidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate." Id. "Projections of future profits based upon a multitude of assumptions that require speculation and conjecture and few known factors do not provide the requisite certainty." Id. (citation omitted).

As described above, the Joint Venture's value or lost profits are not capable of proof with reasonable certainty. Third Home's motion to exclude Anvil's and Scalar's expert testimony has been granted. Lightbox has not submitted reliable expert evidence concerning the Joint Venture's value. The number of unsupported assumptions at play in the Anvil and Scalar reports render them useless. Lightbox fails to provide any evidence suggesting that its lost profits, the value of the enterprise, or any consequential damages can be assessed with

reasonable certainty in this case.  Summary judgment is granted in favor of the defendants on these claims for damages.

### III.  Lightbox's Declaratory Relief Causes of Action

Lightbox moves for summary judgment on its two causes of action for declaratory relief.[19]  It seeks declarations that:

> (1) [Third Home's] actions constitute material breaches of the Agreement and that, therefore, LightBox may be relieved of any further performance obligations pursuant to the Agreement, while [Third Home] would not be entitled to enforce the Agreement against Lightbox.
>
> (2) the Agreement may be validly terminated for cause by Lightbox.

Lightbox is entitled to these declarations.  As previously discussed, Third Home materially breached the Agreement by failing to provide a link to the Website and by entering into the contracts with the Exclusive Brokers.  Lightbox was entitled to terminate the Agreement.

### IV.    Third Home's Breach of Fiduciary Duty

Lightbox moves for summary judgment on its claim that Third Home violated its fiduciary duty when it began to compete with the Joint Venture by entering into the Exclusive Broker arrangements.  It requests compensatory and punitive damages. To establish a breach of fiduciary duty under New York law, a

---

[19]  In the alternative to its causes of action for declaratory relief, Lightbox asserts a cause of action for specific performance of the Agreement by Third Home.

plaintiff must show "(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." Johnson v. Nextel Commc'ns., Inc., 660 F.3d 131, 138 (2d Cir. 2011). Participants in a joint venture owe each other the same fiduciary duties that inhere between members of a partnership, including good faith, fairness, and loyalty. Newburger, Loeb & Co., Inc. v. Gross, 563 F.2d 1057, 1078 (2d Cir. 1977); Gramercy Equities Corp. v. Dumont, 72 N.Y.2d 560, 565 (N.Y. 1988); Stem v. Warren, 174 N.Y.S. 30, 34 (App. Div. 1919). Lost profits are recoverable under New York law for breach of fiduciary duty. Am. Fed. Group, Ltd. v. Rothenberg, 136 F.3d 897, 907 (2d Cir. 1998). In order to recover damages for lost profits on a claim for breach of fiduciary duty, one must prove that the loss was caused by a breach of fiduciary duty and "must prove with reasonable certainty, though not mathematical precision, the amount of the loss." Id. at 907-08. Punitive damages may be awarded "in fraud and deceit cases where the defendant's conduct evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations." Evans v. Ottimo, 469 F.3d 278, 283 (2d Cir. 2006) (citation omitted); see Renaissance Search Partners v. Renaissance Ltd. LLC, 12cv5638 DLC, 2014 WL 4928945, at *6 (S.D.N.Y. Oct. 1, 2014) (breach of fiduciary duty).

Third Home does not directly address –- let alone oppose --
Lightbox's motion with respect to its breach of fiduciary duty
cause of action.  Lightbox has shown it is entitled to partial
summary judgment on this cause of action.  Third Home owed
Lightbox a fiduciary duty as its Joint Venture partner and
knowingly breached that duty.  As described above, however,
Third Home has established its entitlement to summary judgment
on the claim for lost profits.[20]

## V.   Shealy's Aiding and Abetting Third Home's Breach of Fiduciary Duty

Lightbox moves for summary judgment on its claim that
Shealy, as Third Home's principal, aided and abetted Third
Home's breach of its fiduciary duties.  Under New York law, a
plaintiff seeking to establish a cause of action for aiding and
abetting a breach of fiduciary duty must show "(1) a breach by a
fiduciary of obligations to another, (2) that the defendant
knowingly induced or participated in the breach, and (3) that
plaintiff suffered damage as a result of the breach."  Lerner v.
Fleet Bank, N.A., 459 F.3d 273, 294 (2d Cir. 2006).

Shealy is Third Home's CEO.  He worked extensively with
Ellner to set up the Joint Venture, and helped to secure Third
Home's contracts with the Exclusive Brokers.  Shealy has not
opposed this prong of Lightbox's motion and Lightbox has shown

---

[20]  Neither party has addressed in these motions Lightbox's
request for punitive damages.

that it is entitled to partial summary judgment on this cause of

action for the reasons described above.

## VI.    Trademark Infringement Counterclaims

Lightbox and Ellner move for summary judgment on the claims

that Third Home has asserted against them that arise under the

Lanham Act in connection with their use of websites and email

addresses that contain Third Home's name and trademarks.[21]

Paragraph 15(g) of the amended Agreement provides that "neither

party shall have the right to use the other party's trademarks

or name in any manner whatsoever other than in the materials

that are approved in writing by the party whose trademarks or

name is being used."

Trademark infringement claims under of the Lanham Act are

analyzed in two stages.  Christian Louboutin S.A. v. Yves Saint

Laurent Am. Holdings, Inc., 696 F.3d 206, 216 (2d Cir. 2012).

First, a party must establish that its mark is entitled to

protection.  Id.  Once a party proves the mark is entitled to

protection, the party must then show that the other's "use of a

similar mark is likely to cause consumer confusion."  Id. at 217

---

[21]  Third Home's pleadings refer generally to state law claims as
well as a Lanham Act claim, but do not identify violations of
specific state laws.  "Under New York law, common law unfair
competition claims closely resemble Lanham Act claims except
insofar as the state law claim may require an additional element
of bad faith or intent."  Nadel v. Play-By-Play Toys &
Novelties, Inc., 208 F.3d 368, 383 (2d Cir. 2000) (citation
omitted).

(citation omitted).  A mark's registration with the United
States Patent and Trademark Office creates a presumption that
the mark is valid and entitled to protection.  Id. at 216-17.

To determine whether there is a likelihood of confusion,
courts look to the eight factors set out in Polaroid Corp. v.
Polarad Elecs. Corp., 287 F.2d 492 (2d Cir. 1961):

(1)  strength of the trademark;

(2)  similarity of the marks;

(3)  proximity of the products and their
     competitiveness with one another;

(4)  evidence that the senior user may 'bridge the
     gap' by developing a product for sale in the
     market of the alleged infringer's product;

(5)  evidence of actual consumer confusion;

(6)  evidence that the imitative mark was adopted in
     bad faith;

(7)  respective quality of the products; and

(8)  sophistication of consumers in the relevant
     market.

Kelly-Brown v. Winfrey, 717 F.3d 295, 307 (2013).  Courts'
application of these factors is not to be "mechanical, but
rather, [should] focus[] on the ultimate question of whether,
looking at the products in their totality, consumers are likely
to be confused."  Id. (citation omitted).

Lightbox's and Ellner's motion for summary judgment on
these causes of action is principally based on the argument that
their use of web and email addresses containing Third Home's
name were privileged under the Agreement.  Specifically, they

argue that Lightbox had the right to use Third Home's name and marks "until the Joint Venture wound down and was terminated, which it never has been."  As recited above, after Third Home took down the Website, www.3rdhomerealestate.com, Ellner set up a new website in July 2016 with the name 3rdhomerealty.com and sent out emails from an email address, andy@3rdhomerealestate.com.  Lightbox and Ellner do not challenge the validity of the Third Home marks or their entitlement to protection.

The defendants do not identify the precise periods involved, but their trademark claims appear principally addressed to the period between March 2016 (when Third Home sent its notice of termination and this lawsuit was commenced) and April 2017 (when Lightbox and Ellner consented to a preliminary injunction barring them from using Third Home's trademarks). There is no evidence to suggest that Lightbox or Ellner intend to resume use of Third Home's marks.

The motion for summary judgment by Lightbox and Ellner on the Lanham Act claims is denied.  Of course, in its original complaint, filed on March 31, 2016, Lightbox took the position that it was terminating the Joint Venture.  And, in the FAC, filed on August 25, it sought as relief a declaration that the Joint Venture may be terminated.  There remain questions of fact regarding whether Lightbox had a right between March 2016 and

April 2017 to continue to use web addresses or email addresses

identifying themselves as associated with Third Home.

## VII.   UDRP and ACPA Counterclaims

Lightbox and Ellner move for summary judgment on the claims

brought under the UDRP and ACPA in connection with Lightbox's

use of websites and email addresses containing Third Home's name

and trademarks.[22]  The ACPA, codified at 15 U.S.C. § 1125(d), was

enacted to protect consumers and trademark holders from

"cybersquatting," which involves:

> the registration as domain names of well-known
> trademarks by non-trademark holders who then try to
> sell the names back to the trademark owners.  Since
> domain name registrars do not check to see whether a
> domain name request is related to existing trademarks,
> it has been simple and inexpensive for any person to
> register as domain names the marks of established
> companies.  This prevents use of the domain name by
> the mark owners, who not infrequently have been
> willing to pay ransom in order to get their names
> back.

Mattel, Inc. v. Barbie-Club.com, 310 F.3d 293, 295 (2d Cir.

2002) (citation omitted).[23]

---

[22]  ICANN supervises an administrative system for resolving
domain name disputes under the UDRP.  Because domain name
disputes arising under the UDRP are generally resolved by a
mandatory, non-binding administrative proceeding, this Opinion
limits its analysis to Third Home's ACPA claim.

[23]  "A domain name is a unique string of characters or numbers
that typically is used to designate and permit access to an
Internet website."  Mattel, 310 F.3d at 295.

To successfully assert a claim under ACPA, a plaintiff must demonstrate that (1) its marks were distinctive at the time the domain name was registered; (2) the infringing domain names complained of are identical to or confusingly similar to plaintiff's mark; and (3) the infringer has a bad faith intent to profit from that mark.  See 15 U.S.C. § 1125(d)(1)(a).  The ACPA lists nine non-exclusive factors for courts to consider in determining whether a person has acted in bad faith:

>   (1) the trademark or other intellectual property rights of the person, if any, in the domain name;
>
>   (2) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
>   (3) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
>   (4) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
>
>   (5) the person's intent to divert customers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
>
>   (6) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(7) the person's provision of material and misleading
false contact information when applying for the
registration of the domain name, the person's
intentional failure to maintain accurate contact
information, or the person's prior conduct indicating
a pattern of such conduct;

(8) the person's registration or acquisition of
multiple domain names which the person knows are
identical or confusingly similar to marks of others
that are distinctive at the time of registration of
such domain names . . . , without regard to the goods
and services of the parties; and

(9) the extent to which the mark incorporated in the
person's domain name registration is or is not
distinctive and famous . . . .

15 U.S.C. § 1125(d)(1)(B)(i). The statute also sets forth a
"bad-faith safe harbor" provision where the defendant "believed
and had reasonable grounds to believe that the use of the domain
name was a fair use or otherwise lawful." 15 U.S.C. §
1125(d)(1)(B)(ii).

Lightbox's and Ellner's motion for summary judgment on
these claims is denied. As with Third Home's Lanham Act
counterclaim, there exist material questions of fact as to
whether Lightbox's use of web and email addresses using Third
Home's names and marks was permitted under the Agreement and
whether Ellner acted in bad faith.

## VIII. Motion to Amend the Amended Complaint

Lightbox moves for leave to file a second amended complaint
to conform to the evidence under Federal Rule of Civil Procedure
15. Its proposed second amended complaint principally adds that

Third Home sent Lightbox a notice of termination on March 8,
2016 under Paragraph 15 and sub-paragraph 15(e).

Under Federal Rule of Civil Procedure 15(a)(1)(2), a party
may amend its pleading only with the opposing party's written
consent or the court's leave.  Fed. R. Civ. P. 15(a).  "The
court should freely give leave when justice so requires."  Id.
Courts may refuse to grant leave to amend on grounds such as
undue delay or prejudice, bad faith, or futility of amendment.
Foman v. Davis, 371 U.S. 178, 182 (1962).

> A litigant may be prejudiced within the meaning of the
> rule if the new claim would: (i) require the opponent
> to expend significant additional resources to conduct
> discovery and prepare for trial; (ii) significantly
> delay the resolution of the dispute; or (iii) prevent
> the plaintiff from bringing a timely action in another
> jurisdiction.

Pasternack v. Shrader, 863 F.3d 162, 174 (2d Cir. 2017)
(citation omitted).  Mere delay absent a showing of bad faith or
undue prejudice is insufficient to deny the right to amend.  Id.
Nor can complaints of "the time, effort and money expended in
litigating the matter," without more, constitute prejudice
sufficient to warrant denial of leave to amend.  Id. (citation
omitted).

Third Home contends, without explanation, that it will be
"substantially prejudiced if it is now asked to defend a
completely revised lawsuit having already completed discovery
and briefed the case under Rule 56."  But it does not explain

44

why the plaintiff's proposed amendment would result in a "completely revised lawsuit." The issues surrounding Third Home's notice of termination have already been extensively litigated. Lightbox's request to amend the amended complaint under Federal Rule of Civil Procedure 15(a) is granted. Lightbox shall file a second amended complaint by November 17, 2017.

## CONCLUSION

Third Home's June 13 motion to exclude expert testimony is granted. Summary judgment is granted to Lightbox on its declaratory relief claims. Partial summary judgment is granted to Lightbox on its breach of contract, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty claims. Lightbox is awarded its costs incurred in connection with building the Website, with the precise figure to be determined.

Summary judgment is awarded to Third Home on the breach of contract claim for damages arising from Third Home's contracts with Exclusive Brokers. Summary judgment is awarded to Third Home on all claims for lost profits and consequential damages based on a valuation of the Website or Joint Venture.

Dated:     New York, New York
           November 13, 2017

                                   _____
                                        DENISE COTE
                              United States District Judge