UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
                                    :
LIGHTBOX VENTURES, LLC,             :
                                    :          16cv2379(DLC)
                    Plaintiff,      :
                                    :          OPINION AND
          -v-                       :              ORDER
                                    :
3RD HOME LIMITED and WADE SHEALY,   :
                                    :
                    Defendants.:    :
                                    :
------------------------------------X
------------------------------------X
                                    :
3RD HOME LIMITED and WADE SHEALY,   :
                                    :
                    Third-Party:    :
                    Plaintiffs,:    :
                                    :
          -v-                       :
                                    :
ANDREW ELLNER,                      :
                                    :
                    Third-Party:    :
                    Defendant. :    :
                                    :
------------------------------------X

APPEARANCES:

For the plaintiff and third-party defendant:
Brem Moldovsky
Brem Moldovsky, LLC
411 Lafayette Street, 6th Floor
New York, NY 10003

For the defendants:
Philip Byron Jones
Evans, Jones & Reynolds, P.C.
401 Commerce Street, Suite 710
Nashville, TN 37219

DENISE COTE, District Judge:

Plaintiff Lightbox Ventures, LLC ("Lightbox") commenced this suit on March 31, 2016, bringing claims of breach of contract and breach of fiduciary duty against defendants 3rd Home Limited ("Third Home") and Wade Shealy, the CEO of Third Home. Defendants bring three claims against Lightbox and against Third Home investor and Lightbox founder Andrew Ellner ("Ellner"), arising out of Ellner's use of the Third Home name and email address after this lawsuit was filed. There is diversity jurisdiction over this action. This Opinion contains the Court's findings of fact and conclusions of law following a bench trial on submission.

## Background

The following constitutes the Court's findings of fact. This case arises out of a failed joint venture (the "Joint Venture") between the parties. Familiarity with the Court's two prior Opinions in this matter is assumed. See Lightbox Ventures, LLC v. 3RD Home Ltd., No. 16cv2379(DLC), 2017 WL 5312187 (S.D.N.Y. Nov. 13, 2017) (the "Summary Judgment Opinion" or "Lightbox II"); Lightbox Ventures, LLC v. 3RD Home Ltd., No. 16cv2379(DLC), 2016 WL 6562107 (S.D.N.Y. Oct. 28, 2016) (the "Preliminary Injunction Opinion" or "Lightbox I").

Third Home operates a website, www.3rdhome.com, for owners

of luxury homes to exchange time in their homes.  Third Home was created in 2011, and in 2011 Third Home registered two trademarks:  3rdhome and 3rdhome with the image of a house replacing the letter "o."  Exchanges of time on Third Home's platform are facilitated by the use of points, referred to as "keys," which is the currency used to reserve time in users' homes.  In 2015, Third Home had 6,500 members.

Ellner is a former managing director at Lehman Brothers, and is a member of and investor in Third Home.  Ellner created Lightbox in 2015 to be an online real estate listing and sales business.  Ellner proposed forming a joint venture with Third Home in 2015, hoping that Lightbox would earn commissions and fees from the sale of vacation homes on a real estate listing website (the "Website").  The Website would be promoted by Third Home placing a link to the Website on the Third Home main webpage.

I. The Agreement

The parties entered a joint venture agreement (the "Agreement") on July 13, 2015.  The Agreement's stated purpose is "to establish a joint venture between the parties to create an online platform for the resale of vacation homes, fractional ownership properties and other properties eligible to be listed on 3RDHOME.COM, which is to be linked to the existing 3RD HOME site."

Paragraph 1 of the Agreement describes Lightbox's

obligations as follows:

a. [Lightbox] shall be responsible for fronting the cost for the technology build-out of the 3RD Home website including an interface for [Lightbox] use. Fronting the cost of the creating a [Lightbox] website at a level equivalent to the 3RD Home site is also the financial responsibility of [Lightbox].

. . .

c. [Lightbox] shall be fully responsible for managing any and all interactions with buyers and sellers and potential buyers and sellers, as well as all intermediaries required for any sale, including local real estate brokers, property management companies and local attorneys as needed.

. . .

f. [Lightbox] agrees that it will share evenly with 3RD Home (50 % / 50 %) all profits realized from this business venture after deducting reasonable direct costs of doing business, which costs will be documented and records presented to 3RD Home upon request. However, this profit share will begin only after the outlay for the technology build-out has been recouped, as described in paragraph 2b below.

(Emphasis supplied.)

Paragraph 2 of the Agreement describes Third Home's

obligations:

a. 3RD Home agrees to keep an active link on their site to the [Lightbox] site, this link shall be in a prominent place which is easily recognizable and usable by potential buyers and sellers of properties through the site. The location and visibility of the link shall be agreed upon between the parties with final determination by 3RD HOME.

b. 3RD Home agrees that the first profits of [Lightbox] will go toward reimbursing [Lightbox] for

the technology build-out mentioned earlier in
paragraph 1 (a). After that amount has been
reimbursed, the 50%/50% profit sharing will begin and
continue as long as this Agreement remains in full
force and effect.

c. 3RD Home agrees to forward all inquiries related to
the buying and selling of vacation homes, residence
clubs, fractionals and the like to [Lightbox] and that
3RD Home will be a passive partner in the sales and
marketing of these homes, with its only active role
being the maintenance of the links on the 3RD HOME
site with [Lightbox].  It will forward all inquiries
regarding sales and purchases of vacation homes,
residence clubs, fractionals and the like to
[Lightbox] exclusively and in a timely manner.

d. 3RD Home agrees to that this [sic] arrangement is
exclusive and that they will not enter into any
similar arrangement with another sales and marketing
organization without the permission of [Lightbox].

e. 3RD Home will be responsible for all relationships
with the affiliates.  In the interest of maintaining
these relationships, 3RD Home retains the right to
determine that certain affiliate properties may not be
able to be sold through [Lightbox], 3RD Home will
inform [Lightbox] in writing of such an exclusion,
should it occur.

f. 3RD HOME will make the final determination of the
name and the URL of the resale business.  All 3RD HOME
names, marks, and other proprietary assets that may be
used in conjunction with the marketing of this program
will remain the exclusive property of 3RD HOME at all
times during the term and after.

(Emphasis supplied.)

The Agreement also provides that New York law applies.

Paragraph 4 includes a provision shifting attorneys' fees as

follows:

(c) Attorneys' Fees.  If either party employs
attorneys to enforce any rights arising out of or

relating to this agreement, the losing party shall
reimburse the prevailing party for its reasonable
attorneys' fees and costs.

The Agreement also includes a placeholder termination

provision that states as follows:

This is a temporary interim agreement to indicate the
intent of the parties, and will remain in effect until
July 13, 2017 or earlier if superseded by a later
agreement.  If 3RD HOME should desire to terminate
because of unanticipated issues before July 13, 2017
then it will promptly reimburse LightBox for any
unreimbursed costs of the technology build out.
Additional terms regarding termination of this
agreement and the rights and steps to terminate it are
expected before August 31, 2015.

II. The Amended Termination Provision

Ellner and Shealy signed an amended termination provision

in December 2015 (the "Amendment").  That document provides as

follows:

15. TERMINATION

(a) The Agreement shall be for a term of thirty (30)
months, expiring on July 1, 2018, unless terminated
earlier in accordance with the provisions set forth
below. . . .

(b) LIGHTBOX VENTURES may terminate this Agreement in
advance of its expiration upon thirty (30) days'
written notice.  In the event LIGHTBOX VENTURES
terminates this Agreement pursuant to this clause, it
waives any claim it has or may have for reimbursement
of the technology costs referenced in Paragraph 1(a),
herein, and the fees referenced in 1(d), herein.
Furthermore, in the event LIGHTBOX VENTURES so
terminates this Agreement in advance of its
expiration, without selling its portion of the joint
venture to either 3RD HOME or a third party, in
accordance with the terms of Paragraph 16 herein, it
thereby waives any claim it has or may have to its

share of the joint venture between the parties as set forth in this Agreement.

(c) 3RD HOME may terminate this Agreement in advance of its expiration upon a upon [sic] thirty (30) days written notice without cause.  <u>In the event of an early termination pursuant to this clause, 3RD HOME agrees to reimburse LIGHTBOX VENTURES for the technology costs referenced in Paragraph 1(a) herein, to the extent those costs are not already fully recouped at the time of said termination, pursuant to Paragraph 1(f), herein.  Furthermore, in the event 3RD HOME elects to terminate this Agreement in accordance with this Paragraph 15(c), it agrees that it will not re-enter the business of or otherwise operate, in any manner, an online platform for the sale and resale of vacation homes and fractional ownership properties or otherwise engage in any venture which is intended to compete with or does compete with LIGHTBOX VENTURES in the business contemplated by this Agreement for a period of time totaling two (2) years following the date of termination of this Agreement.</u>  Nothing herein however shall restrict, prohibit or otherwise restrain 3RD HOME from the continued operation of its other business activities, including but not limited to its operation of a vacation property management and home exchange website and those matters related hereto.

(d) <u>Either party may terminate this agreement due to cause as follows.</u>  In the case of LIGHTBOX VENTURES, they may terminate this Agreement due to cause if 3RD HOME does not adequately create an attractive inventory of homes and/or generate adequate sales leads.  If 3RD HOME is unable to cure such poor performance within a reasonable period of time, and LIGHTBOX VENTURES decides to exercise its right to terminate the Agreement due to cause, 3RD HOME agrees not to re-enter the business of or otherwise operate, in any manner, an online platform for the sale and resale of vacation homes and fractional ownership properties or otherwise engage in any venture which is intended to compete with or does compete with LIGHTBOX VENTURES in the business contemplated by this Agreement for a period of two (2) years following the date of termination of this Agreement.  In the case of 3RD HOME, they may terminate due to cause if LIGHTBOX VENTURES does not expeditiously follow up on leads

generated and otherwise make a good faith effort to generate sales as contemplated by this Agreement. If LIGHTBOX VENTURES is unable to cure such poor performance within a reasonable period of time, 3RD HOME will promptly reimburse LIGHTBOX VENTURES for any unreimbursed costs of the technology build out and may continue to operate the business independently.

(e) In addition, in the event 3RD HOME wishes to terminate this Agreement with LIGHTBOX VENTURES but continue to operate the business of the joint venture contemplated by this Agreement independently of LIGHTBOX VENTURES, 3RD HOME will buy out LIGHTBOX VENTURES from the joint venture, and the price of such buyout will be determined by averaging three (3) separate prices determined by three separate and independent accredited business valuation professionals who will each value the joint venture created by this Agreement. 3RD HOME will pay all costs of such valuations. At the conclusion of these valuations 3RD HOME will pay to LIGHTBOX VENTURES an amount equal to fifty percent (50%) of the average of the three (3) values as determined by the aforementioned business valuation professionals. Upon such payment the joint venture between the parties shall terminate.

(f) In the event of a termination of this Agreement pursuant to Paragraph 15 above (by LIGHTBOX VENTURES) or 15(c), above (by 3RD HOME), it is agreed and understood that the operation of the joint venture shall cease within a reasonable time thereafter. In such event, the parties agree to cooperate with one another to wrap up the affairs of the joint venture in an appropriate and orderly manner, and to sign any and all documents necessary to effectuate the termination and dissolution of the joint venture. As part of the winding up of the affairs of the joint venture, it is agreed and understood that each party will take those steps necessary, and within a reasonable period of time, to deactivate any links to their respective websites that identify the remaining party.

(g) Other than as set forth herein, neither party shall have the right to use the other party's trademarks or name in any manner whatsoever other than in the materials that are approved in writing by the

> party whose trademarks or name is being used, and only
> for the express purposes set forth herein.  Any such
> permission to use the aforementioned names and/or
> marks shall cease upon the expiration or termination
> of this Agreement, in accordance herewith.

(Emphasis supplied.)

## III. The Exclusive Brokers

In late 2015 and early 2016, Third Home began negotiating and entering agreements with other real estate brokers (the "Exclusive Brokers").  In these contracts, Third Home principally agrees to offer complimentary membership to Third Home's exchange program to owners and buyers sponsored by the Exclusive Broker and to promote the Exclusive Broker's business on Third Home's website.  In return, the Exclusive Broker agrees to pay Third Home an upfront fee and promote the Third Home luxury home exchange program to its owners and buyers.  The upfront fee, which ranged from $2,500 to $10,000, generally gives the Exclusive Broker "the agreed territory for exclusive representation for one year."  Of particular relevance to the instant dispute, some of these contracts also include a provision indicating that the Exclusive Broker "will receive all the leads generated by [Third Home's] inbound members and by our real estate posting site and as part of this agreement agrees to pay a referral fee of 25% on any real estate transaction that takes place based on that referral buying or selling."
(Emphasis in original.)

A December 2015 draft of one such contract required the Exclusive Broker to pay the 25% referral fee to Third Home's "partner" Lightbox. A later version of this contract omitted the duty to pay Lightbox. Third Home received $52,500 from the Exclusive Brokers, all in the form of upfront fees. Lightbox has not received any of these funds.

IV. Lightbox's Costs Creating the Joint Venture

In 2015 and 2016, Lightbox spent money to build the Website and to pay consultants to help develop the Joint Venture's business. The Website was ready to be linked to Third Home's website in January 2016. Third Home does not contest that Lightbox is entitled to reimbursement for $62,158. Lightbox seeks an additional $4,930.19, for a total of $67,088.19.

The total of $67,088.19 consists of the following: $63,658.00 for website development,[1] $593.75 for website maintenance and preservation, $634.03 for the Joint Venture's toll-free number, $1,914.41 for website staging, and $288.00 for recording of communications and documents related to the Joint Venture's anticipated transactions. Although some of these expenses do not seem directly related to the "technology build-out of the 3RD Home website," as contemplated in Paragraph 1(a) of the Agreement, the sole argument Third Home advances to avoid

---

[1] Ellner states that $62,158 of this amount is the portion of Lightbox's expenses that Third Home does not contest.

payment of $4,930.19 is that such expenses were incurred after its March 8, 2016 Notice of Termination.

Of the $4,930.19 in dispute, $1,919.75 reflects work performed before March 8, 2016.[2] The $1,919.75 is composed of website development work done by The Agile Leage LLC in February 2016, in the amount of $1,500, as reflected in its invoice. Another $7.76 reflects work done by Grasshopper Group, LLC in February 2016 and billed to Lightbox on March 6, 2016. Grasshopper Group set up a toll-free number for the Joint Venture. Next, Lightbox paid Heroku $267.99 for "website staging" work performed before the March 8 Notice of Termination. Finally, Lightbox paid $144.00 to Zoho CRM on October 3, 2015, which was paid to "record all communications and document trails related to the Joint Venture's anticipated transactions, from listings through closings."

The remaining $3,010.44 reflects work performed after March 8, 2016. This amount includes additional amounts paid to the companies named above. Lightbox paid $626.27 to Grasshopper Group, $1,646.42 to Heroku, and $144.00 to Zoho CRM for work done after March 8. Lightbox additionally paid $593.75 to

---

[2] As explained in the Summary Judgment Opinion, Lightbox Capital Management LLC is a company run by Ellner that paid some of the Website-related expenses. See Lightbox II, 2017 WL 5312187, at *5 n.3. Third Home does not contest that plaintiffs should be reimbursed regardless of whether Lightbox Capital paid in the first instance.

Cuttlesoft, LLC for performing several technical tasks relating to the Website after March 8.[3]

Lightbox also seeks $115,000, comprised of $60,000 due to David Graff and $55,000 due to Susan Stein. None of these expenses constitute reimbursable payments for the "technology build-out" of the Website directed in Paragraph 1(a) of the Agreement.

Graff worked as a consultant for Lightbox beginning from an unspecified date in early 2015 and extending to February 2016. He provided consulting services to Lightbox in the following areas:

> branding and trademarking; strategic partnerships within the travel industry; advising on the use of virtual-reality augmented technology that would be used to market existing real estate properties and new developments; website design and search engine optimization; revenue opportunities in online advertising; co-branding and other marketing efforts to with [sic] business in related industries such as the vacation and travel sectors; and establishing relationships with online and print mediate outlets.

He also "advised on how to build a user friendly web site in order to facilitate and improve the user experience," which "included using modern technologies such as virtual and

---

[3] Lightbox submitted one invoice in its trial submissions, for $375.00, but did not include in those papers a second invoice for $218.75 that it had submitted in connection with its summary judgment motion. Third Home only challenges the additional $218.75 on the ground that the work was performed after Third Home terminated the Agreement, so the Court will consider the combined amount of $593.75.

augmented reality systems to allow the user to take a 360 degree tour of a property."

Stein is an attorney who worked as a consultant for Lightbox from early 2015 through Fall 2016. Her consulting included "assisting in the researching and creating forms for listing agreements and referral agreements and other documentation and similarly helping to design the [Joint Venture] website interfaces." In addition, she "participated in . . . a conference call training session for use of the fully-operational [Joint Venture] website."

As noted, the Website became operational in January 2016. The principal services provided by Graff and Stein do not constitute work performed as part of the "technology build-out" of the Website. To the extent their services supported the technology build-out, Lightbox has not provided a way to measure or value that portion of their services.

V. The Joint Venture's Operations

In January 2016, the Website became operational at www.3rdhomerealestate.com. Third Home provided Ellner with the email address andy@3rdhomerealestate.com, for Ellner to use in connection with the Joint Venture.

Ellner has shown that he procured two listing agreements from two property owners before this litigation began. The other purported listing agreements he has submitted only reflect

negotiations or inquiries from interested realty companies and are not executed contracts to have property listed on the Website.

In the listing agreements, the property owners retained the Joint Venture "for the purpose of marketing and/or selling" the properties on the Website.  The owners agreed to give the Joint Venture a commission upon the sale of their properties "when such sale is either directly or indirectly the result of the Buyer, or a broker representing the Buyer, contacting 3rdHomeRealEstate.com to inquire about this or another property listed on 3rdHomeRealEstate.com."  The commission percentage ranged from 6% to 10% depending on the price at which the property was sold.  The agreements expired after one year unless a contract was signed during that time.  There is no evidence that either property has been sold since the listing agreements were executed.

Although the Website was operational, Third Home never activated the link to the Website from the Third Home website. By February 2016, the relationship between Ellner and Shealy had soured.  Ellner repeatedly raised concerns with Shealy about Third Home's arrangements with the Exclusive Brokers.  On March 21, Ellner received an email from a broker stating that Shealy had expressed concern with her listing certain real estate property on the Website because one of the Exclusive Brokers

"has an exclusive."

On March 8, counsel for Third Home sent Lightbox a written notice of termination, which stated that Third Home was exercising its termination rights under Paragraph 15 and sub-paragraph 15(e) (the "March 8 Termination Notice"). Third Home sent a second letter to Lightbox on March 21 insisting on its "unconditional right to terminate under Section 15(e)" and to arrange a time for the parties to discuss valuation of the Joint Venture. Third Home never hired or paid the cost of the appraisals of the Joint Venture specified in Paragraph 15(e) of the Amendment. Lightbox filed this lawsuit on March 31.

VI. Ellner's Use of Third Home Trademarks

Shealy ordered that the Website be taken down on or around July 19, 2016. After the Website was taken down, on July 21 and July 22, Ellner used his andy@3rdhomerealestate.com email address to inform Joint Venture clients that "there is a temporary problem with the 3rdhomerealestate.com website," and apologizing on behalf of "Wade and I." On July 21, Shealy wrote Ellner "please do not include me or my name on any more emails."

On July 21, Ellner registered the domain 3rdhomerealty.com. Ellner then published the Website and its real estate listings to the new domain. With the new domain name registered, on July 27 and July 28, Ellner informed clients with properties listed on the Website that their listings are "again live" on the

3rdhomerealty.com website.  The 3rdhomerealty.com website
depicted the "3RD HOME" trademark, which had been registered to
Third Home since 2011.

On August 8, counsel for Third Home sent Lightbox and
Ellner a letter indicating that their use of websites and email
addresses using Third Home's name and marks constituted
violations of law because the Agreement had been terminated.
The letter demanded that Lightbox and Ellner "immediately cease
and forever desist from the use of the Marks and confusingly
similar variations of the Marks in any form, including the
Domain Names, in website content, email addresses, and in any
other form."[4]

On or around July 28, the domain name
thirdhomerealestate.com was registered in Shealy's name.  It was
not until March 2017 that Third Home deactivated Ellner's
andy@3rdhomerealestate.com email address.

---

[4] Ellner states that he took the Website down "within
approximately 24 hours of creating it, which was also within 24
hours of notifying Mr. Shealy of it by the e-mails to the Joint
Venture clients."  It is unclear whether he means that the
Website was taken offline from the 3rdhomerealty.com domain
within 24 hours of registering the domain on July 21, within 24
hours of the emails he sent on July 27 and 28, 2016, or within
24 hours of the cease and desist letter sent by Third Home's
counsel on August 8.

## Procedural History

This case was filed on March 31, 2016.  In its original complaint, Lightbox sued for breach of contract and breach of fiduciary duty arising out of Third Home's decision to terminate the Joint Venture and pursue relationships with the Exclusive Brokers.  The original complaint also sought declarations that Third Home had breached the Agreement and that Lightbox had validly terminated the Agreement for cause.

On July 13, 2016, Lightbox filed a motion for a preliminary injunction to prevent Third Home from entering brokerage agreements or promoting brokerage services other than with Lightbox.  This motion was denied on October 28, 2016.  See Lightbox I, 2016 WL 6562107.

The Preliminary Injunction Opinion explained that Lightbox "failed to show that it will suffer irreparable harm" if an injunction did not issue.  Id. at *10.  The Opinion explained that "damages will largely compensate [Lightbox] for Third Home's violations of the Agreement since the Joint Venture never got off the ground," and Lightbox had only shown that it was "entitled to compensation for some" of the "preparatory work" it had done.  Id.  In addition, the Opinion noted that Lightbox failed to show "that a viable, profitable business was about to launch" before Third Home breached the Agreement.  Id. at *11.  The Opinion also observed that "Lightbox's argument that the

Joint Venture was poised to capture a large share of the vacation homes sales business is . . . too speculative to warrant a preliminary injunction." Id. Finally, in his affidavit submitted in opposition to the preliminary injunction, Shealy noted that Lightbox "had expended $62,158" to create the Website before the March 8 Notice of Termination and that "3rd Home never disputed that [Lightbox] would be entitled . . . to reimbursement for those technology costs."

In October 2016, Lightbox informed the Court that Third Home had not produced in discovery communications in its possession between Third Home and the Exclusive Brokers, as well as related agreements. On November 1, 2016, the Court ordered a forensic examination of defendants' computers and other electronic devices, and on November 15, the Court approved a protocol to govern the examination. The examination revealed a number of relevant documents that the defendants had not previously produced to Lightbox.[5]

---

[5] Lightbox sought reimbursement for the cost of the Fall 2016 forensic examination under Rule 37, Fed. R. Civ. P, on September 15, 2017. Lightbox's motion was granted on November 15, 2017. See Lightbox Ventures, LLC v. 3RD Home Ltd., No. 16cv2379(DLC), 2017 WL 5526073 (S.D.N.Y. Nov. 15, 2017). After briefing on the cost of the examination, Lightbox was granted $38,888.01 in an Order dated January 18, 2018. Third Home then sought a stay of the payment until after trial. This request was denied by Order of February 12, where the Court directed payment to the Clerk of Court. Third Home paid $38,888.01 to the Clerk of Court on March 5.

On January 12, 2017, the Court stayed proceedings so the parties could enter mediation. The stay was lifted April 3, 2017. On April 20, the parties stipulated to an injunction ordering Lightbox and Ellner not to use Third Home's trademarks, including domain names and email addresses, which was so ordered April 20.

On June 13, 2017, Third Home moved to exclude, under Rule 703, Fed. R. Evid., two valuations of the Joint Venture obtained by Lightbox in support of its claim for lost profits, and moved for summary judgment. Lightbox moved for summary judgment on June 16. On November 13, 2017, the Court granted Third Home's motion to exclude Lightbox's valuations, and partially granted each party's motion for summary judgment. See Lightbox II, 2017 WL 5312187.

The Summary Judgment Opinion resolved the motions for summary judgment as follows. Lightbox's two valuations were excluded because neither valuation was reliable. See id. at *9-*11. Lightbox was granted summary judgment on its three breach of contract claims: "Third Home's (1) failure to activate a link to the Website on the Third Home webpage, (2) failure to act as a 'passive partner' in the sales and marketing of homes, and (3) entering into competition against the Joint Venture." Id. at *11. Lightbox was also granted summary judgment on its motion for damages in the amount of the costs it incurred for

the "technology build-out" of the Website.  See id. at *12.

Lightbox was also granted summary judgment on its causes of

action seeking declarations that Third Home breached the

Agreement and that Lightbox could validly terminate the

Agreement for cause.  See id. at *13.  Finally, Lightbox was

granted summary judgment on its claim that Third Home violated

its fiduciary duty to Lightbox, and that Shealy aided and

abetted this breach.  See id. at *13-*14.

Third Home, however, was granted summary judgment regarding

certain theories of damages sought by Lightbox under its breach

of contract claim.  Specifically, Third Home was granted summary

judgment on Lightbox's claim for "any portion of the $52,500

that Third Home received from its Exclusive Broker contracts" as

damages for Third Home's breach of contract, as well as on

Lightbox's request for "consequential damages based on lost

profits or the overall value of the joint venture."  Id. at *12-

*13.  Summary judgment was denied to Lightbox and Ellner as to

Third Home's counterclaims.  See id. at *14-*17.

Following the issuance of the Summary Judgment Opinion, the

Court outlined the remaining issues for trial (the "November 14

Order").  The November 14 Order explained that the remaining

issues were "(1) the determination of Lightbox's costs in excess

of $60,000 incurred in building the Website . . . , (2) whether

Lightbox is entitled on its breach of fiduciary duty claims to

the amount or a share of the amount paid to Third Home by the Exclusive Brokers; and (3) Third Home's counterclaims and third-party claims against Lightbox and Ellner."

On January 29, 2018, Lightbox informed that Court that it believed the parties had agreed to a settlement on January 18, which Third Home refused to confirm. Lightbox's motion to enforce the settlement was denied on February 14.

A jury trial was scheduled for March 12, 2018. On February 14, 2018, the parties waived their jury demand. Third Home submitted motions in limine on February 16 and Lightbox did so on February 26. An Order of February 27 directed the parties to file oppositions by March 5 and to address whether the remaining issues could be tried on submission to the Court. On March 9, the parties informed the Court that they consented to trial on submission, and proposed a schedule for filing reply affidavits and supplemental proposed findings of fact and conclusions of law.[6] The parties filed their final submissions on March 16.

## Discussion

I. Lightbox's Claims

Lightbox has three claims remaining: damages arising out

---

[6] At this time, the parties also resolved two motions brought by Lightbox related to a trial subpoena issued to Richard Scarola, Lightbox's former counsel, and the use of the injunction issued against Lightbox as trial evidence.

of Third Home's breach of contract, damages arising out of Third Home's breach of fiduciary duty, and injunctive relief to enforce portions of the termination provision of the Agreement. Each claim is addressed in turn.

A. Breach of Contract Damages

On its breach of contract claim, Lightbox seeks $67,088.19, which it represents is the amount it spent to create the Website. Lightbox also seeks an additional $115,000, which it represents is what it owes to Stein and Graff for their consultancy work on behalf of the Joint Venture.

To recover damages on a breach of contract claim, a plaintiff must show "that such damages were actually caused by the breach, [and] that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made." Awards.com, LLC v. Kinko's, Inc., 834 N.Y.S.2d 147, 152 (1st Dep't 2007), aff'd, 14 N.Y.3d 791 (2010). To determine whether the parties to an agreement fairly contemplated a type of damages, courts use a "commonsense rule to determine what the parties would have concluded had they considered the subject." Fitzpatrick v. Animal Care Hosp., PLLC, 962 N.Y.S.2d 474, 479 (3d Dep't 2013) (citation omitted).

The Agreement provides that Lightbox is entitled to recoup the "technology costs" defined as the "technology build-out of the . . . cost of creating a . . . website at a level equivalent

to the 3RD Home site" in the event of an early termination of the Agreement by Third Home. The parties do not dispute that Lightbox spent $67,088.19 to build-out the Website. Third Home contends that it does not owe $4,930.19 of this amount, asserting that the costs in excess of $62,158 were incurred after it sent Lightbox the March 8 Termination Notice.

The invoices submitted by Lightbox regarding the disputed $4,930.19 indicate that Lightbox incurred expenses of $1,919.75 by March 2016 and expenses of $3,010.44 after March 2016. Lightbox has thus carried its burden of showing that it incurred $64,077.75 to build the Website before the March 8 Termination Notice. The $3,010.44 remaining is a modest portion of this total. Lightbox has carried its burden to show an entitlement to this remaining amount as well. Third Home has not shown that Lightbox incurred unnecessary expense in building the Website either before or after March 8. In the confusion created by the collapse of the Joint Venture, Lightbox was entitled to spend a modest sum to complete the Website's "build-out," and nothing in the Agreement provides a basis for denying it recovery of the completion costs. The roughly $3,000 represents payments to four different entities, three of which had begun their work before March 8. Accordingly, Lightbox is entitled to the amount of its costs in building the Website, namely $67,088.19.

While Lightbox has established that Third Home breached its

argument with Lightbox in the three ways described above, it has not shown that it is entitled to additional damages in the amount of $115,000 in connection with those breaches.  This sum reflects amounts paid to attorney Stein and consultant Graff. Lightbox has not shown that they assisted in the "technology build-out" of the Website.  There is therefore no basis to find that Lightbox is entitled to reimbursement for $115,000 it owes to Stein and Graff pursuant to Paragraphs 1(a) and 15(c) of the Agreement.

Nor has Lightbox shown that it and Third Home contemplated Lightbox spending over $100,000 on business consultants for the Joint Venture when they negotiated the Agreement, which would be reimbursed by Third Home in whole or in part.  Instead, the only provision under which Lightbox could recoup its costs other than those derived from the build-out of the Website was the 50-50 profit-sharing provision in Paragraph 1(f).  Applying the "commonsense rule" to evaluate the parties' likely intentions had they considered the issue, the fact that the Agreement singles out the technology build-out apart from other costs indicates that Lightbox would have borne the other costs of creating the Joint Venture.  Thus, the only expectation Lightbox had of recovering the $115,000 was based on a division the future profits of the Joint Venture.  The Joint Venture never began operation and therefore it made no profits.  The prospect

of the Joint Venture's profits, as discussed in the Summary
Judgment Opinion, is too speculative to grant expected profits
as damages.  As a result, Lightbox is not entitled to recover
any portion of the $115,000 it seeks in connection with Stein
and Graff's consultancy services.[7]

B. Breach of Fiduciary Duty Damages

Lightbox next seeks damages for Third Home's breach of its
fiduciary duty to Lightbox.  It seeks the $52,500 that Third
Home received from the Exclusive Brokers, as well as punitive
damages.[8]

Lightbox first seeks disgorgement of the money Third Home
obtained from the Exclusive Brokers.  Disgorgement is available
to the victim of a breach of fiduciary duty.  See Restatement
(Second) of Torts § 874, cmt. b ("In addition to or in
substitution for [tort] damages the beneficiary may be entitled
to restitutionary recovery[;] . . . ordinarily [t]he
[beneficiary] is entitled to profits that result to the
fiduciary from his breach of duty and to be the beneficiary of a
constructive trust in the profits." (emphasis supplied)); see

---

[7] Third Home's motion in limine to preclude Lightbox from seeking
to prove damages arising from Stein and Graff's work is granted.

[8] Lightbox was granted summary judgment on its claim that Third
Home breached its fiduciary duty to Lightbox.  Third Home was
granted summary judgment as to Lightbox's claim for lost
profits.  See Lightbox II, 2017 WL 5312187, at *13-*14.

also <u>Bon Temps Agency Ltd. v. Greenfield</u>, 584 N.Y.S.2d 824, 825-26 (1st Dep't 1992) (awarding plaintiff, on its breach of fiduciary duty claim, fees earned from third parties by defendant in course of defendant's breach).  "[U]nlike an ordinary tort or contract case," an award of damages on a breach of fiduciary duty claim is "not merely to compensate the plaintiff for wrongs committed by the defendant but to prevent" those wrongs.  <u>City of Binghamton v. Whalen</u>, 32 N.Y.S.3d 727, 729 (3d Dep't 2016) (citation omitted).  Thus, "a fiduciary may be required to disgorge any ill-gotten gain even where the plaintiff has sustained no direct economic loss."  <u>Excelsior 57th Corp. v. Lerner</u>, 553 N.Y.S.2d 763, 764-65 (1st Dep't 1990).

One half of the fees Third Home improperly obtained from the Exclusive Brokers is awarded to Lightbox.  This award is directly linked to Third Home's breach of its fiduciary duty to Lightbox.  Lightbox proposed to Third Home a Joint Venture through which Third Home would share in the profits from Lightbox's work as a real estate broker.  If the Joint Venture were successful, and the Website assisted Lightbox in selling luxury residences, Lightbox was willing to split brokerage commissions with Third Home.  Instead of fulfilling its obligations as a Joint Venture partner, Third Home breached its fiduciary duty to Lightbox and pocketed $52,500 it received from Lightbox's competitors by proposing a similar commission-sharing

arrangement with them.

Third Home argues that the Exclusive Broker fees that it received were "not contemplate[d]" by the Joint Venture and that Lightbox was accordingly not damaged by Third Home's agreements with the Exclusive Brokers. In making this argument, Third Home misunderstands the nature of the claim. Lightbox is not entitled to those fees because they should have been split by the parties pursuant to the Agreement. Lightbox is entitled to disgorgement precisely because Third Home went outside of the Joint Venture and realized profits with competitors to the Joint Venture. That conduct constitutes Third Home's breach of its fiduciary duty and it is the profits that stem from the breach to which Lightbox is entitled.

Lightbox seeks an award of the entirety of the $52,500 Third Home received from the Exclusive Brokers. Since the Joint Venture never got off the ground, any award larger than one-half of this amount is unwarranted.

Lightbox also seeks an accounting to determine whether Third Home obtained additional profits from the Exclusive Brokers beyond the fees. Lightbox did not seek an accounting in the SAC. In any case, an accounting is unnecessary. Lightbox has had full discovery and has not presented evidence that Third Home has received more than $52,500 from its Exclusive Broker arrangements.

For similar reasons, Lightbox has not shown it is entitled to any punitive damages.[9]  Under New York law, punitive damages are available if a plaintiff shows "a high degree of moral turpitude" by the breaching party and "such wanton dishonesty as to imply a criminal indifference to civil obligations."  Evans v. Ottimo, 469 F.3d 278, 283 (2d Cir. 2006) (citation omitted).  Here, Third Home entered agreements with the Exclusive Brokers that competed with the Joint Venture, but did so before the Agreement got off the ground.  Third Home also notified Lightbox of its intention to terminate the Joint Venture in March 2016, less than eight months after the Agreement was signed and about three months after the Amendment was executed.  This record does not demonstrate a remarkable level of dishonesty.  Lightbox is therefore not entitled to punitive damages.

The Summary Judgment Opinion also granted summary judgment to Lightbox on its claim that Shealy aided and abetted Third Home's breach of its fiduciary duty to Lightbox.  As such, Shealy is jointly and severally liable for the damages awarded to Lightbox on the breach of fiduciary duty claim.  See Talansky v. Schulman, 770 N.Y.S.2d 48, 53 (1st Dep't 2003) ("[A]ny one who knowingly participates with a fiduciary in a breach of trust

---

[9] Third Home's motion in limine, seeking to prevent Lightbox from introducing evidence of Third Home's finances before the Court determines whether Lightbox is entitled to punitive damages, is denied as moot.

is liable for the full amount of the damage caused thereby."
(citation omitted)).  For the same reason as described above,
punitive damages are not warranted.  Accordingly, Third Home and
Shealy are jointly and severally liable to Lightbox in the
amount of $26,250.

C. Specific Performance

Lastly, Lightbox seeks specific performance of the
valuation and noncompete provisions of the Agreement.  Lightbox
has not shown that it is entitled to either.

The parties have long recognized that their Joint Venture
ended no later than March 2016.  In March 2016, Third Home gave
notice of termination.  In filing this action in March, Lightbox
sought a declaration that Lightbox had validly terminated the
Agreement.  The Summary Judgment Opinion granted Lightbox's
request for declarations that

> (1) [Third Home's] actions constitute material
> breaches of the Agreement and that, therefore,
> LightBox may be relieved of any further performance
> obligations pursuant to the Agreement, while [Third
> Home] would not be entitled to enforce the Agreement
> against Lightbox.

> (2) [T]he Agreement may be validly terminated by
> Lightbox.

Lightbox II, 2017 WL 5312187, at * 13.  Thus, the Joint Venture
was terminated by both parties before it had begun its
operations.  There is no basis, therefore, either to order a
valuation of the Joint Venture or to enjoin competition with

that failed venture.  Moreover, the terms of the Agreement do not support either of those requests.

Paragraph 15(e) of the Agreement applies "in the event [Third Home] wishes to terminate th[e] Agreement with [Lightbox] but continue to operate the business of the joint venture . . . independently of [Lightbox]."  In that situation, Paragraph 15(e) provides that Third Home must obtain three separate valuations of the Joint Venture and pay Lightbox 50% of the average of the three valuations.  The Agreement does not provide for a valuation or an accounting in any other circumstances.

Lightbox is not entitled to a valuation pursuant to Paragraph 15(e) because there is no evidence that Third Home wishes to continue operating the Joint Venture.[10]  Third Home has never indicated that it wishes to take over the Joint Venture and, indeed, offered at summary judgment to stipulate that Lightbox "exclusively own[s] and control[s]" the Website.  See Lightbox II, 2017 WL 5312187, at *12.

Nor is Lightbox entitled to an injunction barring Third Home from competing with the Joint Venture for two years.  A party is entitled to a permanent injunction if it shows

(1) that it has suffered an irreparable injury; (2)

_____

[10] In addition, Lightbox has failed to show that any valuation of the Joint Venture would be reliable.  As discussed in the Summary Judgment Opinion, Lightbox's two projections of the Joint Venture's future profits were entirely speculative.  See Lightbox II, 2017 WL 5312187, at *9-*11.

that remedies available at law, such as monetary
damages, are inadequate to compensate for that injury;
(3) that, considering the balance of hardships between
the plaintiff and defendant, a remedy in equity is
warranted; and (4) that the public interest would not
be disserved by a permanent injunction.

Salinger v. Colting, 607 F.3d 68, 77 (2d Cir. 2010) (citation

omitted). Here, Lightbox has neither suffered an irreparable

injury nor shown that monetary damages are insufficient to

compensate it.

As Lightbox acknowledges, "[t]his action is, at its heart,

a damages action." Lightbox I, 2016 WL 6562107, at *10. Over

two years have passed since it filed this lawsuit, and Lightbox

offers no explanation why an injunction would be appropriate at

this stage other than to say that it is entitled to an

injunction under Paragraph 15(c) of the Agreement.[11] Moreover,

the Court credits the testimony from Third Home's CEO and from

its CFO that Third Home has never received any real estate

brokerage commissions from the Exclusive Brokers and no longer

wishes to participate in the real estate sales market. To the

extent Lightbox has been harmed, it has been compensated by the

damages awards granted above.

D. Attorneys' Fees

Lightbox also seeks an award of its attorneys' fees as part

---

[11] Lightbox does not include a request for an injunction in its
proposed findings of fact and conclusions of law.

of its damages on the breach of fiduciary duty claim.  This

request is denied.  In support of its claim, Lightbox cites a

federal ERISA case that does not discuss New York law, and a New

York case that states that

> [t]he general rule is that the legal expenses
> necessarily incurred in carrying on a lawsuit may not
> be recovered as general or special damages.  There is
> a well-recognized exception, however, where the
> damages are the proximate and natural consequence of
> defendants' tortious act which requires plaintiff to
> defend or to bring an action against a third party.

Cent. Trust Co., Rochester, N.Y. v. Goldman, 417 N.Y.S.2d 359,

361 (4th Dep't 1979).  Lightbox was not forced to bring or

defend a suit against a third party as a result of Third Home's

breach of fiduciary duty, so this exception is inapplicable.[12]

    E. Summary

    Lightbox is awarded $67,088.19 on its breach of contract

claim and $26,250 on its breach of fiduciary duty claim, for a

total of $93,338.19.[13]  Third Home is liable for the full amount

of $93,338.19, and Shealy is jointly and severally liable for

$26,250 of this amount for aiding and abetting Third Home's

---

[12] To the extent Lightbox also seeks attorneys' fees on a theory
of surcharge, this request is also denied.  Surcharge is an
equitable remedy available when a trust beneficiary prevails in
a suit against a trustee for the breach of an investment duty
related to the trust.  See Velez v. Feinstein, 451 N.Y.S.2d 110,
114 (1st Dep't 1982); see also CIGNA Corp. v. Amara, 563 U.S.
421, 441-42 (2011).  Third Home was not a trustee.

[13] These awards are in addition to the $38,888.01 awarded in the
January 18 Order as a discovery sanction.

breach of its fiduciary duty to Lightbox.  Judgment is granted

to Third Home, however, on Lightbox's claims for $115,000 in

consultancy fees, for an accounting, for an injunction barring

Third Home from competing against it for two years, and for

attorneys' fees arising out of Lightbox's breach of fiduciary

duty claim.

## II. Third Home's Claims

Third Home brings counterclaims against Lightbox and third-

party claims against Ellner arising out of Ellner's use of Third

Home trademarks after this lawsuit was filed.  Third Home brings

claims under the Anticybersquatting Consumer Protection Act

("ACPA"), 15 U.S.C. § 1125(d), and under the Lanham Act, 15

U.S.C. § 1051, et seq.[14]  As Lightbox acknowledges in its trial

submissions, it has not contested the validity of Third Home's

trademarks in this litigation.

### A. ACPA Claims

Third Home claims that Lightbox violated its rights under

ACPA in three ways.  First, Lightbox registered a domain name

that used Third Home's trademark.  Second, Lightbox

"resurrect[ed]" a domain name.  Third, Lightbox communicated

---

[14] Third Home's Answer and Third-Party Complaint lists claims
under state trademark infringement law and the Uniform Domain
Name Dispute Resolution Policy.  Third Home does not address
those claims in its trial submissions, and they are accordingly
waived.

with property owners using Third Home's trademarks.

Third Home's counterclaim and third-party complaint list three domains that it claims Lightbox and/or Ellner used improperly: thirdhomerealestate.com, 3rdhomerealestate.com, and 3rdhomerealty.com. Lightbox, however, has submitted an internet domain registration statement that reflects Shealy as the registrant of thirdhomerealestate.com. Third Home does not address this in its trial submissions. There is thus no evidence that Lightbox used thirdhomerealestate.com and Third Home's counterclaims and third-party claims are dismissed to the extent that they are based on Lightbox and/or Ellner's use of that domain.[15]

Ellner does not contest that he used the andy@3rdhomerealestate.com email address after this lawsuit was commenced. Nor does he contest that he registered the domain 3rdhomerealty.com on July 21, 2016, after the Website was taken down by Shealy on July 19, 2016. Instead, Ellner explains his actions as motivated by a desire to further the purposes of the Joint Venture and to restore the Website after Shealy took the Website down.

A party is liable under ACPA if it

(i) has a bad faith intent to profit from [a] mark

---

[15] Lightbox's motion in limine to preclude Third Home from offering evidence that Lightbox or Ellner used the thirdhomerealestate.com domain is denied as moot.

. . . ; and

(ii) registers, traffics in, or uses a domain name
that--

    (I) in the case of a mark that is distinctive at
    the time of registration of the domain name, is
    identical or confusingly similar to that mark.

15 U.S.C. § 1125(d)(1)(A).

Among the non-exhaustive list of factors that a court "may

consider" to determine "whether a person has a bad faith intent"

within the meaning of ACPA are:

(I) the trademark or other intellectual property
rights of the person, if any, in the domain name;

. . .

(III) the person's prior use, if any, of the domain
name in connection with the bona fide offering of any
goods or services;

. . .

(V) the person's intent to divert consumers from the
mark owner's online location to a site accessible
under the domain name that could harm the goodwill
represented by the mark, either for commercial gain or
with the intent to tarnish or disparage the mark, by
creating a likelihood of confusion as to the source,
sponsorship, affiliation, or endorsement of the site;

. . .

(VIII) the person's registration or acquisition of
multiple domain names which the person knows are
identical or confusingly similar to marks of others
that are distinctive at the time of registration of
such domain names, or dilutive of famous marks of
others that are famous at the time of registration of
such domain names, without regard to the goods or
services of the parties; and

> (IX) the extent to which the mark incorporated in the
> person's domain name registration is or is not
> distinctive and famous within the meaning of
> subsection (c).

Id. § 1125(d)(1)(B)(i).

In addition, ACPA provides that "[b]ad faith intent . . .
shall not be found in any case in which the court determines
that the person believed and had reasonable grounds to believe
that the use of the domain name was a fair use or otherwise
lawful." Id. § 1125(d)(1)(B)(ii). A plaintiff bringing an ACPA
claim is entitled to elect to recover "actual damages and
profits" or "statutory damages in the amount of not less than
$1,000 and nor more than $100,000 per domain name, as the court
considers just." Id. § 1117(d).

Third Home has failed to show that Ellner acted with a "bad
faith intent to profit" from his use of the
andy@3rdhomerealestate.com email address.[16] Ellner briefly used
the email address in July and perhaps August of 2016 to reassure
the Joint Venture's clients that the business would continue
after the defendants had deactivated the Website. Those emails
do not reflect a bad faith intent to profit from the

---

[16] None of the parties addresses whether Third Home's marks were
distinctive at the time Ellner used the domain names, which is a
predicate for ACPA liability. See 15 U.S.C.
§ 1125(d)(1)(A)(ii). Accordingly, Lightbox and Ellner have
forfeited any argument that Third Home's marks are not
distinctive.

3rdhomerealestate.com domain.  Further, it is undisputed that
Third Home had the ability to close the
andy@3rdhomerealestate.com email account at any time -- which it
did in 2017.  The evidence shows that Ellner "believed and had
reasonable grounds to believe that the use of the
[3rdhomerealestate] domain name was a fair use or otherwise
lawful" based on his use of the domain to further the purposes
of the Joint Venture.  15 U.S.C. § 1125(d)(1)(B)(ii).  The ACPA
counterclaim and third-party ACPA claim are dismissed insofar as
they are based on Ellner's use of the andy@3rdhomerealestate.com
email address.

Third Home has carried its burden of showing that Ellner
acted in bad faith to profit from his registration of
3rdhomerealty.com on July 21, 2016.  While Ellner no doubt did
so in a futile hope that the Joint Venture could be revived, the
creation of a domain name that is confusingly similar to the
defendants' was wrongful.  Ellner knew that he had no right to
do so.  As a result, Third Home has shown that Ellner violated
ACPA when he registered the 3rdhomerealty.com domain.

ACPA directs the court to choose an amount of statutory
damages between $1,000 and $100,000, as a court considers just.
Third Home urges that an award of $100,000 is appropriate,
whereas Lightbox contends that $1,000 is appropriate.

An award of $10,000 in statutory damages is appropriate in

the circumstances.  Ellner and Lightbox are liable for a single ACPA violation.  Defendants have not shown that Ellner made extensive use of the site or profited from it.  It was used to communicate with clients of the failed Joint Venture.  No larger award is necessary to serve the purposes of the ACPA.

B. Lanham Act Claims

Third Home contends that the same evidence that supports its ACPA claim shows three violations of the Lanham Act.  For the reasons that follow, judgment is granted to Lightbox and Ellner on the Lanham Act claims.

Third Home has trademark registrations for "3rd Home" and "3rd Home" with the letter "o" in Home replaced by the image of a home.  As before, Lightbox does not contest the validity of Third Home's trademarks.

Lanham Act claims are analyzed under a two-part test:  "The first prong looks to whether the senior user's mark is entitled to protection; the second to whether the junior user's use of its mark is likely to cause consumers confusion as to the origin or sponsorship of the junior user's goods."  Guthrie Healthcare Sys. v. ContextMedia, Inc., 826 F.3d 27, 37 (2d Cir. 2016).  The first prong is satisfied by showing that a mark is valid and registered, owned by the registrant, and that the registrant has the exclusive right to use the mark in commerce.  See id. Because Lightbox does not contest the validity of the

38

registration of Third Home's marks, the sole issue is consumer confusion.

Consumer confusion is "analyzed with reference to the eight factors first articulated in <u>Polaroid Corp. v. Polarad Elecs. Corp.</u>, 287 F.2d 492, 495 (2d Cir. 1961)." <u>Cross Commerce Media, Inc. v. Collective, Inc.</u>, 841 F.3d 155, 168 (2d Cir. 2016).

> The eight factors are: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

<u>Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC</u>, 823 F.3d 153, 160 (2d Cir. 2016) (citation omitted). "The application of the <u>Polaroid</u> test is not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused." <u>Kelly-Brown v. Winfrey</u>, 717 F.3d 295, 307 (2d Cir. 2013) (citation omitted).

First, for the reasons explained above, there is no evidence that Ellner ever used the thirdhomerealestate.com domain, so the Lanham Act claims fail to the extent they are premised on use of that domain. Second, also for the reasons given in discussing the ACPA claim, Ellner did not act with bad

faith intent to deceive when he used his andy@3rdhomerealestate.com email address, and there is no likelihood that consumers were confused. Accordingly, judgment is granted for Ellner and Lightbox on the Lanham Act claims to the extent they are premised on the thirdhomerealestate.com and 3rdhomerealestate.com domain names and associated email addresses.

With regard to the 3rdhomerealty.com domain that Ellner registered in July 2016, it is assumed that the defendants have established a violation of the Lanham Act. The defendants have not shown, however, that they are entitled to damages for this asserted violation.

Third Home does not attempt to prove actual consumer confusion, and instead relies on a presumption of confusion based on its contention that Ellner acted with intent to deceive. Third Home has failed to show confusion. In addition, Third Home has not shown it is entitled to damages.

Third Home requests "statutory damages of $100,000 for each of the three (3) violations," apparently referring to its ACPA claims, and does not separately request damages on its Lanham Act claims. The Lanham Act does not provide for statutory

damages, however, for the type of violation at issue here.[17]

Instead, damages are limited to "(1) defendant's profits, (2)

any damages sustained by the plaintiff, and (3) the costs of the

action" and are "subject to the principles of equity."  15

U.S.C. § 1117(a).  Lightbox and Ellner did not profit from the

3rdhomerealty.com domain, and Third Home has not shown that it

sustained any damages from Ellner's registration of the domain.

In addition, it would be inequitable on this record to award

Third Home the costs of bringing this action where Third Home

has not shown any damages and where Ellner's registration of the

3rdhomerealty.com domain, though wrongful, was short-lived.

Judgment is granted to Ellner and Lightbox on Third Home's

Lanham Act claims.

      C. Attorneys' Fees

      Third Home seeks an award of attorneys' fees on its ACPA

and Lanham Act claims.  15 U.S.C. § 1117(a) provides that "in

exceptional cases" a court "may award reasonable attorney fees

to the prevailing party."  Third Home prevailed on one of its

ACPA claims.  As the Supreme Court has explained with regard to

the identically worded fee-shifting provision of the patent

laws, "an 'exceptional' case is simply one that stands out from

---

[17] The Lanham Act provides for statutory damages for two types of
violations:  cyberpiracy in violation of ACPA and
counterfeiting.  See 15 U.S.C. §§ 1117(c), (d).

others with respect to substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." <u>Octane Fitness, LLC v. ICON Health & Fitness, Inc.</u>, 134 S. Ct. 1749, 1756 (2014).

There is nothing exceptional about the ACPA claim on which Third Home prevailed. Accordingly, its request for an award of fees is denied.

D. Summary

Third Home has proven one violation of ACPA arising out of Ellner's registration of the 3rdhomerealty.com domain. Judgment is granted to Third Home on that claim, and it is awarded $10,000. Third Home is not entitled to statutory fee shifting. Third Home has failed to prove any other violations of ACPA and failed to prove any violations of the Lanham Act, and judgment is granted to Lightbox and Ellner on those claims.

III. Interest

The net judgment is $83,338.19 in favor of Lightbox. Lightbox is also awarded prejudgment interest of 9% per annum running from January 1, 2016. <u>See</u> N.Y. C.P.L.R. §§ 5001(a), 5004.

IV. Contractual Fee Shifting

The Agreement provides for fee shifting in certain circumstances. Each side seeks attorneys' fees pursuant to the

42

Agreement.  In addition, Third Home seeks fees paid to its

expert witness in connection with its successful motion to

exclude Lightbox's valuation experts at summary judgment.[18]

Paragraph 4(c) of the Agreement provides as follows:

> If either party employs attorneys to enforce any
> rights arising out of or relating to this agreement,
> the losing party shall reimburse the prevailing party
> for its reasonable attorneys' fees and costs.

The Agreement provides in Paragraph 4(a) that New York law

governs.

"Under New York law, a contract that provides for an award

of reasonable attorneys' fees to the prevailing party in an

action to enforce the contract is enforceable if the contractual

language is sufficiently clear."  NetJets Aviation, Inc. v. LHC

Commc'ns, LLC, 537 F.3d 168, 175 (2d Cir. 2008).  A successful

defendant may be a prevailing party and receive fees incurred in

the successful defense of a claim.  See Kessel Brent Corp. v.

Benderson Prop. Dev., Inc., 893 N.Y.S.2d 401, 402 (4th Dep't

2009).

To determine "whether a party is a prevailing party, a

---

[18] Lightbox moves in limine to preclude Third Home from
introducing the affidavit of its expert, William Chandler,
because he has not been qualified by the Court as an expert and
because there are no remaining issues as to which his testimony
is relevant.  Third Home has submitted Chandler's affidavit
solely to support its claim for fee shifting.  As Third Home
does not rely on Chandler as an expert for any of the issues to
be tried, Lightbox's third motion in limine is denied as moot.

fundamental consideration is whether that party has prevailed with respect to the central relief sought." Chainani v. Lucchino, 942 N.Y.S.2d 735, 736 (4th Dep't 2012) (citation omitted). In general, "the prevailing or successful party is the party in whose favor a net judgment was entered." Wiederhorn v. Merkin, 952 N.Y.S.2d 478, 481 (1st Dep't 2012). "It is not necessary for a party to prevail on all of his claims in order to be considered prevailing." Id. at 863 (citation omitted); see also Excelsior 57th Corp. v. Winters, 641 N.Y.S.2d 675, 676 (1st Dep't 1996) (Where landlord sued for 54 months' rent, tenants claimed constructive eviction for 24 of those months but only were awarded rent abatement for 4 1/2 months, the landlord was the prevailing party and entitled to attorneys' fees.).

The core of this dispute was assigning fault for the breakdown of the Joint Venture. Measuring the parties' results in this way, Lightbox prevailed. The upshot of this litigation is a determination that Third Home breached the Agreement and its fiduciary duty to Lightbox. The net judgment is $83,338.19 in Lightbox's favor. Considering the claims numerically, Lightbox prevailed on all but one of its claims while defeating all but one of Third Home's ACPA claims.[19] Third Home was not

---

[19] Although Third Home significantly reduced the damages available to Lightbox in its successful motion to exclude

44

successful in resisting the core of the dispute and so it has not prevailed in this litigation. As a result, Lightbox is the prevailing party.

Under the Agreement, the prevailing party is entitled to "reasonable" attorneys' fees. Third Home has conceded from at least the time that the parties litigated the preliminary injunction motion in the summer of 2016, that it owed Lightbox at least $62,158 for the build-out of the Website. Accordingly, Lightbox's net judgment won it only about $20,000 above the amount that Third Home conceded almost two years ago that it owed to Lightbox. Moreover, from the time the Preliminary Injunction Opinion was issued, Lightbox was on notice that its likelihood of recovering anticipated future profits of the Joint Venture was slim, given how "speculative" those profits were. See Lightbox I, 2016 WL 6562107, at *10-*11. Accordingly, while Lightbox has shown that it is entitled to its reasonable attorneys' fees through the time Lightbox I was issued, it has not shown it is entitled to attorneys' fees beyond that date.


## Conclusion

Third Home is liable to Lightbox for $67,088.19 on

_____

Lightbox's expert valuations, New York law does not appear to recognize nondispositive motion practice as a means of judging whether a party has prevailed, unless the motion affects the core relief sought.

Lightbox's breach of contract claim.  Third Home and Shealy are jointly and severally liable to Lightbox for $26,250 on Lightbox's breach of fiduciary duty claim.  Lightbox and Ellner are jointly and severally liable to Third Home and Shealy for $10,000 for one violation of ACPA.  Lightbox is accordingly awarded $83,338.19, plus prejudgment interest of 9% per annum running from January 1, 2016.  The Clerk of Court is directed to enter final judgment in favor of Lightbox.  Lightbox is also awarded its reasonable attorneys' fees for the period before October 28, 2016, and is directed to file an application for its fees, with supporting documentation, as directed by a Scheduling Order filed contemporaneously with this Opinion.  The Clerk of Court is directed to release funds deposited by Third Home on March 5, 2018 in the amount of $38,888.01 to Lightbox pursuant to the Court's March 12, 2018 Order.


Dated:    New York, New York
          April 13, 2018

                              _____
                                    DENISE COTE
                        United States District Judge