UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LIGHTBOX VENTURES, LLC,<br>        Plaintiff,<br>   v.<br>3RD HOME LIMITED and WADE SHEALY,<br>        Defendants. | No. 16-cv-02379 (DLC) |
| 3RD HOME LIMITED and WADE SHEALY,<br>        Third-Party Plaintiffs,<br>   v.<br>ANDREW ELLNER,<br>        Third-Party Defendant. | |
| LIGHTBOX VENTURES, LLC, and ANDREW ELLNER,<br>        Third Party Plaintiffs,<br>   v.<br>SCAROLA ZUBATOV SCHAFFZIN PLLC, and BREM MOLDOVSKY LLC,<br>        Third Party Defendants. | |

**CERTIFICATION OF JONATHAN R. MILLER, ESQ. REGARDING THE SCAROLA AND MOLDOVSKY FIRMS' COMPETING ALLEGED ATTORNEY'S LIENS**

I, Jonathan R. Miller, Esq., being of full age, hereby certify as follows:

1. I am an attorney admitted to practice law before this Court, and counsel for Lightbox Ventures, LLC ("Lightbox") and Andrew Ellner in this matter.

2. I make this certification based on my personal knowledge and/or my review and familiarity with my clients' files and the case docket.

*Mr. Scarola's false accusations of "slander"*

3. In his August 30, 2018 affidavit, Attorney Scarola purports that he is the victim of pervasive "slanderous and offensive *ad hominem*" attacks, particularly where the

Lightbox Parties allege that "[t]he Scarola Firm is no stranger to fee disputes with its clients" and that, out of all the New York e-filed matters in which Mr. Scarola has appeared as attorney of record, fully 23.33% are matters arising from fee disputes between his firm and its former clients. *See* Scarola Aff. at ¶ 2; *cf.* Compl. at ¶ 57 & Exh. 3.

4. Of course, as any experienced attorney should know, the laws of slander do not apply to statements made in litigation, which are privileged, nor do they apply to statements that are true.

5. In support thereof, attached as **Exhibits 1-6** are the relevant publicly filed pleadings from each of these prior fee disputes (i.e., limited to those filed electronically in New York Supreme Court, but not including federal court actions or fee arbitrations, if any), in addition to the current one. All seven of these matters were filed in the last six years — *amounting to 35% (7/20) of the New York Supreme Court matters (from 2013 forward) in which Mr. Scarola appeared as attorney of record*.

6. I know of no other law firm as frequently involved in litigated fee disputes with former clients. I, myself, have never been a party in litigated, arbitrated or mediated fee disputes with former clients.[1] So, to say that the Scarola Firm is "no stranger" to such disputes is accurate, if not an understatement. In fact, based on Mr. Scarola's New York Supreme Court appearances, litigating fee disputes with his firm's former clients appears to be one of his primary areas of litigation practice.

---

[1] As a creditor, I once filed an uncontested proof of claim in a former client's bankruptcy proceeding.

*The Scarola Firm's use of unlawful retainer provisions*

7.      The Scarola Firm's retainer letter (the "Scarola Agreement")[2] contains at least two unlawful provisions. The first ("Collection Costs") is a provision purporting to entitle the Scarola Firm to non-mutual fee shifting in the event of a fee dispute, which is unlawful and unenforceable. *See Shukla v. Sharma*, 586 Fed. Appx. 752, 754-55 (2d Cir. 2014); *Ween v. Dow*, 35 A.D.3d 58, 63-64 (1st Dept. 2006). The second ("Time Limitation on Malpractice Claims") is a purported restriction on legal malpractice claims in gross violation of Rule 1.8(h) of the New York Rules of Professional Conduct.

8.      Moreover, it appears that the Scarola Firm has been using these unethical, unlawful and unenforceable retainer provisions with clients *for almost a decade*. As evidence thereof, attached as **Exhibit 7** is a copy of a December 23, 2009 retainer agreement between the Scarola Firm and its former client, which I obtained from the New York Supreme Court's website. *See Ducker et al. v. Scarola Malone & Zubatov LLP*, No. 651439/2013 (Sup. Ct., County of New York). While I cannot authenticate this document myself, attached as **Exhibit 8** is the former client's sworn affidavit, which does. Also, attached as **Exhibit 9** is a copy of Mr. Scarola's March 11, 2016 email to Mr. Ellner, purporting that the Scarola Agreement is his firm's "standard firm retainer agreement" — establishing that the Scarola Firm has been routinely using unethical and unlawful retainer provisions, including unlawful non-mutual fee-shifting in the event of a fee dispute and also the unlawful restriction on a client's right to sue for legal malpractice, for many years and with presumably with all its clients.

---

[2] *Cf.* Ellner Cert., Exh. 5.

9. I express no opinion whether these matters warrant attorney discipline *per se*. However, I respectfully submit that the Court should consider the Scarola Firm's apparently routine use of unlawful retainer provisions when adjudging the firm's equitable rights under New York Judiciary Law § 475 and/or in *quantum meruit*.

***The Scarola Firm's prior manipulative behavior before this Court***

10. In considering the credibility and persuasiveness of the parties' respective submissions in this matter, I believe that the Court may also consider the Court's firsthand familiarity with each law firm's performance.

11. In the context of the Scarola Firm's credibility and persuasiveness, I respectfully direct the Court's attention to the matter of *Scarola Ellis LLP v. Skyworks Ventures, Inc.*, 09-cv-10003, 2010 U.S. Dist. LEXIS 90721 (S.D.N.Y. Sep. 1, 2010) (Cote, J.), a copy of which is attached as **Exhibit 10**.

12. In that matter, the Scarola Firm[3] sued a former client ("Ventures") and another entity ("Interactive") for unpaid legal fees after having already been paid over $900,000.00. *Id.* at *2-3. The second defendant, Interactive, was not even a party to the retainer agreement. *Id.* The Scarola Firm dismissed its initial filing, apparently to prevent the defendants from asserting counterclaims, and then refiled — but did not attempt to serve — the identical complaint a few days later, admittedly to preclude the defendants from filing suit in another jurisdiction. *Id.* at *3-4.

---

[3] According to the website of New York's Department of State, "Scarola Ellis LLP" underwent several name changes before becoming "Scarola Zubatov Schaffzin PLLC." *Cf.* N.Y. LLC Law § 1006. Indeed, Mr. Scarola confirmed this when I raised the issue several months ago.

13. The Scarola Firm then joined, as creditor, an involuntary bankruptcy proceeding filed against Interactive (only), and misrepresented to this Court that the bankruptcy proceeding was against Ventures as well — again, apparently, to stay the Scarola Firm's own action and preclude Ventures from filing counterclaims. *Id.* at *4. The Scarola Firm then commenced its own involuntary bankruptcy proceeding against Ventures, which then filed suit against the Scarola Firm in New Jersey state court for, among other things, overbilling and breach of fiduciary duty. *Id.* at *4-5. After both involuntary bankruptcy proceedings were dismissed, the Scarola Firm failed to advise this Court. *Id.* at *5.

14. The bankruptcy court expressly found that the Scarola Firm had filed the Ventures bankruptcy proceeding as a bad faith litigation tactic in an attempt to force Ventures into bankruptcy and to preclude it from filing counterclaims against the Scarola Firm in this Court, and imposed punitive damages against the Scarola Firm. *Id.* at *5-6.

15. Expressing noting the Scarola Firm's "manipulative behavior," *id* at *11, this Court dismissed the Scarola Firm's lawsuit in favor of the defendants' own action. *Id.* at *13.

*The Scarola Firm's manipulative behavior in the current dispute*

16. Confirming the old adage that a leopard cannot change its spots, the Scarola Firm continues to engage in similar tactics in the current dispute. First, it rushed to file suit against my clients in state court in March 2017, barely ten days after its representation was terminated and while the 3rd Home dispute was in active litigation, clearly in order to establish the state court's jurisdiction over the fee dispute — but did not file or serve the actual complaint until April 2017. A copy of the Scarola Firm's March 17, 2017 summons is attached as **Exhibit 11**. Its state court complaint has been filed as ECF #283-8.

17. In January 2018, while my clients' motion to dismiss the complaint was still pending,[4] the Scarola Firm applied to the state court for a TRO and order to show cause, asking the state court to prohibit Lightbox from receiving any funds awarded by this Court until the state court could adjudicate the Scarola Firm's alleged contractual lien rights. Copies of the Scarola Firm's January 4, 2018 proposed order to show cause, and my clients' January 5, 2018 opposition brief, are attached as **Exhibits 12 & 13.**

18. After lengthy oral argument, that application was dismissed on March 8, 2018. The state court denied the request for a TRO and also declined to issue an order to show cause for injunctive relief. Copies of the court order and hearing transcript are attached as **Exhibits 14 & 15**.

19. Among other things, Justice Cohen expressly ruled that the alleged contractual lien was no more and no less than a reiteration of the Scarola Firm's statutory lien under Judiciary Law § 475, *see* T58:3-19, and further indicated that adjudication of the Scarola Firm's statutory lien would be best handled by this Court, *see* T25:15-31:15,[5] and in any event only after joining the Moldovsky Firm and all other parties in interest in one proceeding, *see* T:59:2-13.

---

[4] The motion is still pending in state court. Oral argument is set to be heard on November 7, 2018 before a new judge.

[5] Among other things, Justice Cohen observed:

> [T]o do what you want me to do, I have to be persuaded that . . . the Federal Court doesn't have authority to enforce your lien, only I do. . . . I deal with charging liens on my cases all the time. I've never dealt with a charging lien when I have been asked to enforce a lien on someone else's case; never. . . . Is the answer that you come to State Court and you ask a State Court Judge to enforce your charging lien on a Federal Court case?  Is that the only way to do it?  Is that the answer for how you do that?

20.     Instead of complying with the foregoing and heeding Justice Cohen's comments, the Scarola Firm delayed another six months, waiting for the state court matter to be administratively reassigned to a different judge before filing an amended state court complaint purporting to seek relief against the Moldovsky Firm. That amended state court pleading does not comply with New York's Civil Practice Law and Rules and is subject to dismissal.[6] Moreover, as of the date of this Certification, the Scarola Firm still has not served the amended complaint and summons on the Moldovsky Firm.

***The Scarola Firm had a full opportunity to participate in all prior determinations of its reasonable legal fees in this matter.***

21.     Lightbox respectfully submits that the Scarola Firm should be bound by this Court's two prior determinations regarding its "reasonable" legal fees. I understand that the Scarola Firm argues that issue preclusion should not apply to it. On this issue I present the following information.

22.     This Court has already reviewed the Scarola Firm's legal invoices twice. In January 2018, the Court awarded Lightbox its reasonable expenses incurred in connection with the discovery dispute with 3rd Home. Reviewing the Scarola Firm's submitted invoices, amounting to $114,715.55, the Court determined that less than 10% is reasonable, and awarded Lightbox $10,000 on account of the Scarola Firm's invoices. ECF #172 at 4.

23.     The Scarola Firm actively supported Lightbox's fee application, submitting supporting affidavits from Mr. Scarola and Mr. Zubatov. ECF #163, #174. Both attorneys

---

[6] My clients will file an appropriate motion by or before the CPLR pleading deadline. Mr. Scarola has refused my request for a courtesy extension of time, despite the consent 60-day pleading deadline extended to him in this matter.

asserted that the $114,715.55 invoiced (from August through December 2016)[7] was "reasonable and necessary". (Hedging their bet somewhat, neither attorney expressed a position regarding the appropriate fee award.)

24. Before that, however, the Scarola Firm had demanded to be paid by Lightbox for their time in preparing these affidavits and related invoices. (I know this because I was involved behind the scenes, coordinating with Mr. Moldovsky.) Attached as **Exhibit 16** is a copy of my August 11, 2017 letter to Mr. Scarola, asserting that this Court's findings as to his firm's reasonable fees will have an issue-preclusive effect in state court. The point of this letter was to persuade the Scarola Firm to actively participate in Lightbox's fee application, out of the Firm's own self-interest in avoiding a finding adverse to its claims.

25. Attached as **Exhibit 17** is an exchange of emails with Mr. Scarola further discussing issue preclusion. Attached as **Exhibit 18** is my follow-up email to Mr. Scarola reminding him about issue preclusion and suggesting that his firm actively prepare papers justifying its fees. I believe that issue preclusion was the motivating factor in the Scarola Firm's decision to assist with Lightbox's December 2017 discovery-related fee application.

26. Similarly, in awarding Lightbox contractual fee-shifting, this Court ruled that the cut-off date for Lightbox's recovery of reasonable attorney's fees would be October 28, 2017, the date of the Court's summary judgment opinion excluding both of Lightbox's expert reports as speculative.[8] *See* ECF #233.

---

[7] *See* ECF #163-1, 163-2, 164-1, 164-2.

[8] The Court's decision to set October 28th as the cut-off date implies that since the attorneys for both sides were already on notice about the likelihood of a low six-figure damages award (not including speculative future lost profits), a reasonable attorney would not have accrued time and fees disproportionately in excess of Lightbox's likely monetary recovery, certainly not after both expert reports were excluded. Nevertheless, the Scarola Firm generated another $130,000 in invoices in a

27. Since Mr. Moldovsky had withdrawn his appearance by then, as Lightbox's prospective replacement counsel I sent Mr. Scarola an email conveying Lightbox's proposal to assign its right to a fee award to the Scarola Firm. Had the Scarola Firm accepted this proposal, Mr. Scarola and Mr. Zubatov would have had free rein to prepare submissions and oral argument advocating for as high a fee award as could reasonably be supported.

28. That April 16, 2018 email further stated that, absent an agreed-upon assignment, the parties would be left with two alternatives: either Lightbox would prepare a fee application with sworn statements from Mr. Scarola and/or Mr. Zubatov regarding the reasonableness of their invoices, or Lightbox would prepare its fee application without input from the Scarola Firm.

29. In response to Lightbox's offer of an assignment of rights that would have provided the Scarola Firm standing to pursue a fee application as it deemed best, Mr. Scarola declined.

30. **Exhibit 19** is an exchange of emails with Mr. Scarola discussing the aforesaid proposed assignment of rights and his rejection of this proposal.[9]

31. Immediately thereafter, I invited the Scarola Firm to prepare affidavits justifying their invoices as "reasonable." I tried to work with Mr. Scarola in good faith, and we each prepared and revised various versions of a draft affidavit. After numerous attempts, Mr. Scarola and I were unable to devise a mutually acceptable document, mainly because he refused to assert under oath, without various preambles, qualifiers and conditions, that the

---

bit more than two months, and the Moldovsky Firm *purports* to have incurred another $520,000 or so in billable hours, at least according to the sixth version of its "final" invoice. *See* Ellner Cert. at ¶¶ 20, 105-106 & Exh. 46.

[9] In conformance with Fed. R. Evid. 408, this evidence is offered as proof of the proposed assignment *per se* and not for any prohibited purpose.

invoices were "reasonable". Attached as **Exhibit 20** is an exchange of emails with Mr. Scarola on this issue, showing his firm's full participation in the process.

32.     Mr. Scarola's adamant refusal to provide a sworn statement that his firm's legal fees were reasonable — without ifs, ands or buts — should be taken as an implied admission that the legal fees were *not* reasonable, not within the meaning of N.Y. RPC 1.5(a)[10], not for purposes of determining the lodestar,[11] and not otherwise.

33.     After Mr. Scarola and I were unable to agree on a mutually acceptable submission from his firm, I proceeded with "Plan C" and filed a fee application that included all of the Scarola Firm's invoiced fees up to the October 28, 2016 cut-off date, but without Mr. Scarola's sworn statement as to reasonableness. *See* ECF #238.

34.     On May 10, 2018, while Lightbox's fee application was pending before the Court, I suggested and invited Mr. Scarola to intervene. Had the Scarola Firm done so, it would have been able to fully articulate its factual and legal arguments regarding the reasonableness of its invoices. However, the Scarola Firm once again waived the opportunity to fully participate and to justify its fees. A copy of those May 10th emails are attached as **Exhibit 21**. On May 15, 2018, I followed up yet again with Mr. Scarola, sending him a copy of 3rd Home's opposition to Lightbox's fee application, but Mr. Scarola

---

[10] RPC 1.5(a) states, "A lawyer shall not make an agreement for, charge, or collect an excessive or illegal fee or expense." As a matter of simple logic, Mr. Scarola cannot refuse to swear that his firm's legal invoices were not excessive, and then turn around later and claim that they were reasonable.

[11] In calculating attorney's fees under the lodestar method, a district court multiplies a reasonable hourly rate by the reasonable number of hours required by the case, which creates a presumptively reasonable fee. *See, e.g., Stanczyk v. City of New York*, 752 F.3d 273, 284-85 (2d Cir. 2014) (reducing the fees awarded in light of the attorneys' "poor performance").

continued to sit on the sidelines instead of using the various opportunities offered to him to justify his firm's invoices in this matter.

***The Moldovsky Firm is a citizen of Pennsylvania for purposes of diversity.***

35. In response to concerns raised by the Scarola Firm regarding a supposed lack of diversity between the interpleader claimants, i.e. between the Scarola and Moldovsky Firms, *cf.* 28 U.S.C. § 2201, I state the following.

36. The Moldovsky Firm is headquartered in Mr. Moldovsky's home in Washington Crossing, Pennsylvania. I have visited there on certain social occasions, when Mr. Moldovsky showed me his office layout. It is my understanding that Mr. Moldovsky works out of his home almost exclusively, as does his office manager, and that his paralegal divides her time between his home office and working from her home nearby, also in Pennsylvania.

37. While Mr. Moldovsky also maintains addresses in Philadelphia, Princeton and New York City, to the best of my knowledge these are all virtual offices through the Regus company. I know this because he told me.

38. In light of the foregoing, it is my understanding that the Moldovsky Firm is a citizen of Pennsylvania for purposes of diversity. *See OneWest Bank, NA v. Melina*, 827 F.3d 214, 218 (2d Cir. 2016) ("A corporation's principal place of business under § 1332 is 'the place where a corporation's officers direct, control, and coordinate the corporation's activities' . . . , i.e., the 'nerve center.'" (quoting *Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010))).

*The Moldovsky Firm's use of unlawful retainer provisions*

39. The Lightbox Parties allege that the Moldovsky Firm's original retainer letter contains at least two unlawful provisions. *See* Compl. at ¶ 91. The first is a provision purporting to entitle the Moldovsky Firm to non-mutual fee shifting in the event of a fee dispute, which is unlawful and unenforceable. *See Shukla*, *supra*, 586 Fed. Appx. at 754-55; *see also Ween*, *supra*, 35 A.D.3d at 63-64. The second is a provision calling for 18% interest on any unpaid balance, which interest rate is double than the statutory prejudgment interest rate in New York.

40. I personally brought the unlawful fee-shifting issue to Mr. Moldovsky's attention in November 2017, when we were on the same side and discussing unlawful and/or unethical aspects of the Scarola Firm's retainer agreement. His response was to try to poke holes in my legal analysis. Attached as **Exhibit 22** is a copy of our email discussion.

41. I now understand that Mr. Moldovsky's flawed response was related to the fact that his own firm's retainer agreement contained the same unlawful fee-shifting provision. Not only that, but his firm's provision also purports to entitle his firm to an arbitrary minimum 33.33% surcharge as so-called minimum collection costs:

> If any outstanding balance remains outstanding in excess of 60 days, and certainly if collection effects begin, you agree to be responsible for and to pay all reasonable legal fees, costs and expenses of collection and you agree that such amount shall not be less than 1/3 the balance due.

*See* Moldovsky Agreement[12] at 6.

---

[12] *Cf.* Ellner Cert., Exh. 20.

42. This provision appears to be unlawful on its face under *Shukla* and *Ween*, and also squarely violates N.Y. RPC 1.5(a) ("A lawyer shall not make an agreement for . . . an excessive or illegal fee or expense.").

43. Notably, the Moldovsky Firm's amended retainer letter leaves that unlawful provision intact — i.e., by failing to delete it — even though Mr. Moldovsky prepared that amendment shortly after I explained to him that it is unlawful and unethical.

**Mr. Moldovsky's "unclean hands" and related considerations.**

44. I present the following information as relevant in determining the Moldovsky Firm's equitable right, if any, to compensation.

45. Mr. Ellner has certified to the circumstances leading up to the Moldovsky Firm's abandonment of its clients, i.e. that instead of addressing the substance of Mr. Ellner's expressed concerns over the firm's February 2018 invoice and/or allowing Mr. Ellner sufficient time to evaluate those concerns, Mr. Moldovsky gave him the bum's rush, cut him off, and issued a series of ultimatums, demanding that Lightbox pay $30,000 (later $25,000) on short notice just to buy a week's time before the Moldovsky Firm would proceed with its motion to withdraw. *See* Ellner Cert. at ¶¶ 107-112.

46. Around that same time, i.e. around the beginning of April 2018, Mr. Moldovsky called me out of the blue, for no apparent purpose but to launch into a tirade against Mr. Ellner, the gist of which was that Mr. Ellner is a terrible person, that I had no idea what kind of person he is (even though I have defended the Lightbox Parties in state court since May 2017), and that he intended to withdraw from representing the Lightbox Parties in this Court and that I would need to withdraw as well from the state court

proceeding. I ended the call quickly because I was driving, but also because of Mr. Moldovsky's general tone and unethical, over-the-top demands of me.

47. As I have certified previously, *see* ECF #258, It was my understanding that Mr. Moldovsky was attempting to use me to gain leverage over Mr. Ellner with respect to their fee dispute. I resented this, considered this to be unethical and improper, and declined to go along.

48. Subsequently, Mr. Moldovsky falsely accused me of disclosing his privileged and/or confidential information (as my former client in an entirely unrelated Pennsylvania matter) to Mr. Ellner. This is untrue and, in my view, scandalous. In fact, when Mr. Ellner occasionally raised concerns about Mr. Moldovsky I demurred and told him I would not discuss such concerns or get involved, because Mr. Moldovsky was my "friend."

49. On another occasion, Mr. Moldovsky falsely accused me of "undermining" his law firm and "poaching" his clients — even though it was the Moldovsky Firm itself that withdrew from this matter, and did so over its clients' opposition. *See* ECF #231, 232.

50. Attached as **Exhibit 23** are a number of emails between Mr. Moldovsky and I from April 2018 which document his attempt to brow-beat me into abandoning my clients in state court in order to gain leverage over them with regard to his payment demands.[13]

51. The Moldovsky Firm's motion to withdraw was granted April 9th. I entered my appearance on April 27th. Immediately thereafter, I requested Mr. Moldovsky's cooperation in transferring the file to me. Instead of transferring the electronic file

---

[13] Mr. Moldovsky's use of sharp tactics in order to try to squeeze additional money from Lightbox raises troubling questions about his candor in representing this Court that his motion to withdraw was primarily grounded in communication difficulties, and only secondarily by his pecuniary interest in a barely past-due invoice. *Cf.* Compl. at ¶¶ 147-52; Ellner Cert. at ¶¶ 107-113.

immediately, Mr. Moldovsky demanded payment, 1.5 hours paralegal time and 0.5 hours attorney time, for copying an electronic case file to a USB flash drive — a secretarial task that might take ten seconds.[14] I was eventually able to obtain my clients' file only after lengthy back-and-forth with Mr. Moldovsky and only after three weeks had passed. I believe that Mr. Moldovsky's actions in this regard were based on pettiness and vindictiveness, whether to his former clients or to me personally. Attached as **Exhibit 24** are copies of communications documenting Mr. Moldovsky's petty haggling over this trivial task.

52.     In parallel to my efforts to obtain a copy of my clients' file, I made similar efforts to elicit information from Mr. Moldovsky concerning any lien his firm might assert against Lightbox's recovery. Ultimately, Mr. Moldovsky did not provide an intelligible response, leaving me to assume his firm was asserting lien rights over Lightbox's full recovery. Attached as **Exhibit 25** are copies of communications documenting those efforts.

53.     On June 14th, the Court granted Lightbox leave to commence an interpleader proceeding. Mr. Moldovsky moved to disqualify me just five days later, which motion was denied on June 26th. Had Mr. Moldovsky succeeded in this meritless ploy and had I been disqualified, Lightbox would have been left without representation and would have been unable to proceed with the interpleader. Notwithstanding Mr. Moldovsky's sharp tactics, his motion was denied and Lightbox filed its Complaint timely on July 3rd.

*The Court's prior determinations regarding reasonable attorney's fees in this matter*

54.     For the Court's convenience, I have summarized below certain information regarding the Court's prior fee awards in this matter, which I understand were based on the

---

[14] The fact that Mr. Moldovsky tried to bill me for two hours of legal time for a ten-second secretarial task raises questions about his firm's time entries and billing practices. *Cf.* Compl. at ¶ 167.

Court's review of Lightbox's prior fee applications in the context of (a) discovery sanctions; and (b) contractual attorney fee-shifting in favor of the prevailing party.

55.     Based on my review of Lightbox's prior submissions to the Court, and taking into account the applicable period of time encompassed by each such fee application and the Court's decision, the following picture emerges:

| fee application | Law Firm | From | to | invoiced | awarded | percent |
|---|---|---|---|---|---|---|
| final fee award | Scarola | 3/11/16 | 10/28/16 | $ 467,622.00 | $ 100,000.00 | 21.4% |
| discovery sanctions | Scarola | 8/22/16 | 12/30/16 | $ 114,755.55 | $ 10,000.00 | 8.7% |
| discovery sanctions | Moldovsky | 3/1/16 | 11/30/17 | $ 69,669.00 | $ 10,000.00 | 14.4% |

56.     As shown above, it is my understanding that, in deciding Lightbox's fee applications in this matter, the Court reviewed and considered the vast majority of the Scarola and Moldovsky Firms' invoices spanning most of the period that these firms represented Lightbox in this matter, and that the Court took judicial notice of its own, firsthand familiarity with the nature of the 3rd Home litigation, the relative complexity (or lack thereof) of the legal and factual issues in dispute, and any other relevant factors, and that all this was carefully weighed and accounted for when the Court awarded Lightbox, on average, less than 15% of the amounts invoiced.

*Conclusion*

57.     In light of the equitable considerations and other factors set forth herein and in Mr. Ellner's accompanying certification, and pursuant to applicable New York law as set forth in Lightbox's memorandum of law, and in light of the money already received by the Scarola and Moldovsky Firms, I respectfully submit that neither law firm should be awarded any additional money under their respective liens.

Case 1:16-cv-02379-DLC   Document 337   Filed 10/24/18   Page 17 of 17

- 17 -

                                              Respectfully submitted,

Date: October 12, 2018            <u>/s/ Jonathan R. Miller, Esq.</u>
                                              **The Law Firm of Jonathan R. Miller**
                                              100 Overlook Drive, 2nd Floor
                                              Princeton, N.J. 08540
                                              Tel. 609-955-1226
                                              Fax. 609-964-1026
                                              Email: <u>jonathan.miller@lawyer.com</u>