**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LIGHTBOX VENTURES, LLC, | No. 16-cv-02379 (DLC) |
|       Plaintiff, | |
|     v. | |
| 3RD HOME LIMITED and WADE SHEALY, | |
|       Defendants. | |
| 3RD HOME LIMITED and WADE SHEALY, | |
|       Third-Party Plaintiffs, | |
|     v. | |
| ANDREW ELLNER, | |
|       Third-Party Defendant. | |
| LIGHTBOX VENTURES, LLC, and ANDREW ELLNER, | |
|       Third Party Plaintiffs, | |
|     v. | |
| SCAROLA ZUBATOV SCHAFFZIN PLLC, and BREM MOLDOVSKY LLC, | |
|       Third Party Defendants. | |

---

**MEMORANDUM OF LAW AS TO THE SCAROLA AND MOLDOVSKY FIRMS' COMPETING ATTORNEY'S LIENS**

---

Jonathan R. Miller, Esq.
**The Law Firm of Jonathan R. Miller**
100 Overlook Drive, 2nd Floor
Princeton, N.J. 08540
Tel. 609-955-1226
Fax 609-964-1026
jonathan.miller@lawyer.com

*Counsel for Lightbox Ventures, LLC
and Andrew Ellner*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................ 1

PERTINENT FACTS AND PROCEDURAL HISTORY ................................. 1

LEGAL ARGUMENT ................................................................................... 4

I.     THE SCAROLA AND MOLDOVSKY FIRMS' LIEN RIGHTS HAVE BEEN SATISFIED BY THE FEES ALREADY PAID TO THEM ................... 4

     A.    N.Y. Judiciary Law § 475 ........................................................ 4

     B.    An attorney who withdraws with good cause has the same lien rights as one discharged by the client without good cause. ............................... 5

     C.    Determination of the Amount of the Lien ............................................. 6

          1.    As between attorneys and clients ............................... 6

          2.    As between outgoing attorneys and their successors .................... 8

          3.    Equitable considerations ............................................. 9

     D.    Application of general principles to the matter before the Court ............ 10

          1.    The Scarola and Moldovsky Firms' respective lien rights should initially be determined according to their proportional contribution to Lightbox's recovery. ........................................... 10

          2.    The defendant law firms' respective lien rights must be reduced by the prior payments each has already received. ........... 11

          3.    Each law firm's lien rights should reflect this Court's prior determinations of the reasonable value of each firm's services. .................................................................................... 12

          4.    The Scarola Firm is collaterally estopped from relitigating the issue of its reasonable attorney's fees. ........................................ 13

          5.    Blatant overbilling .................................................... 14

          6.    Unlawful retainer provisions ...................................... 18

          7.    Fraudulent Inducement .............................................. 18

II.    THE MOLDOVSKY FIRM HAS FORFEITED ITS LIEN RIGHTS ............ 23

     A.    Breach of fiduciary duty .................................................... 23

     B.    Client abandonment / withdrawal without good cause ......................... 24

CONCLUSION ........................................................................................ 25

# TABLE OF AUTHORITIES

## CASES

*Beadwear, Inc. v. Media Brands, LLC*, 2001 U.S. Dist. LEXIS 20927 (S.D.N.Y. Dec. 18, 2001) ................................................................................ 7

*Buchta v. Union Endicott Cent. Sch. Dist.*, 296 A.D.2d 688 (3d Dept. 2002) ......................... 10

*Cheng v. Modansky*, 73 N.Y.2d 454 (N.Y. 1989) ........................................................ 6, 7, 8, 9

*Cohen v. Grainger, Tesoriero, & Bell*, 81 N.Y.2d 655 (N.Y. 1993) ............................................. 9

*Condren v. Grace*, 783 F. Supp. 178 (S.D.N.Y. 1992) ............................................................ 23

*Ficaro v. Alexander*, 142 A.D.3d 1043 (2d Dept. 2016) ........................................................ 10

*Greenberg v. Cross Island Indus.*, 522 F. Supp. 2d 463 (E.D.N.Y. 2007) ................................ 10

*Hoffenberg v. Hoffman & Pollok*, 248 F. Supp. 2d 303 (S.D.N.Y. 2003) ................................ 19

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442 (2d Cir. 1998) ............... 4, 7

*Jacobson v. Sassower*, 66 NY 2d 991 (N.Y. 1985) ............................................................. 7, 17

*Klein v. Eubank*, 87 N.Y.2d 459 (N.Y. 1996) .................................................................... 5, 6

*Lansky v. Easow*, 304 A.D.2d 533 (2d Dept. 2003) ............................................................. 5, 6

*Luca v. Giaccone*, 2017 U.S. Dist. LEXIS 136177 (E.D.N.Y. Aug. 24, 2017) ........................ 10

*Lynch v. Wise Metals Group, LLC*, 19 A.D.3d 273 (1st Dept. 2005) ....................................... 19

*Machcinski v. Lehigh V. R. Co.*, 272 F. 920 (2d Cir. 1921) ...................................................... 7

*Matter of Bracken, Margolin, Besunder, LLP v. Raymond*, 2013 N.Y. Misc. LEXIS 3155 (N.Y. Sup. Ct. July 12, 2013) ................................................................... 6, 11

*Melnick v. Press*, 2009 U.S. Dist. LEXIS 77609 (E.D.N.Y. Aug. 28, 2009) ........................... 12

*Metro. Life Ins. Co. v. United States*, 9 A.D.2d 356 (App. Div. 1959) .................................... 10

*Petition of Harley & Browne*, 957 F. Supp. 44 (S.D.N.Y. 1997) ............................................... 5

*Pilitz v. Incorporated Vil. of Freeport*, 762 F. Supp. 2d 580 (E.D.N.Y. 2011) ........................... 6

*Purdy v. Zeldes*, 337 F.3d 253 (2d Cir. 2003) .................................................................... 14

*Sellick v. Consol. Edison Co. of N.Y., Inc.*, 2017 U.S. Dist. LEXIS 43554
(S.D.N.Y. Mar. 23, 2017) ........................................................................ 10

*Sequa Corp. v. GBJ Corp.*, 156 F.3d 136 (2d Cir. 1998) ....................................... 7, 8

*Shalom Toy v. Each & Every One of the Members of the N.Y. Prop. Ins. Underwriting
Ass'n*, 239 A.D.2d 196 (App. Div. 1997) ........................................... 23, 25

*Shelton v. Shelton*, 151 A.D.2d 659 (2d Dep't 1989) ........................................... 23

*Silbiger v. Prudence Bonds Corp.*, 180 F.2d 917 (2d Cir.), *cert. denied*, 340 U.S. 831
(1950) ...................................................................................................... 23

*Stair v. Calhoun*, 722 F. Supp. 2d 258 (E.D.N.Y. 2010) ..................................... 5, 11

*Sutton v. N.Y.C. Transit Auth.*, 462 F.3d 157 (2d Cir. 2006) ................................ 5, 9

*United States v. Ripa*, 323 F.3d 73 (2d Cir. 2003) ............................................... 10

## STATUTES

N.Y. Judiciary Law § 475 .......................................................................... 4, 5

## PRELIMINARY STATEMENT

Lightbox Ventures, LLC and Andrew Ellner (the "Lightbox Parties") submit this Memorandum of Law addressing the Scarola and Moldovsky Firms' competing lien claims over Lightbox's recovery in this matter.[1]

For the reasons set forth herein and in their accompanying papers, the Lightbox Parties respectfully request that the Court issue the following factual findings and legal conclusions: (1) the Scarola Firm has a statutory lien in an initial amount of $100,000.00, which amount is reduced by $316,535.41 in prior payments, for a zero-dollar net lien; (2) the Moldovsky Firm has forfeited its lien by fraudulently inducing the Lightbox Parties to agree to its demands for an amended and more lucrative fee agreement, thereby violating its fiduciary duties, and by withdrawing from representing Lightbox without good cause; and (3) alternatively, the Moldovsky Firm has a statutory lien in an initial amount of $75,000.00, which amount is reduced by $119,742.41 in prior payments, for a zero-dollar net lien.[2]

## PERTINENT FACTS AND PROCEDURAL HISTORY

The Lightbox Parties incorporate by reference and rely upon the facts in Mr. Ellner's October 11, 2018 certification, Attorney Jack Olivo's October 3, 2018 certification, and Attorney Jonathan R. Miller's October 12, 2018 certification, and all exhibits thereto.

---

[1] Mr. Ellner, personally, does not assert a lien or other direct right to Lightbox's recovery but is participating herein to the extent that the Court may determine issues relating to the defendant law firms' representation of him as third party defendant in the 3rd Home litigation. As Lightbox's managing member, Mr. Ellner has a derivative interest in its recovery in this matter.

[2] A lien cannot be for a negative amount, of course, but may be fully satisfied by prior payments made to the lienholder.

Lightbox retained the Scarola Firm on March 11, 2016 in connection with Lightbox's dispute with 3rd Home Limited and Mr. Shealy concerning a joint venture agreement. Ellner Cert. at ¶¶ 1-5 & Exh. 5.

By and through the Scarola Firm, Lightbox filed suit against 3rd Home Limited on March 31, 2016 (ECF #1) and filed an amended complaint naming Wade Shealy as an additional defendant on August 25, 2016 (ECF #46). In response, 3rd Home filed a counterclaim against Lightbox and also a third party complaint against Mr. Ellner, alleging Lanham Act and related violations. (ECF #48).[3]

Lightbox terminated the Scarola Agreement on February 27, 2017 for a variety of reasons including concerns about exorbitant overbilling,[4] hyper-aggressive and counter-productive litigation and settlement strategy, extortionate attempt to make Mr. Ellner personally liable for Lightbox's legal fees,[5] and other conduct which Lightbox's other attorney at that time, Jack Olivo, has described as "chilling", "confrontational", "distasteful", "vicious", "insulting", and "disrespectful." *See generally* Ellner Cert. at ¶¶ 14-45 & Exhs. 6, 19 thereto; Olivo Cert. at ¶¶ 6-7 & Exh. 1 thereto.

The Lightbox Parties retained the Moldovsky Firm on February 20, 2017. Ellner Cert., Exh. 20. Mr. Moldovsky entered his appearance on March 1, 2017. ECF #97. Two

---

[3] Mr. Shealy did not assert a counterclaim or third party complaint in this matter. *See* ECF #48. The caption reflected in the docket and on court filings is incorrect; Mr. Shealy was a defendant but not a third party plaintiff.

[4] The Scarola Firm is no stranger to fee disputes with its clients. In fact, of all New York Supreme Court matters filed since 2013, in which Mr. Scarola has appeared, thirty-five percent (35%) are lawsuits arising from fee disputes between the Scarola Firm and its former clients. Miller Cert. at ¶¶ 3-6 & Exhs. 1-6; *cf.* Compl. at ¶ 57 & Exh. 3.

[5] At one point, the Scarola Firm reneged on a prior oral agreement to defer 40% of its fees and instead demanded a 40% *increase* in its effective hourly billing rate, plus Mr. Ellner's personal liability for same, in exchange for partial deferral of its invoices. *See* Ellner Cert. at ¶¶ 20-30 & Exhs. 10-11.

days later, Scarola Firm's representation was formally terminated by way of so-ordered substitution. ECF #99.

Under the Moldovsky Firm's February 20, 2017 retainer agreement (the "Moldovsky Agreement") the firm agreed to represent the Lightbox Parties for an up-front flat fee of $75,000 plus a contingency fee.

On November 13, 2017, the Court ruled that Lightbox's two experts would not be permitted to testify at trial because their reports were based on speculation. The Court further ruled that Lightbox was not entitled to recover future lost profits nor the value of the joint venture because of the speculative nature of such damages but would be entitled to recover only its costs incurred with building the joint venture's website, in an amount to be determined later. *See* ECF #149. This decision was consistent with the Court's October 28, 2016 decision denying Lightbox preliminary injunctive relief, in which the Court ruled, "The loss of theoretical future sales is too speculative to warrant a preliminary injunction," and further indicated that Lightbox would likely recover about $80,000 plus its reasonable attorney's fees. *See* ECF #69.

Immediately thereafter, on November 14, 2017, Mr. Moldovsky drafted an amended fee arrangement, converting the contingency fee into an hourly fee, one-third to be paid as invoiced and the remainder payable at the conclusion of litigation according to a complicated, virtually unintelligible formula. *See* Ellner Cert. at ¶¶ 89-93 & Exhs. 29-30.

In a series of communications over the following month, the Moldovsky Firm browbeat the Lightbox Parties into signing the amended fee agreement (the "Moldovsky Fee Amendment"). Among other things, Mr. Moldovsky took advantage of Mr. Ellner's lack of legal expertise — misrepresenting to him that the Moldovsky Firm had a contractual right to

terminate the representation any time that he deemed it no longer financially worthwhile to his firm; that the Moldovsky Firm also had a contractual right to unilaterally replace the agreed-upon contingency fee with hourly billing; and that Mr. Ellner could not inform the Court about Mr. Moldovsky's threat to quit the case. *See id.* at ¶¶ 95-102 & Exh. 31.

In March 2018, Mr. Ellner raised questions about the Moldovsky Firm's February invoice. Mr. Moldovsky blew him off, insisting that everything was "honest", and rejected Lightbox's offer to make a sizable payment in good faith while continuing to review the invoice. When Lightbox did not comply with his various ultimatums, Mr. Moldovsky moved for leave to withdraw, misleading the Court with a false narrative about "strategic differences" instead of a simple dispute over a single invoice that was only a few days past due. *See id.* at ¶¶ 107-114 & Exhs. 39, 47-50.

The Moldovsky Firm's motion was granted on April 9, 2018, effective April 13th. That same day, the Court awarded Lightbox $100,517.27 in damages and prejudgment interest. Lightbox retained new counsel for post-trial submissions, including its fee application and the current interpleader proceeding. On June 12, 2018 the Court awarded Lightbox $100,000.00 in attorney's fees. Both these awards, together with $38,888.01 in previously awarded discovery sanctions, have been deposited into court.

## LEGAL ARGUMENT

### I.   THE SCAROLA AND MOLDOVSKY FIRMS' LIEN RIGHTS HAVE BEEN SATISFIED BY THE FEES ALREADY PAID TO THEM

#### A.   N.Y. Judiciary Law § 475

New York law governs charging liens in this Court. *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 448-49 (2d Cir. 1998). N.Y. Judiciary Law § 475 provides:

> From the commencement of an action . . . in any court . . . the attorney who appears for a party has a lien upon his or her client's cause of action, claim or counterclaim, which attaches to a verdict, report, determination, decision, award, settlement, judgment or final order in his or her client's favor, and the proceeds thereof in whatever hands they may come; and the lien cannot be affected by any settlement between the parties before or after judgment, final order or determination. The court upon the petition of the client or attorney may determine and enforce the lien.

N.Y. JUDICIARY LAW § 475.

"A charging lien, although originating at common law, is equitable in nature, and ***the overriding criterion for determining the amount of a charging lien is that it be 'fair.'***" *Sutton v. N.Y.C. Transit Auth.*, 462 F.3d 157, 161 (2d Cir. 2006) (citations omitted) (emphasis added).

### B. An attorney who withdraws <u>with</u> good cause has the same lien rights as one discharged by the client <u>without</u> good cause.

"[A]ttorneys who terminate their representation are still entitled to enforce their charging liens, as long as the attorney does not withdraw without 'good cause' and is not discharged for 'good cause.'" *Stair v. Calhoun*, 722 F. Supp. 2d 258, 267 (E.D.N.Y. 2010); *see also Petition of Harley & Browne*, 957 F. Supp. 44, 48 (S.D.N.Y. 1997); *Klein v. Eubank*, 87 N.Y.2d 459 (N.Y. 1996).

Contrary to the Scarola Firm's insistence that it sought to be relieved as counsel and was not truly terminated, this is a distinction without a difference. *Lansky v. Easow*, 304 A.D.2d 533, 534 (2d Dept. 2003) ("Where an attorney's representation terminates upon mutual consent, and there has been no misconduct, no discharge for just cause, and no unjustified abandonment by the attorney, the attorney maintains his or her right to enforce the statutory lien.").

New York law simply does not support this kind of hair-splitting:

> When an attorney's withdrawal from a case is justifiable . . . the terms of a retainer agreement no longer serves to establish the sole standard for the attorney's compensation. The amount of the lien must be fixed not alone upon the basis of a rescinded contract but also upon a foundation built of the volume and quality of the professional services actually and necessarily performed.

*Matter of Bracken, Margolin, Besunder, LLP v. Raymond*, 2013 N.Y. Misc. LEXIS 3155, *9-10 (N.Y. Sup. Ct. July 12, 2013); *see also Pilitz v. Incorporated Vil. of Freeport*, 762 F. Supp. 2d 580, 583 (E.D.N.Y. 2011) (once rescinded, the retainer agreement no longer controls the attorney's right to compensation).

Moreover, a charging lien is waived by an attorney who neglects or refuses to proceed with the prosecution of the case without just cause. *Klein,* 87 N.Y.2d at 463; *see also Lansky*, 304 A.D.2d at 534 ("where an attorney withdraws without good cause, his or her lien is automatically forfeited"). There is no distinction in this regard between an attorney who withdraws without good cause, an attorney who simply abandons the client, and an attorney who is terminated for cause by the client.

### C.   Determination of the Amount of the Lien

#### 1.   As between attorneys and clients

When the fee dispute is only between an attorney and his or her former client, the rule is that the attorney is entitled to compensation "measured by the fair and reasonable value of the services rendered whether that be more or less than the amount provided in the contract or retainer agreement." *Cheng v. Modansky*, 73 N.Y.2d 454, 457-58 (N.Y. 1989). In such situations, either side may choose to have the attorney's compensation be fixed at the time of discharge on the basis of *quantum meruit*, or they can both agree that the attorney

will receive a contingent percentage of the recovery, which percentage may be determined at the time of discharge or at the conclusion of the case. *Id.* at 458.

Absent an agreement between the attorney and his or her client that the attorney's charging lien will be determined as a contingent percentage, the amount of the lien is based on *quantum meruit*, taking into account, among other equitable considerations, "the difficulty of the matter, the nature and extent of the services rendered, the time reasonably expended on those services, the quality of performance by counsel, the qualifications of counsel, the amount at issue, and the results obtained (to the extent known)." *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 148 (2d Cir. 1998).[6]

---

[6] The Scarola Firm urges that the contractual lien provision in its retainer agreement is itself an "agreement" that its charging lien shall be in the amount of its unpaid invoices — but has failed to cite valid legal support for its sleight of hand reasoning. The century-old opinion in *Machcinski v. Lehigh V. R. Co.*, 272 F. 920 (2d Cir. 1921) merely stands for the noncontroversial proposition that a lawyer who has not been discharged has the right to enforce a contingency fee agreement against the client's recovery. *See also Beadwear, Inc. v. Media Brands, LLC*, 2001 U.S. Dist. LEXIS 20927 (S.D.N.Y. Dec. 18, 2001) (same). And, the *dicta* in *Itar-Tass*, 140 F.3d 442, is just that. The method of calculation of an attorney's charging lien was not before the court, nor did that case involve **competing** attorney's liens.

Moreover, the Scarola Agreement ***does not*** contain a provision fixing the amount of its statutory lien. Indeed, in January 2018 the Scarola Firm moved the state court for a TRO and preliminary injunctive relief in order to protect its alleged contractual lien. Justice Cohen studied that very provision and, upon consideration of the parties' papers and legal memoranda, and after lengthy oral argument, found that the purported contractual lien provision was essentially no more than a pro forma recitation of the firm's statutory lien rights:

> In terms of the liens, . . . certainly if you read the provision of the contractual lien, . . . you will note that, essentially, the lien that it asserts, essentially, is part and parcel of what a charging lien is. And, it doesn't really seem to be any distinction except that what a charging lien is reiterated within the course of the contract.

*See* Miller Cert., ¶¶ 17-19 & Exh. 15 thereto.

In light of the foregoing, and as a matter of collateral estoppel and issue preclusion, the purported contractual lien provision is merely a reiteration of the Scarola Firm's statutory lien, not an agreement to fix the amount of that lien. Moreover, even if viewed as a provision sufficiently ambiguous for an experienced judge to mull over, such ambiguity must be construed against the Scarola Firm. *See, e.g., Jacobson v. Sassower*, 66 NY 2d 991, 993 (N.Y. 1985).

### 2.   As between outgoing attorneys and their successors

Where the fee dispute involves successive attorneys, the rules are somewhat different. In such cases, the outgoing attorney is entitled to elect between: (a) "compensation on the basis of a presently fixed dollar amount based upon *quantum meruit* for the reasonable value of services;" and (b): "a contingent percentage fee based on the proportionate share of the work performed on the whole case." *Sequa*, 156 F.3d at 148. When the outgoing attorney elects the latter option, i.e. the contingent percentage fee, the percentage is best determined "at the conclusion of the case when such factors as the amount of time spent by each lawyer on the case, the work performed and the amount of recovery can be ascertained." *Cheng*, 73 N.Y.2d at 458.

### a.   An attorney who fails to elect compensation in *quantum meruit* upon being discharged is entitled to a proportionate contingency fee.

If the outgoing attorney does not make an election at the time of substitution, the New York Court of Appeals has instructed that there is a presumption in favor of compensation based on a proportionate contingency fee:

> Where an election is not made or sought at the time of discharge, the presumption should be that a contingent fee has been chosen. This result avoids both the problem of belated claims for compensation when proof of services rendered is hard to rebut and the inequity involved in allowing the discharged attorney to wait until the case is lost and then demand a fee measured [in] quantum meruit. Our holding places the discharged attorney in the position of having to demand payment of a fixed sum at the time of discharge, or if he or she remains silent, of collecting payment only if the litigation proves successful and then on a contingency basis. Of course, if the parties are uncertain of their positions either may obtain a judicial determination of the fee at any time.

*Cohen v. Grainger, Tesoriero, & Bell*, 81 N.Y.2d 655, 660 (N.Y. 1993).[7]

In other words, an attorney who is replaced by substitute counsel cannot wait until the litigation is concluded and only then elect between *quantum meruit* and a court-determined proportional contingency fee, after seeing the results and monetary recovery obtained by his or her former client. If the attorney does not make a timely election upon the termination of representation, he or she will be deemed to have elected a proportional contingency fee.[8]

### 3.   Equitable considerations

"A charging lien . . . is equitable in nature, and the overriding criterion for determining the amount of a charging lien is that it be 'fair.'" *Sutton*, 462 F.3d at 161.

---

[7] In the present matter, neither the Scarola Firm nor the Moldovsky Firm made an election upon termination of representation. The Scarola Firm sued Lightbox in state court for breach of contract, account stated, and for enforcement of its alleged contractual lien for the full amount of its unpaid invoices. It did not assert a claim for *quantum meruit* nor did it elect to receive a proportionate contingency fee at the conclusion of the 3rd Home litigation. *See* ECF #283-8. And, since the outgoing attorney must elect *quantum meruit* upon the termination of representation, the Scarola Firm's flawed September 2018 amendment of its state court complaint is eighteen months too late.

Similarly, the Moldovsky Firm moved to leave to withdraw as counsel more than six months ago but has not asserted a claim for *quantum meruit*, not in any tribunal and not informally. Instead, the Firm's six different versions of its "final" invoice merely claim that its lien is anywhere between $80,000 and $400,000, without any expressed rationale. *See* Ellner Cert. at ¶ 105 & Exhs. 41-46; *see also* Miller Cert. at ¶ 52 & Exh. 25.

[8] In candor, this analysis is different than that expressed in Lightbox's opposition to dismissal of Counts 2-5, where I argued that fixing each lawyer's *quantum meruit* claim is a necessary antecedent to determining its statutory lien. *See* ECF #308 at 23-28. Under *Cheng*, the proper analysis is more nuanced, especially where, as here, the outgoing attorney did not elect to have his lien fixed in *quantum meruit*.

In this case, since the Scarola and Moldovsky Firms did not ask the Court to determine their rights in *quantum meruit* upon being discharged as counsel of record, their respective liens should be determined as a proportional percentage of Lightbox's actual recovery, taking into account each firm's relative contribution to the results obtained as well as the amounts each firm has already received, and other considerations addressed herein.

"In determining each firm's proportionate share of the work, the Court considers the time and labor involved, the difficulty of the case, the skill required to handle the matter, the results achieved, the amount of money involved, and the fee customarily charged for similar services." *Greenberg v. Cross Island Indus.*, 522 F. Supp. 2d 463, 469 (E.D.N.Y. 2007). Among other things, courts consider "the effectiveness of counsel in bringing the matter to resolution." *See Buchta v. Union Endicott Cent. Sch. Dist.*, 296 A.D.2d 688, 689-90 (3d Dept. 2002)). The determination of a proportionate share is a matter "within the sound discretion of the court." *Ficaro v. Alexander*, 142 A.D.3d 1043, 1043 (2d Dept. 2016); *Sellick v. Consol. Edison Co. of N.Y., Inc.*, 2017 U.S. Dist. LEXIS 43554, at *19 (S.D.N.Y. Mar. 23, 2017).

### D.    Application of general principles to the matter before the Court

#### 1.    The Scarola and Moldovsky Firms' respective lien rights should initially be determined according to their proportional contribution to Lightbox's recovery.

In this case, there is a dispute between the Scarola and Moldovsky Firms as to their competing lien rights and also a dispute between both law firms and Lightbox regarding the same issue.[9] However, there is no question but that, upon being discharged from this matter, neither of the defendant law firms sought to have their compensation be fixed in *quantum*

---

[9] The Scarola Firm argues that there is no bona fide lien dispute with the Moldovsky Firm, because their lien arose first, i.e. as Lightbox's first attorney of record in this matter. While this is more an argument for the Moldovsky Firm to rebut, it is worth noting that the Scarola Firm once again relies on wholly irrelevant caselaw. *United States v. Ripa*, 323 F.3d 73 (2d Cir. 2003) and *Metro. Life Ins. Co. v. United States*, 9 A.D.2d 356 (App. Div. 1959) both concern federal tax liens, not New York attorney's liens. A third case — which the Scarola Firm quotes at length but omits any cognizable form of citation for (and which I was only able to identify by Boolean keyword proximity search) — concerns the relative priority of liens held by ***attorneys for different clients in two entirely different proceedings five years apart, not among successive attorneys in the same matter***. *See Luca v. Giaccone*, 2017 U.S. Dist. LEXIS 136177, *13-14 (E.D.N.Y. Aug. 24, 2017).

*meruit*. The Scarola Firm opted to pursue contractual remedies in state court.[10] And, despite being asked several times about this issue by Lightbox's below-signed incoming attorney more than six months ago, the Moldovsky Firm has done little more than issue six versions of its "final" invoice — and move for disqualification. *See* Ellner Cert., Exhs. 41-46; Miller Cert. at ¶ 52 & Exh. 25.[11]

> ### 2. The defendant law firms' respective lien rights must be reduced by the prior payments each has already received.

In addition, it is undisputed that the Scarola Firm has already been paid $316,535.41 for its services, the Moldovsky Firm has already been paid $119,742.41, and Lightbox has also incurred over $160,000 in legal fees, costs and expenses in this matter. *See* Ellner Cert. at ¶ 123. Each firm's respective liens must be reduced by the amounts previously paid to them, dollar for dollar. *See Bracken, supra,* 2013 N.Y. Misc. LEXIS 3155, *30 (in determining attorney's § 475 lien, "the Court must deduct $26,734.83 for payments already made . . . for fees and expenses"); *Stair*, *supra*, 722 F. Supp. 2d at 276 (same; "deduction of $25,906.86 for payments already made"); *Melnick v. Press*, 2009 U.S. Dist. LEXIS 77609, *39 (E.D.N.Y.

---

[10] The Scarola Firm's April 2017 state court complaint also includes a claim against Mr. Ellner, personally, for unjust enrichment, which in no way implicates the firm's statutory lien rights against Lightbox's recovery in this matter. *See* ECF #283-4. And, its defective September 2018 attempt to amend its state court complaint with a belated *quantum meruit* claim is eighteen months too late — and addressed to the wrong court. *See* n.7, *supra*.

[11] In order to avoid complicating matters still further, I have not asserted my own statutory rights into this interpleader proceeding as Lightbox's attorney of record since April 2018 and as the attorney who prepared its application for attorney's fees. For what it's worth, all my invoices have been fully paid. I do not have an equitable right to be paid more than what my retainer agreement provides.

Aug. 28, 2009) (same). Indeed, to do otherwise would inequitably bestow a windfall upon the attorney.[12]

> ### 3. Each law firm's lien rights should reflect this Court's prior determinations of the reasonable value of each firm's services.

Despite the fact that the Scarola and Moldovsky Firms have been paid about $430,000 combined, and Lightbox's other attorneys about $40,000 more, not including more than $120,000 for expert fees and various outsourced legal services, Ellner Cert. at § 123, and notwithstanding the Defendant Law Firms' claims for purportedly unpaid fees in the additional combined amount of $700,000 more,[13] this Court has already ruled that these invoices are unreasonable:

> An award of anything near the amount invoiced by Scarola would be excessive. The legal issues implicated by the preliminary injunction motion were straightforward, and the scope of the factual disputes was relatively small. The skill and time required to litigate this matter before the hearing and to prepare for and conduct the preliminary injunction hearing should not have been great. . . . In light of the Court's broad discretion to set awards of attorneys' fees, the Court finds that $100,000 is at the upper range of a reasonable attorneys' fee for litigating this matter through the date of the Preliminary Injunction Opinion.

ECF #252.

---

[12] It is anticipated that the Scarola and/or Moldovsky Firms may argue that their respective liens should disregard prior payments and instead be fixed according to the unpaid invoices only. There is no legal support for such a position. If that were true, then no court would ever reduce the amount of a charging lien by the amounts previously paid, which is clearly not the situation. Instead, courts must determine the lien by evaluating the entire scope of representation and then reduce the amount of the lien by all prior payments received by the attorney.

[13] The Scarola Firm claims $295,000 in unpaid invoices, plus interest and its costs of collection. The Moldovsky Firm sixth revised "final" invoice demands $400,000. Ellner Cert., Exhs. 8 & 46.

Moreover, in the context of Lightbox's two applications for its reasonable attorney's fees related to the discovery dispute with 3rd Home, and again as the prevailing party entitled to contractual fee-shifting, the Court has already considered the vast majority of the Scarola and Moldovsky Firms' invoices spanning most of the period that these firms represented Lightbox in this matter, together with the Court's own, firsthand familiarity with the nature of the 3rd Home litigation, the relative complexity (or lack thereof) of the legal and factual issues in dispute, and any other relevant factors. On average, the Court awarded Lightbox less than 15% of the amounts invoiced:

| fee application | Law Firm | from | to | invoiced | awarded | percent |
|---|---|---|---|---|---|---|
| final fee award | Scarola | 3/11/16 | 10/28/16 | $ 467,622.00 | $ 100,000.00 | 21.4% |
| discovery sanctions | Scarola | 8/22/16 | 12/30/16 | $ 114,755.55 | $ 10,000.00 | 8.7% |
| discovery sanctions | Moldovsky | 3/1/16 | 11/30/17 | $ 69,669.00 | $ 10,000.00 | 14.4% |

*See* Miller Cert. at ¶¶ 54-56.

Under such circumstances it would be anomalous to use these invoices as a starting point for determining each law firm's lien rights. Instead, the starting point should be the $100,000 that the Court has determined to be reasonable, and any adjustments to that starting point should be clearly consistent with prior proceedings and decisions in this matter — including deducting all prior payments from each firm's "gross" lien.

### 4.   The Scarola Firm is collaterally estopped from relitigating the issue of its reasonable attorney's fees.

"Under federal law, collateral estoppel [or issue preclusion] applies when (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate

the issue; and (4) the resolution of the issue was necessary to support a valid and final

judgment on the merits." *Purdy v. Zeldes*, 337 F.3d 253, 258 (2d Cir. 2003) (citation omitted).

 In this case, the reasonableness of the Scarola Firm's fees has been litigated and fully

decided, which issue was intrinsic to determining Lightbox's fee award as the prevailing

party. The Court ruled that, of the legal fees incurred by Lightbox in this matter, just

$100,000 was reasonable — and that this amount is at the upper edge of the range of

reasonableness.

 The Scarola Firm certainly had a full and fair opportunity to litigate the issue: Mr.

Scarola rejected an assignment of rights, which would have afforded him standing to argue

the reasonableness of his firm's invoices. He was repeatedly asked to prepare an affidavit in

support of the issue of reasonableness but actually hemmed and hawed and ultimately

refused to certify that his firm's invoices are unqualifiedly reasonable — most likely because

that would have been untrue. And, his firm was offered an opportunity to intervene in this

matter for the express purpose of presenting its position as to this issue, but again refused

the opportunity to do so. Having passed up on at least three opportunities to defend the

reasonableness of its invoices, the Scarola Firm is estopped from doing so now.

### 5. Blatant overbilling

 As noted above, this Court has implicitly found that the Scarola and Moldovsky

Firms had collectively overbilled by sevenfold, on average, from the beginning and through

the end of November 2017. Notably, in setting a cut-off date for contractual fee-shifting, the

Court emphasized that, in light of the October 28, 2016 PI Opinion, both law firms had

actual or constructive notice that speculative lost future profits would be disallowed, and

that without these, Lightbox's likely recovery would be around $80,000.

The Scarola Firm had actual knowledge as attorneys of record at that time, and the Moldovsky Firm had actual or constructive knowledge because Mr. Moldovsky received a copy of the PI Opinion as well as virtually the entire docket, confidential settlement communications, and other documents at least one month before agreeing to get involved in this matter and about six weeks before formally entering his appearance. *See* Ellner Cert. at ¶¶ 48-55 & Exhs. 20-23.

### a.      The Scarola Firm

Mr. Scarola knew from the very beginning that Lightbox was looking for a reasonably priced attorney to amicably resolve 3rd Home's breach of the joint venture agreement, with litigation as the less preferred option. Ellner Cert., Exh. 2. Despite the client's express wishes, Mr. Scarola recommended ███████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Ellner Cert. at ¶¶ 4-9.

In fact, it was Mr. Scarola who precipitated 3rd Home's Lanham Act and related claims against the Lightbox Parties when he expressly recommended ██████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████

Moreover, even though his firm's retainer agreement provides lower billing rates for associate-level and paralegal work, *see* Scarola Agreement at 1, Mr. Scarola assigned almost no work whatsoever to paralegals and none whatsoever to associates, preferring to work this case himself at $765/hour with Mr. Zubatov's $495/hour assistance. *See* ECF #163, #164. This means that any discussions between Mr. Scarola and Mr. Zubatov would have been

invoiced at $1,260 per hour. For a thirteen-paragraph affidavit with a routine, pro-forma recitation of his background and credentials, Mr. Scarola billed $7,650, while Mr. Zubatov billed another $7,276.50 for his own eight-paragraph version. *Id.* Et cetera.[14]

After the Court put the parties on notice that Lightbox's likely recovery in this case would be only around $80,000, Mr. Scarola's response was to ignore and/or downplay the Court's opinion, convincing Lightbox to spend more than $40,000 on an expert report that failed to overcome the inherently speculative nature of a new business venture's future profits and/or intrinsic value — and was promptly ruled unreliable and inadmissible.

Mr. Scarola's overweening bluster was disastrous for Lightbox but lucrative for his firm, generating over $300,000 in receipts (and $600,000 in invoices) to get only halfway through litigating an $80,000 case.[15] This was laid bare when he reneged on an oral agreement to defer up to 40% of the firm's invoices, and later tried to leverage the situation to his firm's advantage by demanding a 40% increase in the firm's effective billing rates, together with Mr. Ellner's personal liability, in exchange for non-contingent deferral of 40% of future invoices.[16]

### b.    The Moldovsky Firm

From the very beginning, Mr. Ellner t██████████████████████████████
████████████████████████████████████████████████████████████████

---

[14] In addition, the Scarola Firm's invoices are replete with excessive and duplicative time entries as well as extensive block-billing. *See* Ellner Cert., Exh. 8.

[15] Because the Scarola Firm was discharged at the halfway point.

[16] Mr. Scarola proposed deferring 40% of the invoiced amounts, which amount would be doubled and fully payable so long as Lightbox received even one dollar in damages. *See* Ellner Cert., Exh. 10. In light of the PI Opinion, this was an illusory contingency.

████████████████████████████████████████████████████████

████████████████████████████████████████ Ultimately, the

Moldovsky Firm agreed to handle the entire matter for $75,000 plus a contingency fee.

In agreeing to this arrangement Mr. Moldovsky evidently failed to review the PI Opinion, the PI hearing transcript, Mr. Nguyen's expert report, or any other documents reasonably needed to evaluate the merits, value and inherent risk in Lightbox's case. Two months later, Mr. Moldovsky was alerted by his associate, Mr. Goldey, to the "case-sinking" implications of the PI Opinion and the flawed, speculative Anvil Report — at which point Mr. Moldovsky convinced Lightbox to spend another $45,000 on a second expert report — over and above Lightbox's $75,000 litigation budget, which his firm pocketed up front.

Then, just one day after the Court excluded both expert reports, Mr. Moldovsky demanded ████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████[17]

In addition to strong-arming its clients to pay hourly fees instead of the agreed-upon contingency fee, the Moldovsky Firm's invoices are suspect. In particular, there are six different "final" invoices, the last of which tacked on another $148,000 after this

---

[17] Although somewhat ambiguous, the relevant provision gives the Moldovsky Firm the right to drop clients with non-meritorious, i.e. frivolous claims, as well as when the client's likely recovery is *de minimis*. Ambiguous retainer agreement provisions must be construed against the attorney and in favor of the client. *Jacobson, supra*, 66 NY 2d at 993.

interpleader proceeding was commenced. All in all, the Moldovsky Firm now purports to have "reasonably" invoiced about $520,000 on an $80,000 case that they jumped into at the halfway point and bailed out from as soon as Mr. Ellner asked to review one of its invoices.[18]

### 6.    Unlawful retainer provisions

As detailed in Lightbox's supporting papers, the Scarola and Moldovsky Firms both employ unlawful provisions in their retainer agreements, presumably routinely and with all clients, not just with Lightbox.

The Scarola Firm's "standard" form of retainer agreement unlawfully purports to foreclose clients from suing for malpractice in violation of N.Y. RPC 1.8(h). It also includes non-mutual fee-shifting in the event of a dispute with clients, which has been unlawful since 2006 at least. *See* Miller Cert. at ¶¶ 7-9.

The Moldovsky Agreement also includes unlawful non-mutual fee-shifting, and also provides for 18% interest for past due invoices — an interest rate which is "excessive" within the meaning of N.Y. RPC 1.5(a). *See* Miller Cert. at ¶¶ 39-43 & Exh. 22.

### 7.    Fraudulent Inducement

In light of the limited scope of this interpleader proceeding the Lightbox Parties have not asserted a formal claim for fraudulent inducement. Nevertheless, the evidence at bar

---

[18] The Moldovsky Firm's contemporaneous timesheets, particularly but not exclusively Mr. Moldovsky's own time entries, are largely inscrutable, duplicative and excessive, including billing at attorney rates for paralegal tasks, as well as running up time on a foreseeably futile motion to enforce a purported settlement. *See generally* Ellner Cert., Exhs. 32-40; *see also* ECF #178, #189.

establishes that Mr. Moldovsky fraudulently induced the Lightbox Parties to agree to amend the retainer agreement, replacing the contingency fee with an hourly fee arrangement.

Because of this, the amended fee agreement is unenforceable (and may not be used to determine the Moldovsky Firm's charging lien, except to reduce it). Moreover, as argued in the following section, the Moldovsky Firm has forfeited its charging lien by acting in gross dereliction of its fiduciary duties.

"Under New York law, a claim of fraudulent inducement requires proof: (1) that the defendant made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity (8) to his injury." *Hoffenberg v. Hoffman & Pollok*, 248 F. Supp. 2d 303, 310 (S.D.N.Y. 2003).

"A contract induced by fraud . . . is subject to rescission, rendering it unenforceable by the culpable party." *Lynch v. Wise Metals Group, LLC*, 19 A.D.3d 273, 275 (1st Dept. 2005).

Here, Mr. Ellner has submitted evidence that, right after the Court ruled that Lightbox's two expert reports were speculative and inadmissible, and that Lightbox was not entitled to recover future lost profits nor the value of the joint venture *per se*, but only its five-figure costs incurred with building the joint venture's website, Mr. Moldovsky prepared an amendment to his firm's retainer agreement, based on a partly deferred hourly fee. When Lightbox resisted, the Moldovsky Firm threatened to withdraw.

Over the following month, and most notably on November 23, 2017, ███████████

███████████████████████████████████████████████



Mr. Moldovsky's aforesaid statements were materially false, because nothing in the original retainer agreement entitled the Moldovsky Firm to unilaterally terminate the agreement if he deemed it insufficiently profitable, nor to unilaterally replace the contingency fee with hourly billing.

Instead, these are the relevant contractual provisions, which Mr. Moldovsky himself

drafted (and presumably understood):

> 10a. Special Payment and Arrangement Terms.
>
> - A fee of $75,000.00 is required for work to begin on your matter.
> - This matter will be handled on the trial level through and up to trial on a contingency fee of 20% of any gross recovery if the recovery occurs within the first 60 days from the time this firm is hired; 25% of any gross recovery if the recovery occurs before a summary judgment decision is decided in the case; 30% of any gross recovery if the recovery occurs once a summary judgment decision has been made in the case; 35% of any gross recovery if the recovery occurs after 15 days before the start of trial; and 40% of any gross recovery if the recovery occurs after an appeal has been started in this matter.
>
> . . . .
>
> - Normal billing would apply for any work needed for bankruptcy, post-Judgment work, appeals, post-trial work, third party litigation, fraudulent conveyance litigation, collateral and other litigation, matters in jurisdiction in which this firm does not practice, other litigation, and matters generally deemed outside of the lawsuit here.
> - Should the contingency fee not apply for any reason, then the regular legal fee terms will apply.
> - This agreement for representation is conditioned upon a finding of sufficient and lawful grounds and reasonable opportunity for recovery for your claims. In the event your attorney's investigation at any phase of these matters, whether before or after suit is filed, indicates that you do not have sufficient and lawful grounds and/or reasonable opportunity for worthwhile recovery, then this agreement shall not obligate your attorney to proceed any further on your behalf whether before or after a claim (or claims) or suit has been filed on your behalf.

The foregoing provisions establish that if Mr. Moldovsky determined that "you [the

Lightbox Parties] do not have sufficient and lawful grounds and/or reasonable opportunity

for worthwhile recovery," the Moldovsky Firm would not be contractually obligated "to

proceed any further on your behalf whether before or after [commencement of litigation]."

This provision would be triggered only upon Mr. Moldovsky finding that *the Lightbox

Parties* did not have "sufficient and lawful grounds and/or reasonable opportunity for

worthwhile recovery" — not whenever he anticipated that his firm's contingency fee may not be as large as he had hoped for.

And, even if this provision was triggered, the firm's sole recourse would be to end the representation, not to start billing hourly fees.

The retainer agreement also has a provision permitting the Moldovsky Firm to withdraw under circumstances of unreasonable financial burden:

alternative legal representation. In addition, we are subject to the New York Rules of Professional Conduct (and NJ and PA attorney conduct rules with similar provisions) that require or allow us to withdraw from representing a client in several circumstances, including:

. . . .

Circumstances where our continued representation of the client will result in an unreasonable financial burden on us or has been rendered unreasonably difficult by the client.

Once again, even in such circumstances the firm's sole recourse would be to withdraw from the matter, not to start billing hourly fees.

As outlined above, there is no question but that Mr. Moldovsky's representation about being entitled to start billing hourly fees was knowingly and materially false, made to induce Mr. Ellner's detrimental reliance, and that Mr. Ellner rightfully and detrimentally relied on his attorney's legal advice and interpretation of the retainer agreement. In fact, Mr. Ellner expressly stated t



*See* Ellner Cert., Exh. 31.

Faced with the prospect of being abandoned by their attorney or being billed at full hourly rates, the Lightbox Parties were compelled to accept the Moldovsky Firm's "compromise" proposal/demand, i.e. hourly billing, but with deferral of two-thirds and with limited personal liability for Mr. Ellner. This was certainly worse for the Lightbox Parties than a contingency fee arrangement, but, compared to Mr. Moldovsky's threat to impose undiscounted and nondeferred hourly billing, the faux "compromise" was suddenly attractive.

## II.      THE MOLDOVSKY FIRM HAS FORFEITED ITS LIEN RIGHTS

### A.      Breach of fiduciary duty

An attorney who breaches his or her fiduciary responsibility to a client may forfeit his or her statutory lien. *See Condren v. Grace*, 783 F. Supp. 178, 185 (S.D.N.Y. 1992) ("without question, case law addressing the topic of breach of an attorney's fiduciary duties to his client sanctions denial of legal compensation"); *see also Silbiger v. Prudence Bonds Corp.*, 180 F.2d 917, 920-21 (2d Cir.), *cert. denied*, 340 U.S. 831 (1950); *In re Estate of Winston*, 214 A.D.2d 677 (2d Dept. 1995) (holding that '"an attorney who engages in misconduct by violating the Disciplinary Rules is not entitled to legal fees for any services rendered'") (quoting *Shelton v. Shelton*, 151 A.D.2d 659 (2d Dep't 1989); *cf. Shalom Toy v. Each & Every One of the Members of the N.Y. Prop. Ins. Underwriting Ass'n*, 239 A.D.2d 196, 198 (App. Div. 1997) ("unless the representation terminates as a result of attorney misconduct, discharge for cause, or unjustified abandonment by the attorney, the attorney's right to compensation is preserved").

In this matter, after Lightbox's expert reports were excluded, the Moldovsky Firm was faced with the prospect of preparing for a trial on a contingency fee basis (plus the $75,000 paid up front). Even if Mr. Moldovsky could plausibly argue that this situation amounted to "an unreasonable financial burden" within the meaning of the retainer agreement, his sole recourse would have been to seek the Court's leave to withdraw, in which event the Court would have considered whether the "financial burden" imposed on the Moldovsky Firm (by working for the very contingency fee that it had negotiated) outweighed the financial burden and other negative consequences that the Lightbox Parties would face by having to find substitute counsel on short notice and just before the trial was set to begin. That kind of motion would be doomed to failure.

So, instead of invoking the "unreasonable financial burden" clause and exercising his contractual right to seek leave to withdraw, Mr. Moldovsky fabricated out of whole cloth a different recourse found nowhere within the four corners of the retainer agreement: converting to an hourly billing arrangement.

In short, Mr. Moldovsky put his firm's pecuniary interest ahead of his clients, leveraging the Lightbox Parties' dependence on him so he could fraudulently induce them to agree to an hourly fee arrangement.

## B.    Client abandonment / withdrawal without good cause

After being hoodwinked into accepting the Moldovsky Fee Amendment, Lightbox and Mr. Ellner timely paid all such invoices until March 2018, when Mr. Ellner raised questions about the prior month's invoice. Mr. Ellner offered to pay $25,000 in good faith while continuing to review that month's time entries. Mr. Moldovsky issued several ultimatums, demanding $25,000 immediately and the remainder within a week, and

threatened to move to withdraw if his demands were not met. As shown by t███████████ ███████████████████████ Mr. Ellner tried to raise specific concerns but Mr. Moldovsky interrupted him repeatedly. *See* Ellner Cert. at ¶¶ 107-112 & Exhs. 47-49.

When Mr. Ellner did not comply with his ultimatums, Mr. Moldovsky moved for leave to withdraw, falsely representing that withdrawal was warranted by strategic differences and difficulty communicating — but conveniently omitted all mention that, in substance, his motion was precipitated by an invoice that was barely a few days past due. Mr. Moldovsky's material omission and lack of candor amount to forfeiture of his firm's lien. *See Shalom Toy*, *supra*, 239 A.D.2d at 198.

For the foregoing reasons and others set out in the Lightbox Parties' submission, the Court should find that Mr. Moldovsky has forfeited his lien rights due to misconduct.

## CONCLUSION

For all the foregoing reasons, the Lightbox Parties respectfully request that the Court issue the following factual findings and legal conclusions: (1) the Scarola Firm has a statutory lien in an initial amount of $100,000, which amount is reduced by $316,535.41 in prior payments, for a zero-dollar net lien amount; (2) the Moldovsky Firm has forfeited its lien rights; and (3) alternatively, the Moldovsky Firm has a statutory lien in an initial amount of $75,000, which amount is reduced by $119,742.41 in prior payments, for a zero-dollar net lien amount.

Respectfully submitted,

Date: October 12, 2018

/s/ Jonathan R. Miller, Esq.
**The Law Firm of Jonathan R. Miller**